RYAN RAPP
PACHECO
SORENSEN PLC

# EXHIBIT 1

**REVISED AND RESTATED**
**OPERATING AGREEMENT**

**OF**

**ATLANTIC HOME HEALTH CARE, LLC**

**(A ARIZONA LIMITED LIABILITY COMPANY)**

THE MEMBERSHIP INTERESTS BOUND BY THIS OPERATING AGREEMENT ARE SUBJECT TO RESTRICTIONS ON ASSIGNMENT AND TRANSFER AS SET FORTH HEREIN. THESE MEMBERSHIP INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR ANY SECURITIES LAW. THESE MEMBERSHIP INTERESTS ARE NOT TRANSFERABLE, ABSENT EITHER REGISTRATION UNDER THE ACT AND EVERY APPLICABLE STATE SECURITIES LAW OR ADVICE OF COUNSEL SATISFACTORY TO THE COMPANY THAT REGISTRATION IS NOT REQUIRED.

# OPERATING AGREEMENT
# OF
# ATLANTIC HOME HEALTH CARE, LLC
(A Arizona Limited Liability Company)

In accordance with Arizona Statutes, this Limited Liability Company Operating Agreement (the "Operating Agreement"), is made and entered into effective as of July 1, 2017 (the "Effective Date"), by and among **ATLANTIC HOME HEALTH CARE, LLC**, a Arizona limited liability company (the "Company") and **HAVEN HOLDINGS MI, LLC**, a Florida limited liability company, and **ACT NOW MANAGEMENT, LLC, i.e. KIRK TJALAS et al**, an Arizona single-member limited liability company (each a "Member" and, collectively, the "Members").

## ARTICLE I
## FORMATION AND OFFICES

1.1 **Formation.** The Company was formed as a Arizona limited liability company effective upon the filing of the Articles of Organization of the Company, with the Arizona Corporation Commission. Under this Operating Agreement each Member:

(a) Acknowledges the organization of the Company as a limited liability company because of the Articles of Organization filed with the Arizona Corporation Commission;

(b) Confirms and agrees to the Member's status as a Member and the Member's subscription for the respective Percentage Interests (as that term is defined in this Operating Agreement), upon the terms and conditions set forth in this Operating Agreement and as set forth on **Exhibit A** attached to this Operating Agreement;

(c) Confirms and agrees that the purpose of the Company shall be to carry on any lawful business, purpose or activity permitted under the laws of the United States and the State of Arizona; and,

(d) Executes and adopts this Operating Agreement under the provisions of the Arizona Corporation Commission.

1.2 **Principal Office.** The principal office of the Company will be located in the State of Arizona or at such other place as the Members may determine from time to time. The Company may maintain such other offices and places of business as the Members shall determine to be beneficial to the Company.

1.3 **Registered Office and Registered Agent.** The location of the registered office and the name of the registered agent of the Company in the State of Arizona will be as stated in the Articles, or as will be determined from time to time by the Members.

1.4 **Executory Agreement.** The Members agree that this Operating Agreement constitutes an executory agreement with respect to all Interests issued by the Company and shall

be governed by 11 U.S.C. §365 in connection with the bankruptcy of the Company or of any Member because, among other provisions and obligations, this Operating Agreement imposes on each Member the following affirmative duties (each of which constitutes a material unperformed, future obligation): (a) the duty and obligation not to withdraw or disassociate as set forth in Section 3.4, (b) the duty and obligation of good faith and fair dealing in accordance with Section 6.3, (c) the duty and obligation not to transfer his, her or its Interest in the Company except in accordance with ARTICLE IX, and (d) the duty and obligation not to bring any action for dissenter or appraisal rights as set forth in Section 13.20. Accordingly, any trustee in bankruptcy with rights in and to any of the Interest issued by the Company shall be required to comply with the terms of this Operating Agreement and Arizona law governing this Operating Agreement, including without limitation, the restrictions of the rights of a creditor of a Member or transferee.

1.5 **Manager-Managed.** This limited liability company shall be Manager-Managed with the management of the Company vested in its Managers.

## ARTICLE II
## DEFINITIONS

2.1 **Defined Terms.** As used in this Operating Agreement, the following terms have the following meanings, unless the context otherwise specifies:

"Act" means the Arizona Revised Limited Liability Company Act, as amended from time to time.

"Additional Member" has the meaning set forth in Section 9.7 below.

"Adjusted Capital Account Deficit" shall mean the deficit balance in a Member's Capital Account after giving effect to the following adjustments: (i) credit to such Capital Account any amounts which such Member is obligated to restore to such Capital Account pursuant to any provision of this Operating Agreement or is deemed to be obligated to restore to such Capital Account pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations; and (ii) debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations. The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted consistently with that section.

"Affiliate" means (i) any Person directly or indirectly controlling, controlled by, or under common control with another Person, (ii) any Person owning or controlling 10% or more of the outstanding voting securities of such other Person, (iii) any officer, director or partner of such Person, and (iv) if such other Person is an officer, director or partner, any company for which such Person acts in any such capacity.

"AFR" has the meaning set forth in Section 10.9 below.

"Articles" means the Articles of Organization of the Company filed with the Arizona Department of State, as amended from time to time.

"Bankruptcy" means, and a Member will be deemed a "Bankrupt Member," upon (i) the entry of a decree or order for relief against the Member by a court of competent jurisdiction in any involuntary case brought against the Member under any bankruptcy, insolvency, or other similar law (collectively, "Debtor Relief Laws") generally affecting the rights of creditors and relief of debtors then in effect, (ii) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator, or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property, (iii) the ordering of the winding up or liquidation of the Member's affairs, (iv) the filing of a petition in any such involuntary bankruptcy case, which petition remains undismissed for a period of one hundred eighty days or which is not dismissed or suspended pursuant to Section 305 of the United States Federal Bankruptcy Code (or any corresponding provision of any future United States bankruptcy law), (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Law in effect now or after the date of this Operating Agreement, (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator, or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property, or (vii) the making by a Member of any general assignment for the benefit of its creditors.

"Board of Managers" shall mean the Managers of the Company.

"Capital Account" means the account maintained for each Member in the Company's books and records in a manner described in Section 3.4.

"Capital Contribution" means the total value of cash and agreed fair market value of tangible and intangible property contributed and agreed to be contributed to the Company by each Member, as shown in **Exhibit A**, as amended from time to time. Any reference in this Operating Agreement to the Capital Contribution of a current Member includes a Capital Contribution previously made by any prior Member for the interest of that current Member, reduced by any distribution to that Member that was classified as a return of "Capital Contribution" as contemplated in this Operating Agreement. Additional capital contributions in cash, property, services, or the obligation to make such additional cash, property, or service contributions is to be made only in accordance with Sections 3.2 and 3.5 below.

"Closing" has the meaning ascribed to the term in Section 10.8 below.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Company" means **ATLANTIC HOME HEALTH CARE, LLC**, a Arizona limited liability company.

"Company Interest" has the meaning ascribed to the term in Section 5.11(d)(ii) below.

"Compelled Sale Notice" has the meaning ascribed to the term in Section 9.5(b) below.

"Definitive Agreement" has the meaning ascribed to the term in Section 9.5(b) below.

"Disability" means, and a Member will be deemed a "Disabled Member" upon, the

adjudication by a court of competent jurisdiction that an individual is incompetent to manage the individual's person or property.

"Family Member" has the meaning ascribed to the term in Section 9.1(c) below.

"Former Member" has the meaning ascribed to the term in Section 10.1 below.

"Indemnitee" has the meaning ascribed to the term in Section 8.2 below.

"Interest" refers to all of a Member's rights and interests in the Company in that Member's capacity as a Member, all as provided in the Articles, this Operating Agreement and the Act.

"IRS" means the United States Internal Revenue Service.

"Jeopardizing Act" means an act on the part of a Member or an Affiliate of a Member (a) that results in the arrest of such Member or of any such Affiliate; (b) that jeopardizes any license (for any jurisdiction in the United States or elsewhere) either held by the Company or an Affiliate of the Company at the time of the act or for which the Company or an Affiliate of the Company may be reasonably expected to apply in the future; (c) a failure to bring to the proper parties attention any material fact, circumstance or condition that exists within the Company; or (d) that violates any state, federal or patients' rights regulation that is not reported and that could jeopardize the Company's licenses.

"Majority-in-Interest" means any group of Members holding an aggregate of more than fifty percent (50%) of the Percentage Interests entitled to vote held by all Members, unless otherwise indicated. Percentage Interests not entitled to vote shall not be included hereunder.

"Manager(s)" means the Person(s) appointed, elected, or designated from time to time as Manager or Managers of the Company under ARTICLE VI below. The Managers also collectively may be referred to herein as the "Board of Managers."

"Member Loans" has the meaning ascribed the term in Section 3.5(a) below.

"Members" mean those Persons executing this Operating Agreement as members of the Company, directly or through an attorney in fact, including any Substitute Members or Additional Members, in each such Person's capacity as a member of the Company.

"Minority Interest" means any Interest in the Company that is less than fifty percent (50%) of the Percentage Interests held by all Members.

"Minority Member" means any Member holding less than fifty percent (50%) of the Percentage Interests held by all Members.

"Net Profits" and "Net Losses" mean, as the case may be, the taxable income or loss of the Company, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following

adjustments: (1) any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this Operating Agreement shall be added to such taxable income or loss; and (2) any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses under this Operating Agreement, shall be subtracted from such taxable income or loss.

"Nonrecourse Deductions" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1).

"Offeree Members" has the meaning ascribed to the term in Section 9.4 below.

"Offeror Members" has the meaning ascribed to the term in Section 9.5(a) below.

"Operating Agreement" means this Operating Agreement of the Company and attached Exhibits, as amended from time to time.

"Partner Minimum Gain" shall mean an amount, with respect to each Partner Nonrecourse Debt, equal to the Partnership Minimum Gain that would result if such Partner Nonrecourse Debt were treated as a nonrecourse liability, determined in accordance with Treasury Regulations Section 1.704-2.

"Partner Nonrecourse Debt" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(4).

"Partner Nonrecourse Debt Minimum Gain" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(2).

"Partner Nonrecourse Deductions" has the meaning set forth in Treasury Regulations Sections 1.704-2(i)(1) and 1.704-2(i)(2).

"Partnership Minimum Gain" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(2).

"Percentage Interest," with respect to a Member, means the percentage interest set forth opposite that Member's name on **Exhibit A**.

"Permitted Transferee" means any Person identified in subparagraphs (i) through (iii) of Section 9.1(d) of this Operating Agreement.

"Person" means any individual, partnership, limited liability company, corporation, cooperative, trust or other entity.

"Pro Rata" means in the proportion that a Percentage Interest of a current Member bears to the aggregate Percentage Interests in the Company of all the then current Members.

"Remaining Members" has the meaning ascribed to the term in Section 9.5(a) below.

"Subject Interest" has the meaning ascribed to the term in Section 9.1(c) below.

"Substituted Member" has the meaning ascribed to the term in Section 9.3 below.

"Third-Party Loans" has the meaning ascribed the term in Section 3.5(a) below.

"Transfer" means (i) when used as a verb, to give, sell, exchange, assign, transfer, pledge, hypothecate, bequeath, devise or otherwise dispose of or encumber, and (ii) when used as a noun, the nouns corresponding to such verbs, in either case voluntarily or involuntarily, by operation of law or otherwise. The Transfer of a direct or indirect ownership interest in a Member shall be considered a "Transfer" under this Operating Agreement.

"Transferor Member" has the meaning set forth in Section 9.1(c) below.

"Treasury Regulations" means the federal income tax regulations promulgated by the U.S. Department of Treasury, or any amendment or successor provision to such regulations, pursuant to or in interpretation of the Code.

"Triggering Event" has the meaning set forth in Section 10.1 below.

"Unreturned Capital" of a Member on any day shall be equal to the excess, if any, of (a) the aggregate Capital Contributions of the Member as of such date, over (b) the aggregate distributions to such Member pursuant to Sections 4.4 and 11.2(a)(iv) of this Operating Agreement as of such date.

2.2 **Other Definitions.**

(a) As used in this Operating Agreement, accounting terms to the extent they are not defined in this Operating Agreement, have the respective meanings given to them under United States generally accepted accounting principles.

(b) The words "below" and "above" and words of similar import when used in this Operating Agreement refer to this Operating Agreement as a whole and not to any particular provision of this Operating Agreement, and section, subsection, schedule and exhibit references are to this Operating Agreement unless otherwise specified.

## ARTICLE III
## CAPITALIZATION OF THE COMPANY

3.1 **Initial Capital Contributions**. At the time of the execution of this Operating Agreement, or promptly thereafter, the Members shall make the Capital Contributions set forth on **Exhibit A**. No Member shall be deemed to have the rights of a Member until such Capital Contribution is paid in full.

3.2 **Additional Capital Contributions.** No Member will be required to make any additional capital contribution except as otherwise provided in this Operating Agreement, by law or by consent of the Members.

3.3 **Member Loans or Services.** Loans or services by any Member to the Company will not be considered contributions to the capital of the Company, but will be upon such terms as the Member and the Company negotiate.

3.4 **Capital and Capital Accounts.**

(a) An individual capital account ("Capital Account") will be established and maintained on behalf of each Member, including any Additional or Substituted Member who receives an Interest in the Company after the date of this Operating Agreement. The Capital Account of each Member consists of (i) the amount of cash that such Member has contributed to the Company, plus (ii) the agreed fair market value of any tangible and intangible property that Member has contributed to the Company, net of any liabilities assumed by the Company or to which that property is subject, plus (iii) the amount of profits or income (including tax-exempt income and any other item required to be credited for proper maintenance of capital accounts by the final Treasury Regulations under Section 704(b) of the Code) allocated to that Member, less (iv) the amount of losses and deductions allocated to that Member, less (v) the amount of all cash distributed to or for that Member (including without limitation, taxes that are withheld with respect to a Member and remitted to the United States Department of Treasury), less (vi) the fair market value of any property distributed to that Member, net of any liability assumed by that Member or to which that property is subject, and less (vii) that Member's share of any other expenditures which are not deductible by the Company for federal income tax purposes and which are not allowable as additions to the basis of Company property; all, however, subject to such other adjustments as may be required for proper maintenance of capital accounts by the Treasury Regulations under Section 704(b) of the Code. The Capital Account of a Member will not be affected by any adjustments to basis made pursuant to Section 743 of the Code but will be adjusted with respect to adjustments to basis made pursuant to Section 734 of the Code. The opening entry for each Member will be its Capital Contribution as set forth on **Exhibit A**.

(b) No interest is to be paid on any Capital Contribution.

(c) No Member has the right to withdraw such Member's Capital Contribution or to demand and receive property of the Company or any distribution in return for such Member's Capital Contribution, except as may be specifically provided in this Operating Agreement or required by law. No Member may receive, out of Company property, any part of such Member's Capital Contribution until (i) all liabilities of the Company, except liabilities to the Members on account of their undistributed income, have been paid or there remains property of the Company sufficient to pay them, and (ii) the consent of the Majority-in-Interest is obtained, unless the return of the Contribution to Capital may be rightfully demanded as provided in the Act.

(d) A Member may rightfully demand the return of such Member's Capital Contribution (i) on the winding up of the Company or (ii) as may otherwise be provided in the Act.

(e) Except as specifically provided otherwise in this Operating Agreement or in the Act, no Member will have any liability or obligation to restore a negative or deficit balance

in that Member's Capital Account.

3.5 **Additional Capital.**

(a) In the event that at any time (or from time to time) funds are required by the Company in excess of the Capital Contributions shown on **Exhibit A** for or in respect of the operation of the Company or any of its obligations, expenses, costs, liabilities or expenditures (including without limitation of the generality of the foregoing, the cost of repairing or replacing Company property, interest and principal payments, or operating deficits), then, either some or all Members may make loans to the Company with respect to those funds on such commercially reasonable terms as the Members may deem appropriate ("Member Loans") or the Members shall use their best efforts to arrange for third-party loans (the "Third-Party Loans") to the Company. The Members shall have the full discretion to determine to what extent subsequent advances, if any, to the Company shall be made by Member Loans or Third-Party Loans, but in no way shall the Members guarantee the availability of such funds beyond assuming the responsibility for using reasonable efforts to obtain the same on commercially reasonable terms.

(b) All fees, costs and expenses paid or incurred for Third-Party Loans and for Member Loans will be paid by the Company. Third-Party Loans and Member Loans may be secured by Company property.

(c) If the Members determine, in good faith and in the exercise of their reasonable business judgment, that it would not be commercially prudent to make Member Loans, to obtain Third-Party Loans, or to seek additional capital contributions from existing Members or third parties, then the Members may decide to cease funding Company obligations, and the Members shall dissolve the Company in accordance with ARTICLE XI.

## ARTICLE IV
## ALLOCATIONS OF PROFITS AND LOSSES; DISTRIBUTIONS

4.1 **Allocation of Net Profits.** For each taxable year of the Company, Net Profits are to be allocated to the Members in the following order of priority, subject to the provisions of Section 4.3 below:

(a) First, if one or more Members have a negative Capital Account balance, to those Members in proportion to their negative Capital Account balances until all negative Capital Accounts have zero balances; provided, however, that no such negative Capital Account is to be increased to an amount in excess of zero as a result of this Section 4.1(a);

(b) Second, to each Member in an amount equal to the amount of Net Losses allocated to that Member under Section 4.2(a) for all prior years, reduced, however, by prior allocations of Net Profits under Section 4.1(a) and this Section 4.1(b) (the "Section 4.2(a) Net Loss Allocation") and provided that the net profits allocated under this Section 4.1(b) shall be allocated to each Member pro rata by dividing the Section 4.2(a) Net Loss Allocation for each such Member by the total of all Section 4.2(a) Allocation; and

(c) Third, the remainder of the Net Profits, if any, is to be allocated Pro Rata to

the Members.

4.2 **Allocation of Net Losses.** For each taxable year of the Company, Net Losses are to be allocated to the Members in the following order of priority, subject to the provisions of Section 4.3 below:

(a) First, if one or more Members have a positive Capital Account balance, to those Members in proportion to their positive Capital Account balances until all positive Capital Accounts have zero balances; provided, however, that no such positive Capital Account balance is to be decreased to an amount below zero as a result of this Section 4.2(a); and

(b) Second, any portion of the Net Losses not allocated under Section 4.2(a) is to be allocated Pro Rata to the Members.

4.3 **Regulatory and Tax Allocations.** Notwithstanding the provisions of Sections 4.1 and 4.2, it is the intent of the Members that each Member's distributive share of Net Profits and Net Losses (or any item of income, gain, loss, deduction or credit) shall be determined and allocated in accordance with this Operating Agreement and shall be interpreted and applied to the fullest extent permitted to satisfy the requirements of the Treasury Regulations promulgated under Code Section 704, as follows:

(a) To the extent that (1) any Member may bear the burden of an economic loss corresponding to any Company loss, deduction or similar item attributable to a Company liability that would be considered nonrecourse for purposes of Treasury Regulations Section 1.1001-2, or (2) any Member makes a loan or an additional capital contribution to the Company in order to fund a Company expense corresponding to any loss, deduction or similar item, then that loss, deduction or similar item is to be allocated solely to the Member who bears that economic burden, or who makes that loan or additional capital contribution. The foregoing provisions are intended to comply with and satisfy the requirements of Treasury Regulations Sections 1.704-2(f),(i) and (j) and are to be interpreted and applied in a manner consistent with those Treasury Regulations.

(b) To the extent Net Losses allocated to any Member would cause that Member to have a deficit in that Member's Capital Account at the end of any taxable year, those Net Losses are not to be allocated to that Member but shall be allocated instead on a pro rata basis to those Members to whom such an allocation would not cause a deficit in their Capital Account.

(c) In the event there is a determination that Section 483 or Sections 1271 through 1275 of the Code is applicable to the Capital Contributions of any Member, or any loan between a Member and the Company is subject to Section 7872 of the Code, any income or deduction of the Company attributable to interest on such Capital Contribution or loan (whether stated or unstated) shall be allocated solely to such Member.

(d) In the event the deduction of all or a portion of any fee paid or accrued from earnings of the Company to a Member or an Affiliate of a Member is disallowed by the IRS for federal income tax purposes with respect to a taxable year of the Company, the Company shall

allocate to such Member an amount of gross income of the Company for such year equal to the amount of such fee with respect to which the deduction is disallowed.

(e)

(i) Notwithstanding anything contained in Section 4.1 or 4.2 or this Section 4.3 to the contrary, if there is a net decrease in Partnership Minimum Gain during any taxable year of the Company, except as otherwise permitted by Sections 1.704-2(f)(2), (3), (4) and (5) of the Treasury Regulations, items of Company income and gain for such taxable year (and subsequent years, if necessary) in the order provided in Section 1.704-2(j)(2)(i) of the Treasury Regulations shall be allocated among all Members whose shares of Partnership Minimum Gain decreased during that year in proportion to and to the extent of such Member's share of the net decrease in Partnership Minimum Gain during such year. The allocation contained in this Section 4.3(e)(i) is intended to be a minimum gain chargeback within the meaning of Section 1.704-2 of the Treasury Regulations, and shall be interpreted consistently with such section of the regulations.

(ii) Notwithstanding anything contained in Sections 4.1 and 4.2 or this Section 4.3 to the contrary, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain, except as provided in Section 1.704-2(i) of the Treasury Regulations, items of Company income and gain for such taxable year (and subsequent years, if necessary) in the order provided in Section 1.704-2(j)(2)(ii) of the Treasury Regulations shall be allocated among all Members whose share of Partner Nonrecourse Debt Minimum Gain decreased during that year in proportion to and to the extent of such Member's share of the net decrease in Partner Nonrecourse Debt Minimum Gain during such year. This Section 4.3(e)(ii) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2 of the Treasury Regulations and shall be interpreted consistently with such section of the regulations.

(iii) Any Member shall have the right to request from the Commissioner of Internal Revenue a waiver of the minimum gain chargeback requirement if the minimum gain chargeback would cause a distortion in the economic arrangements among the Members and it is not expected that the Company will have sufficient other income to correct that distortion.

(f) Notwithstanding any provisions of Section 4.1 or 4.2 or this Section 4.3 to the contrary, in the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations, items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that any allocations pursuant to this Section 4.3(f) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit. In the event that any such adjustments, allocations or distributions create an Adjusted Capital Account Deficit of more than one Member in any taxable year of the Company, all such items of income and gain of the Company for such taxable year and all subsequent taxable years shall be allocated among all such Members in proportion to their respective Adjusted Capital Account Deficits in such amount and manner sufficient to

eliminate such Adjusted Capital Account Deficits as quickly as possible. The allocation contained in this Section 4.3(f) is intended to be a "qualified income offset" within the meaning of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations, and shall be subject to such section of the regulations.

(g) To the extent an adjustment to the adjusted basis of any Company asset under Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of adjustment to the Capital Accounts is to be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis) and that gain or loss is to be specifically allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to Section 1.704-l(b)(2)(iv)(m) of the Treasury Regulations.

(h) Any special allocation of items of income or gain under this Section 4.3 is to be taken into account in computing subsequent allocations of Net Profits under this ARTICLE IV, so that during the term of the Company the net amount of any items so allocated and the Net Profits, Net Losses and all other items allocated to each Member pursuant to this ARTICLE IV shall, to the extent possible, be equal to the net amount that would have been allocated to each Member under the provision of Sections 4.1 and 4.2 if such special allocations had not been required.

(i) In accordance with Code Section 704(c) and the Treasury Regulations under that section, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of that property to the Company for federal income tax purposes and its initial adjusted book value.

(j) Sections 4.3(e) and 4.3(f) shall be interpreted and applied in accordance with, and in the order provided in, Section 1.704-2 of the Treasury Regulations.

(k) Except as provided in Section 4.3(i), any allocations made pursuant to this Section 4.3 shall be taken into account in the making of subsequent allocations under other provisions of this ARTICLE IV in a manner that will, to the maximum extent possible, avoid or eliminate duplicative or excessive allocations of income to any Member.

(l) If any adjustment by the IRS (or any other taxing authority) to any Company allocations of any item of Company income, gain, loss, deduction or credit shall become final and have the effect of duplicating any previous (or subsequent) allocation pursuant this Operating Agreement, the Company shall, as promptly as possible, make such allocation of tax items to the affected Member as may be necessary to offset such duplication.

(m)Notwithstanding anything to the contrary contained in Sections 4.1 and 4.2, Nonrecourse Deductions shall be allocated among the Members according to their respective Percentage Interests.

4.4 **Distributions.** By March 31 of each year, the Manager(s) must make a distribution to each Member of forty percent (40%) of such Member's pro rata share of the

Company's taxable income from the previous taxable year.

4.5 **Other Distributions.** Other than the distributions described in Section 4.4, the Company shall not distribute property of the Company without the consent of a Majority-in-Interest.

## ARTICLE V
## MEMBERS' MEETINGS

5.1 **Meetings of Members; Place of Meetings.** A meeting of the Members of the Company for the election of Managers and the transaction of other business is to be held on the date and at the time and place that the Board of Managers determines. Such meeting may be called by a Majority-in-Interest or by the Board of Managers. All meetings of the Members will be held at such place as may be designated from time to time by a Majority-in-Interest or by the Board of Managers and stated in the notice of the meeting or in a duly executed waiver of the notice thereof.

5.2 **Quorum; Voting Requirement.** At any meeting of Members, each Member entitled to vote will have a number of votes equal to the product of (i) its Percentage Interest as set forth on **Exhibit A** below, as the same may be amended from time to time, multiplied by (ii) one hundred. The presence, in person or by proxy, of a Majority-in-Interest constitutes a quorum for the transaction of business by the Members. The affirmative vote of a Majority-in-Interest constitutes a valid decision of the Members, except where a greater or lesser vote is required by the Act, the Articles or the Operating Agreement.

5.3 **Proxies.** At any meeting of the Members, every Member having the right to vote at that meeting will be entitled to vote in person or by proxy appointed by an instrument in writing signed by that Member and bearing a date not more than three years prior to that meeting.

5.4 **Teleconferences.** Any and all Members may participate in any Members' meeting by, or through the use of, teleconferences or any other means of communication by which all Members participating may simultaneously hear each other during the meeting. A Member so participating is deemed to be present in person at the meeting.

5.5 **Secretary of Meeting.** At any Members' meeting, a Majority-in-Interest shall appoint an individual to preside at the meeting and an individual to act as secretary of the meeting. The secretary of the meeting shall prepare minutes of the meeting, which are to be placed in the record books of the Company.

5.6 **Action Without Meeting.** Any action required or permitted to be taken at any meeting of Members of the Company may be taken without a meeting, without prior notice, and without a vote if the action is taken by the Members entitled to vote thereon having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Members entitled to vote thereon were present and voted. In order to be effective the action must be evidenced by one or more written consents describing the action taken, dated and signed by the approving Members having the requisite number of votes entitled to vote thereon, and delivered to the Company by delivery to its principal office, the Board of

Managers or another officer or agent of the Company having custody of the book in which proceedings of meetings of Members are recorded. No written consent shall be effective to take the action referred to therein unless, within sixty days of the date of the earliest dated consent delivered in the manner required by this section, written consents signed by the number of Members required to take action are delivered to the Company by delivery as set forth in this section. Any written consent may be revoked prior to the date that the Company receives the required number of consents to authorize the proposed action. No revocation is effective unless in writing and until received by the Company at its principal office or received by the Board of Managers or by an officer or agent of the Company having custody of the book in which proceedings of meetings of Members are recorded. Within ten days after obtaining such authorization by written consent, notice must be given to those Members who have not consented in writing or who are not entitled to vote on the action. The notice shall fairly summarize the material features of the authorized action. A consent signed under this section has the effect of a meeting vote and may be described as such in any document.

5.7 **Notice.** Written notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose for which the meeting is called, is to be given not less than ten days nor more than sixty days before the date of the meeting, either personally or by mail or facsimile transmission, by or at the direction of the person calling the meeting, to each Member entitled to vote at that meeting at the address of the Member as it appears on the records of the Company.

5.8 **Waiver of Notice.** When any notice is required to be given to any Member of the Company hereunder, a waiver thereof in writing signed by the Member entitled to such notice, whether before, at, or after the time stated therein, will be equivalent to the giving of that notice. Attendance by a Member entitled to vote at a meeting, in person or by proxy, will constitute a waiver of (a) notice of the meeting, except when the Member attends a meeting solely for the purpose, expressed at the beginning of the meeting, of objecting to the transaction of any business because the meeting is not lawfully called or convened, and (b) an objection to consideration of a particular matter at the meeting that is not within the purpose of the meeting unless the Member objects to considering the matter when it is presented.

5.9 **No Preemptive Rights.** The Members do not have any preemptive right to acquire additional Interests in the Company.

5.10 **Other Business Ventures.** Any Member may engage in or possess an interest in other business ventures independently or with others. Unless otherwise agreed to, no Member will be required to devote all of that Member's time or business efforts to the affairs of the Company, but is to devote so much of that Member's time and attention to the Company as is reasonably necessary and advisable to manage the affairs of the Company to the best advantage of the Company.

5.11 **Representations, Warranties and Covenants.**

(a) Each Member represents and warrants that, as of the date of this Operating

Agreement, such Member and each of such Member's Affiliates have not committed a Jeopardizing Act.

(b) In addition to any and all other covenants made by each Member in this Operating Agreement, each Member covenants that such Member and each of such Member's Affiliates will not commit a Jeopardizing Act.

(c) Each Member shall notify the Board of Managers, in writing, if, at any time during the course of this Operating Agreement, any of the representations, warranties or covenants made by such Member in this Operating Agreement become inaccurate or untrue and of the facts related thereto.

(d) Each Member represents and warrants to the Company and to the other Members as follows:

(i) The Member is acquiring the Interest set forth on **Exhibit A** for the Member's own account and not with a view to distribution or resale.

(ii) The Company and the Board of Managers have made available to the Member or the Member's attorney, accountant or purchaser representative all documents that the Member has requested relating to an investment in the Company (the "Company Interest"), as well as all documents that the Member has requested relating to the Board of Managers, and have provided answers to all of the Member's questions concerning the Board of Managers and concerning an investment in the Company Interest and, as a result, understands the legal, economic and tax aspects of an investment in the Company Interest. In evaluating the suitability of an investment in the Company Interest, the Member has not relied upon any representations or other information (whether oral or written) other than as set forth in any documents furnished to the Member by the Company or the Board of Managers.

(iii) The Member recognizes that an investment in the Company Interest involves a high degree of risk. The Member further represents and warrants that:

(A) the Member is acquiring the Company Interest after adequate investigation of the business and prospects of the Company and the Board of Managers and that the Member is fully informed of the Company's and Board of Managers' business and prospects;

(B) the Member is not relying upon the accuracy of any projections or predictions as to the future productivity, prospects or developments of the Company or of the Board of Managers, and acknowledges that any such projections are based solely upon the judgment of the Company or the Board of Managers in the light of present circumstances and do not constitute warranties;

(C) the Member is familiar with the nature of and risks involved with an investment in securities, and has determined that the acquisition of the Company Interest is consistent with the Member's investment objectives and income prospects;

(D) the Member is aware that no public trading market for the Company Interest presently exists and might not exist in the future;

(E) the Member has adequate means for providing for current needs, and possible contingencies, and has no reason to anticipate any change in the Member's circumstances, financial or otherwise, which might cause or require any sale or distribution of the Company Interest;

(F) the Member realizes that because the Company Interest cannot be transferred, the Member may not readily liquidate the investment and understands that the Member must not purchase the Company Interest unless the Member has sufficient liquid assets to assure that the purchase will not cause undue financial difficulties;

(G) the Member has adequate net worth and means of providing for the Member's current needs and contingencies if the Member sustains a complete loss of the Member's investment in the Company Interest, and the Member has no need for liquidity in this investment;

(H) the Member has been advised and fully understands that an investment in the Company Interest is highly speculative and involves a high degree of risk; and

(I) the Member recognizes the Member's interest in the Company Interest will be substantially diluted if the Company offers additional interests in the Company;

(iv) The Member is acquiring the Company Interest without being furnished any offering literature or prospectus.

(v) The Member further represents that the Member has such knowledge and experience in financial matters that the Member is capable of evaluating the merits and risks of an investment in the Company Interest. The Member has taken full cognizance of and understands that this investment involves a high degree of risk.

(vi) The Member hereby agrees that legends, substantially in the form set forth below, may be placed upon all certificates, agreements or other instruments issued to such Member representing the Company Interest for which such Member is subscribing.

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR ANY SECURITIES LAW. THESE SECURITIES ARE NOT TRANSFERABLE, ABSENT EITHER REGISTRATION UNDER THE ACT AND EVERY APPLICABLE STATE SECURITIES LAW OR ADVICE OF COUNSEL SATISFACTORY TO THE COMPANY THAT REGISTRATION IS NOT REQUIRED.

NEITHER THE CAPITAL INTEREST REPRESENTED BY THIS CERTIFICATE, NOR ANY INTEREST THEREIN, MAY BE SOLD, EXCHANGED OR OTHERWISE DISPOSED OF UNLESS THE RESTRICTIONS AND PROVISIONS CONTAINED IN ARTICLE IX OF THE OPERATING AGREEMENT OF THE COMPANY ARE FIRST COMPLIED WITH. A COPY OF SAID OPERATING AGREEMENT MAY BE OBTAINED AT THE OFFICE OF

THE COMPANY.

(e) In addition to any remedies available to the Company at law or equity, the Company and the Members that do not breach the representations, warranties and covenants in this section will have the rights provided in ARTICLE X.

5.12 **Right to Rescind.**

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE ARIZONA SECURITIES ACT IN RELIANCE UPON EXEMPTION PROVISIONS CONTAINED THEREIN. §517.061(11)(A)(5) OF THE ARIZONA SECURITIES AND INVESTOR PROTECTION ACT (THE "ARIZONA ACT") PROVIDES THAT ANY PURCHASER OF SECURITIES IN ARIZONA WHICH ARE EXEMPTED FROM REGISTRATION UNDER §517.061(11) OF THE ARIZONA ACT MAY WITHDRAW HIS OR HER SUBSCRIPTION AGREEMENT AND RECEIVE A FULL REFUND OF ALL MONIES PAID, WITHIN THREE BUSINESS DAYS AFTER TENDER OF CONSIDERATION FOR SUCH SECURITIES IS MADE BY SUCH PURCHASER TO THE ISSUER, OR AN AGENT OF THE ISSUER, OR AN ESCROW AGENT OR WITHIN THREE DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH PURCHASER, WHICHEVER OCCURS LATER. THEREFORE, ANY ARIZONA RESIDENT WHO PURCHASES SECURITIES IS ENTITLED TO EXERCISE THE FOREGOING STATUTORY RESCISSION RIGHT WITHIN THREE BUSINESS DAYS AFTER TENDERING CONSIDERATION FOR THE COMPANY INTEREST BY TELEPHONE, TELEGRAM, OR LETTER NOTICE TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS. ANY TELEGRAM OR LETTER SHOULD BE SENT OR POSTMARKED PRIOR TO THE END OF THE THIRD BUSINESS DAY. A LETTER SHOULD BE MAILED BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ENSURE ITS RECEIPT AND TO EVIDENCE THE TIME OF MAILING. ANY ORAL REQUESTS SHOULD BE CONFIRMED IN WRITING.

## ARTICLE VI
## RIGHTS AND DUTIES OF BOARD OF MANAGERS; MEETINGS OF BOARD OF MANAGERS

6.1 **Management.** The business and affairs of the Company shall be managed under the direction of its Board of Managers. The Board of Managers shall direct, manage and control the business of the Company. Except for situations in which the approval of the Members is expressly required by this Operating Agreement or by nonwaivable provisions of the Act, the Board of Managers shall have exclusive, sole, full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters, and to perform any and all other acts or activities customary or incident to the management of the Company's business.

6.2 **Number, Tenure and Qualifications of Managers.** There shall initially be three (3) Managers; provided, however, said number may be increased or decreased from time to time by a Majority-in-Interest. The initial Manager shall be **JAMIN RUARK.** The Managers of the Company shall be appointed annually by a Majority-in-Interest, at the annual meeting of the

Members. The term of each Manager shall expire at the next annual meeting of the Members, unless sooner terminated by reason of the earlier resignation, removal or death of a Manager. Despite the expiration of a Manager's term, the Manager shall continue to serve until the Manager's successor is appointed by the Members. A Manager need not be a Member.

6.3 **Fiduciary Duties.** The Members acknowledge and agree that Section 605.0105 of the Act prohibits the terms of the Operating Agreement from: (a) eliminating a Manager's duty of loyalty or duty of care under Section 605.04091 of the Act except as otherwise provided by Section 605.0105(4) of the Act and (b) eliminating a Member or Manager's obligation of good faith and fair dealing under Section 605.04091 of the Act except as otherwise provided by Section 605.0105(3)(f) of the Act. Accordingly, each of the Members and Managers shall comply with its fiduciary duties owed to the Company and Members in accordance with Arizona law.

6.4 **Liability for Certain Acts.** Each Manager shall perform their duties as a Manager in good faith, in a manner he or she reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. A Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of bad faith, fraud, deceit, gross negligence, willful or intentional misconduct, knowing violation of law, or a wrongful taking by the Manager.

6.5 **Resignation of Managers.** Any Manager may resign at any time by giving written notice to the Company. The resignation of any Manager shall take effect upon receipt of notice thereof or at such later date specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. The resignation of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

6.6 **Removal of Managers.** A Majority-in-Interest may remove any Manager at any time, with or without cause, by giving a written notice of removal to the Board of Managers. The removal of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of the Member

6.7 **Vacancies.** Any vacancy occurring for any reason in the number of Managers of the Company (including a vacancy created as a result of an increase in the number of Managers) may be filled by a Majority-in-Interest. A Manager elected to fill a vacancy shall be elected for the unexpired term of his or her predecessor in office and shall hold office until the expiration of such term and until his or her successor shall be elected and qualified or until the Manager's earlier death, resignation or removal. A Manager chosen to fill a position resulting from an increase in the number of Managers shall hold office until his or her successor shall be elected and qualified, or until his or her earlier death, resignation or removal.

6.8 **Service of Managers; Expense Reimbursement.** The Managers shall devote whatever time and effort may be necessary or appropriate to the business and affairs of the Company. Each Manager may receive annual compensation as determined from time to time by the Members. The Company shall promptly reimburse each Manager for any and all costs and expenses reasonably incurred by such Manager in connection with the business of the Company.

6.9 **Place of Meetings of Board of Managers.** The Board of Managers may hold its meetings at such places within or without the State of Arizona as it from time to time may determine.

6.10 **Annual/Regular Meetings of the Board of Managers.** The Board of Managers shall hold an annual meeting each year on the same date and at the same place as the annual meeting of the Members, immediately following such annual meeting of Members, for the purpose of appointing officers of the Company and transacting such other business as may come before the meeting. The Board of Managers may hold more frequent regular meetings on such dates, at such times, and at such places, as the Board of Managers shall determine from time to time. If any day fixed for a regular meeting shall be a legal holiday at the place where the meeting is to be held, then said meeting shall be held at the same hour on the next succeeding business day which is not a legal holiday. Any annual or regular meeting of the Board of Managers may be held without notice of the date, time, place or purpose of the meeting, unless the date, time or place of such meeting is different from the date, time or place prescribed in accordance with this ARTICLE VI.

6.11 **Special Meetings of the Board of Managers.** Special meetings of the Board of Managers shall be held whenever called by the Chairman of the Board of Managers or by a *majority* of the Board of Managers then in office, on the date and at the time and place fixed by such person, and specified in the notice given to each Manager. Notice must be given to each Manager of the date, time, place and purpose or purposes of each special meeting of the Board of Managers. The only business that may be transacted at any special meeting shall be that specified in the notice.

6.12 **Notice of Meetings.** If any provision of this Operating Agreement requires the giving of notice of the date, time, place or purpose of a meeting of the Board of Managers, the notice shall be delivered to each Manager no fewer than three days before the date set for such meeting. Any such notice shall be in writing unless oral notice is reasonable under the circumstances.

6.13 **Action by Board of Managers.** Except as otherwise provided in this Operating Agreement, a *majority* of the number of Managers then in office shall constitute a quorum at a meeting of the Board of Managers. If a quorum is present, the affirmative vote of a *majority* of the Managers present shall be required to pass any resolution or to constitute a valid act of the Board of Managers. If a quorum is not present, a *majority* of the Managers present at the meeting shall have the power to adjourn the meeting from time to time until a quorum is present.

6.14 **Participation by Telephone.** A Manager shall be deemed to be present in person at a meeting of the Board of Managers if the meeting is conducted through the use of any means of communication by which all Managers may simultaneously hear each other during the meeting.

6.15 **Action by Board of Managers Without a Meeting.** Any action required or permitted to be taken at a meeting of the Board of Managers may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in writing, setting forth the

action so taken, shall be signed by a *majority* of the Managers. Action taken by written consent of the Board of Managers is effective when the last Manager signs the written consent, unless the written consent specifies a different effective date.

6.16 **Appointment of Proxy.** Any Manager may appoint a proxy to vote or otherwise act for such Manager by signing an appointment instrument, either personally or by the Manager's attorney-in-fact.

6.17 **Committees.**

(a) Appointment. The Board of Managers may appoint from among its members an executive committee and other committees, composed of one or more Managers, to serve at the pleasure of the Board of Managers.

(b) Powers of Committees. The Board of Managers may delegate to committees appointed under Section 6.17(a) any of the powers of the Board of Managers, except as prohibited by law.

(c) Quorum. In the absence of any member of any committee, the members of that committee present at any meeting, whether or not they constitute a quorum, may appoint a Manager to act in the place of the absent member.

(d) Participation. Members of a committee of the Board of Managers may participate in a meeting by means of a conference telephone or similar communications equipment if all persons participating in the meeting can hear each other at the same time. Participation in a meeting by these means shall constitute presence in person at the meeting.

(e) Consent in Lieu of Meeting. Any action required or permitted to be taken at any meeting of a committee of the Board of Managers may be taken without a meeting, if a consent in writing to the action is signed by each member of the committee and the written consent is filed with the minutes of proceedings of the committee.

## ARTICLE VII
## OFFICERS OF THE COMPANY

7.1 **Appointment of Officers.** The officers of the Company may consist of a Chairman of the Board, a Vice-Chairman of the Board, a Chief Executive Officer, a President, one or more Vice Presidents, a Treasurer, one or more Assistant Treasurers, a Secretary, and one or more Assistant Secretaries. The Board of Managers may also appoint such other officers as the Board of Managers may determine. At each annual meeting of the Board of Managers, the Board of Managers shall appoint individuals to serve as the officers of the Company. Any person may hold two or more offices, except President and Vice President. The term of each officer shall expire at the next annual meeting of the Board of Managers, and shall terminate upon the earlier resignation, removal or death of such officer. Despite the expiration of an officer's term, he or she shall continue to serve until his or her successor is appointed.

7.2 **Chairman of the Board of Managers.** The Chairman of the Board shall preside over the meetings of the Board of Managers and of the Members. In the absence of the

Chairman of the Board, the Vice Chairman of the Board shall preside at those meetings. The Chairman of the Board and the Vice Chairman of the Board shall, respectively, perform all other duties assigned by the Board of Managers. The initial Chairman of the Board of Managers shall be **JAMIN RUARK**.

7.3 **Chief Executive Officer.** The Board of Managers may designate a Chief Executive Officer from among the elected officers. The Chief Executive Officer shall have responsibility for implementing the policies of the Company, as determined by the Board of Managers, and for administering the Company's business and affairs. The initial Chief Executive Officer shall be **JAMIN RUARK**.

7.4 **President.** The President shall in general supervise and control all of the business and affairs of the Company. Unless the President is not a member of the Board of Managers, in the absence of both the Chairman and the Vice Chairman of the Board, the President shall preside at all meetings of the Board of Managers and of the Members. If a Chief Executive Officer has not been designated by the Board of Managers, the President shall be the Chief Executive Officer and shall be ex officio a member of all committees that may, from time to time, be constituted by the Board of Managers. The President may execute any deed, mortgage, bond, contract or other instrument which the Board of Managers has authorized to be executed, except in cases where execution shall be expressly delegated by the Board of Managers or by this Operating Agreement to some other officer or agent of the Company or shall be required by law to be otherwise executed; and in general shall perform all duties incident to the office of President and any other duties prescribed by the Board of Managers from time to time. The President shall be **JAMIN RUARK**.

7.5 **Vice Presidents.** The Vice President (or in the event there will be more than one Vice President, in the order designated at the time of their appointment; or in the absence of any designation, then in the order of their appointment), shall perform the duties of the President in the event of the absence, disability or death of the President, and, when so acting, shall have all of the powers of, and be subject to, the restrictions upon the President. Any Vice President shall perform such other duties as may be assigned to him or her from time to time by the President or the Board of Managers. The Board of Managers may designate one or more Vice Presidents as Executive Vice President or as Vice President for particular areas of responsibility. The Vice President shall be **JAMIN RUARK**.

7.6 **Secretary.** The Secretary shall keep the minutes of the meetings of the Members and the Board of Managers, authenticate the records of the Company, and give and serve all notices of the Company. The Secretary shall have charge of such books and papers as the Board of Managers may direct, and shall perform all of the duties incidental to this office. The Secretary shall be **JAMIN RUARK**.

7.7 **Treasurer.** The Treasurer shall have the custody of the Company's funds and securities and shall keep full and accurate account of receipts and disbursements in books belonging to the Company and shall deposit all monies and other valuable effects in the name and to the credit of the Company in those depositories designated by the Board of Managers. The Treasurer shall disburse the funds of the Company as may be ordered by the Board of Managers, taking proper vouchers for the disbursements, and shall render to the President and

Board of Managers, at the regular meetings of the Board of Managers or whenever they may require it, an account of all transactions as Treasurer and of the financial condition of the Company. If required by the Board of Managers, the Treasurer shall give the Company a bond in an amount and with a surety or sureties which are satisfactory to the Board of Managers for the faithful performance of the duties of the Treasurer's office and for the restoration to the Company, in case of the Treasurer's death, resignation, retirement or removal from office, of all books, papers, vouchers, monies and other property of whatever kind in the Treasurer's possession or control belonging to the Company. The Treasurer shall be **JAMIN RUARK**.

7.8 **Assistant Secretaries; Assistant Treasurers.** The Assistant Secretaries and Assistant Treasurers, in general, shall perform the duties assigned to them by the Secretary or Treasurer, respectively, or by the President or the Board of Managers. The Assistant Treasurers shall, if required by the Board of Managers, give bonds for the faithful performance of their duties in amounts with a surety or sureties which are satisfactory to the Board of Directors.

7.9 **Resignation of Officers.** An officer may resign at any time by delivering notice to the Board of Managers. A resignation is effective when the notice is delivered unless the notice specifies a later effective date. Upon the resignation of an officer, the Board of Managers shall appoint a successor to such office to serve until the next annual meeting of the Board of Managers.

7.10 **Removal of Officers.** The Board of Managers may remove any officer at any time, with or without cause, by giving a written notice of removal to such officer. Upon the removal of an officer, the Board of Managers shall appoint a successor to such office to serve until the next annual meeting of the Board of Managers.

7.11 **Disability of Officers.** In the absence or disability of an officer, or for any other reason deemed sufficient by the Board of Managers, the Board of Managers may delegate the powers or duties of such officer to any other individual for the time being.

## ARTICLE VIII
## LIABILITY AND INDEMNIFICATION

8.1 **Liability of Members.** A Member will be liable only to make the payment of the Member's Capital Contribution. No Member will be liable for any obligations of the Company. Except as otherwise provided in Sections 3.2 and 3.5, after the Member's Capital Contribution has been paid, no Member will be required to make any further Capital Contribution or lend any funds to the Company.

8.2 **Indemnification.** The Members, Managers and officers and their Affiliates and their respective stockholders, directors, officers, partners, agents, employees, heirs, trustees and personal representatives (individually, an "Indemnitee") are to be indemnified and held harmless by the Company from and against any and all losses, claims, damages, liabilities, expenses (including legal fees and expenses), judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative, in which the Indemnitee may be involved, or threatened to be involved, as a party or otherwise by reason of the fact that such Person is or was a Member, Manager or officer or an

Affiliate of such Member, Manager or officer or a stockholder, director, officer, agent, partner or employee of such Member, Manager or officer, which relates to or arises out of the Company, its assets, business or affairs; provided, however, that indemnification shall not be made to or on behalf of an Indemnitee if a judgment or other final adjudication establishes that the actions, of such Indemnitee were material to the cause of action so adjudicated and constitute any of the following: (i) a knowing violation of law, conduct involving bad faith or willful or intentional misconduct; (ii) a transaction from which the Indemnitee derived an improper personal benefit; (iii) a circumstance under which the liability provisions of Section 605.0406 of the Act are applicable; and, (iv) a breach of duties or obligations under Section 605.04091 of the Act, taking into account the variations of such duties and obligations provided for in this Operating Agreement and allowed under Section 605.0105(4) of the Act. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere, or its equivalent, will not, of itself, create a presumption that the Indemnitee acted in a manner contrary to that specified in (i) through (v) above. Any indemnification pursuant to this ARTICLE VIII is to be made only out of the assets of the Company and no Member shall have any personal liability on account of such indemnification.

8.3 **Expenses.** Expenses (including reasonable legal fees and expenses at all levels of proceedings) incurred by an Indemnitee in defending or investigating any actual or threatened claim, demand, action, suit or proceeding described in Section 8.2 will, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Indemnitee to repay such amount if it shall be determined that the Indemnitee is not entitled to be indemnified as authorized in this ARTICLE VIII.

8.4 **Non-Exclusivity.** The indemnification and advancement of expenses provided by, or granted pursuant to, this ARTICLE VIII will not be exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any statute, the Articles, this Operating Agreement, any other agreement, a vote of the Members, a policy of insurance, or otherwise, and will not limit in any way any right that the Company may have to make additional indemnifications with respect to the same or different Persons or classes of Persons. The indemnification and advancement of expenses provided by, or granted pursuant to, this ARTICLE VIII will continue as to a Person who has ceased to be a Member and will inure to the benefit of the heirs, executors, administrators, successors, and assigns of such a Person.

8.5 **Insurance.** Upon the approval of the Members, the Company may purchase and maintain insurance on behalf of the Members, Managers and officers against any liability asserted against them and incurred by them in such capacity, or arising out of the Members' status as Members, the Managers' status as Managers and the officers' status as officers, whether or not the Company would have the power to indemnify them against such liability under this ARTICLE VIII.

8.6 **Reliance by Members and Managers.** In discharging their duties, the Members and Managers, when acting in good faith, may rely upon information, opinions, reports, or statements, including financial statements and other financial data, in each case prepared or presented by (a) one or more officers or employees of the Company whom the Members and Managers reasonably believe to be reliable and competent in the matters presented, or

(b) counsel, public accountants, or other Persons as to matters that the Members and Managers believe to be within any such Person's professional or expert competence.

## ARTICLE IX
## TRANSFERABILITY OF AN INTEREST

9.1 **Restrictions on Transfers of Interest.**

(a) Notwithstanding any other provisions of this Operating Agreement and this ARTICLE IX, no purported Transfer may be made unless in the opinion of responsible counsel (who may be counsel for the Company), satisfactory in form and substance to a Majority-in-Interest, the Board of Managers (by *unanimous* consent) and counsel for the Company (which opinion may be waived, in whole or in part, in the sole and absolute discretion of a Majority-in-Interest):

(i) That Transfer, when added to the total of all other Transfers of Membership Interests within the preceding twelve months, would not result in adverse tax consequences to any Member as a result of the Company being considered to have terminated within the meaning of Section 708 of the Code;

(ii) That Transfer would not violate any federal securities laws or any state securities or "Blue Sky" laws (including any investor suitability standards) applicable to the Company or the Interest to be transferred;

(iii) That Transfer would not cause the Company to lose its status as a partnership for federal income tax purposes; and

(iv) Any required opinion of counsel is delivered in writing to the Company prior to the date of the Transfer.

(b) In no event may all or any part of an Interest be the subject of a Transfer to a minor or an incompetent, except in trust for the benefit of such minor or incompetent, or to a custodian under an applicable Uniform Transfers to Minors Act or other statute of similar purpose and effect.

(c) No Member shall transfer all or any part of the Member's Interest ("Subject Interest") in the Company without prior written notice to the Board of Managers and the prior written consent of a Majority-in-Interest.

(d) The Transferor Member may otherwise Transfer all or any part of the Subject Interest only after giving written notice to the Board of Managers and receiving the written consent of a Majority-in-Interest, and only to:

(i) A Member;

(ii) Any other Person, but only after compliance with the provisions of Section 9.4 or the provisions of ARTICLE X applicable to a Triggering Event (whichever provisions are applicable).

(e) Each Transferor Member will, upon the request of the Members, execute any certificates or other documents and perform any acts that the Members deem appropriate, before, upon, or after Transfer of an Interest by the Transferor Member. For purposes of this ARTICLE IX, any Transfer of an Interest, whether voluntary or by operation of law, will be considered an assignment.

(f) Any purported Transfer of an Interest that is not made in compliance with this Operating Agreement shall be null and void and of no force or effect.

(g) Each Member agrees that he, she or it will, before the Members consent to a Transfer of an Interest by that Member, if applicable, pay all reasonable expenses, including attorneys' fees, incurred by the Company in connection with the assignment requested by such Member.

(h) If a Transfer is approved and the transferee admitted as a new Member, the provisions of this ARTICLE IX will continue to apply to that assignee with respect to all future Transfers.

9.2 **Assignees.**

(a) The Company will not recognize for any purpose any purported Transfer of an Interest for any purpose unless the provisions of Section 9.1 have been complied with and there has been filed with the Company a dated notification of that Transfer, in form satisfactory to the Members, executed and acknowledged by both the Transferor Member and the purchaser, assignee, or transferee, and that notification (i) contains the acceptance by the purchaser, assignee, or transferee of all of the terms and provisions of this Operating Agreement and (ii) represents that the Transfer was made in accordance with this Operating Agreement and all applicable laws and regulations. Any Transfer will be recognized by the Company as effective on the date on which that notification is filed with the Company.

(b) Unless and until an assignee of an Interest becomes a Substituted Member, that assignee will not be entitled to vote or give consents with respect to that Interest.

(c) Any Member who assigns all of such Member's Interest will cease to be a Member, except that, unless and until a Substituted Member is admitted in his, her or its stead, the assigning Member will retain the statutory rights of the assignor of a limited liability company interest under the Act.

(d) Notwithstanding anything to the contrary in this Operating Agreement, both the Company and the Members will be entitled to treat the Transferor Member of an Interest as its absolute owner in all respects, and will incur no liability for distributions made in good faith to that Transferor Member, until a written assignment that conforms to the requirements of this ARTICLE IX has been received by the Company.

(e) Notwithstanding anything to the contrary in this Operating Agreement, the exclusive remedy for an assignee of an Interest, including an assignee of a judgment creditor of an Interest, shall be limited to a charging order against a Member's interest. In the event of an assignment or charging order, the other Members may elect, at their sole option, to buy the

Interest subject to the charging order at its then-current fair market value, taking into account all applicable discounts, as determined by appraisal.

9.3 **Substituted Members.**

(a) No Member will have the right to substitute a purchaser, assignee, transferee, donee, heir, legatee, distributee, or other recipient of any of that Member's Interest as a Member in its place in particular, but not limited to, any right of the Member to vote or consent. Any purchaser, assignee, transferee, donee, heir, legatee, distributee, or other recipient of an Interest (whether by a voluntary or involuntary Transfer) will be admitted to the Company as a substituted member ("Substituted Member") only (i) if applicable, with the *unanimous* consent of the Members, which consent will be granted or withheld in the sole and absolute discretion of the Members and may be arbitrarily withheld, (ii) by satisfying the requirements of Sections 9.1 and 9.2, and (iii) upon an amendment to this Operating Agreement. Any consent by the Members may be evidenced by the execution of the Members of an amendment to this Operating Agreement evidencing the admission of that Person as a Member. The Members agree to cause this Operating Agreement to be appropriately amended, and recorded as so amended, and **Exhibit A** to be appropriately amended, in the event of such an admission.

(b) Each Substituted Member, as a condition to such Person's admission as a Member, shall execute and acknowledge such instruments, in form and substance satisfactory to the Members, as the Members deem necessary or desirable to effectuate the admission and to confirm the agreement of the Substituted Member to be bound by all the terms and provisions of this Operating Agreement with respect to the Interest acquired. All reasonable expenses, including attorneys' fees and expenses, incurred by the Company in this connection will be borne by the Substituted Member.

(c) Until an assignee has been admitted to the Company as a Substituted Member under Section 9.3(a), that assignee will be entitled only to the rights of an assignee of a limited liability company interest under the Act.

9.4 **Option to Purchase Interest.** In the event a Member desires to sell, assign, transfer or dispose of all or any part of the Interest which he, she or it owns or acquires in the Company after the date of this Operating Agreement, and if that Member receives a bona fide offer to purchase his, her or its Interest from a third party, then the Transferor Member shall be required to make a written offer to sell his, her or its Interest to the other Members (the "Offeree Members") at the same price and upon the same terms and conditions as the Interest was offered to the third party. If there is only one Offeree Member and that Offeree Member elects to purchase all or part of such Interest, then such Offeree Member shall give the Transferor Member written notice of such election within thirty days of the receipt of the written offer from the Transferor Member. If there is more than one Offeree Member, the portion of the Interest to be purchased by each Offeree Member shall be Pro Rata based upon each Member's Percentage Interest, exclusive of the Interest then owned by the Transferor Member. If any Offeree Member does not desire to purchase his, her or its Pro Rata portion, the other Offeree Members may purchase his, her or its portion, Pro Rata, based upon each such Offeree Member's Percentage Interest after the exercise of the preceding offers. If this offer is not accepted in full by the

Offeree Members within such thirty day time period, the Transferor Member shall make a similar offer in writing to the Company, which shall have the right to purchase all, but not less than all, of the remaining Interest of the Transferor Member offered for sale, at the same price and upon the same terms and conditions as such Interest has been offered to the third party. If the offer to the Company is not accepted in full within thirty days of its receipt by it, then the preceding offer to the Offeree Members shall be null and void, and the Transferor Member may sell such Interest offered for sale to the third party within thirty days after the offer to the Offeree Members is null and void, but only at the price and upon the same terms and conditions as such Interest has been offered to the Company and the Offeree Members and only in compliance with Section 9.5. No sale of such Interest shall be effective, however, until the transferee of the Interest agrees in writing to be bound by and be subject to all the terms and restrictions set forth in this Operating Agreement. In the event the Interest is not sold to the third party within the thirty day period, the limitations of this Section shall again apply to the Interest owned by the Transferor Member. The purchase price and the terms and conditions of sale contemplated under this Section shall be governed by Sections 10.7 through 10.10.

9.5 **Drag-along Rights.**

(a) Notwithstanding any other provision of this Operating Agreement, if the Company and the Offeree Members do not exercise their right to purchase all of the Transferor Members' Interest under Section 9.4 and if a Majority-in-Interest (the "Offeror Members") collectively agree to engage in any Sale Transaction (as defined below) with a third party in an arm's-length transaction, then, subject to the Act, such Offeror Members may require all of the remaining Members (the "Remaining Members") to sell their Interests to such third party for the same per Percentage Interest consideration as is offered to the Offeror Members and otherwise on the terms and conditions provided in this Section 9.5. For purposes of this Section 9.5, a "Sale Transaction" shall mean a sale of all of the Offeror Members' Interests to a third-party that is not an Affiliate of any of the Offeror Members.

(b) In order to exercise their rights under this Section 9.5, the Offeror Members shall send to each of the Remaining Members written notice (the "Compelled Sale Notice") of the exercise of the Offeror Members' rights pursuant to this Section 9.5, setting forth the consideration per Percentage Interest to be paid by the third-party purchaser, summarizing the other terms and conditions of the Sale Transaction, enclosing a copy of the definitive agreement, if any, pursuant to which the Sale Transaction is to be effected (the "Definitive Agreement") and confirming that each Remaining Member is to be treated in substantially the same manner as each Offeror Member under the terms of the Definitive Agreement. Within ten days following the date of the Compelled Sale Notice, each of the Remaining Members shall execute the Definitive Agreement, provided that each of the Offeror Members has executed the Definitive Agreement. Thereafter, the obligations of the Offeror Members and Remaining Members with respect to such Sale Transaction shall be governed by the terms of the Definitive Agreement.

(c) It is understood that a Definitive Agreement may set aside a pro rata portion of the proceeds payable with respect to the Interests in escrow, upon terms satisfactory to the Offeror Members, as a source of indemnification to be provided to the third party purchaser. Upon termination of such escrow, each Member shall be entitled to receive his, her or its pro

rata share of any funds or other consideration remaining in escrow, after the payment of all indemnity claims, the fees and expenses of the escrow agent and the out-of-pocket expenses of any representative of the Members pursuant to the escrow agreement in connection with the administration of the escrow and the settlement, compromise and/or defense of any claims made against the escrow.

9.6 **Member Buyout.** At any time, any Member (the "Initiating Member") shall have the right and option (the "Put/Call Option") to either purchase all of the units of another Member (the "Other Member") or, if the Other Member does not desire to sell such units to the Initiating Member, to obligate the Other Member to purchase all of the units of the Initiating Member, on the terms and conditions set forth in this Section 9.6. The Initiating Member may exercise the Put/Call Option by giving written notice (the "Call Notice") to the Other Member of an offer to purchase all of the Other Member's units at a stated price per unit (the "Call Price"), payable in cash or on payment terms as provided in the Call Notice at the Put/Call Closing (as defined below). The effective date of such exercise of the Put/Call Option shall be the date of Call Notice. The Other Member shall have thirty (30) days after the date of the Call Notice if the Call Price and payment terms are acceptable to the Other Member to elect to sell all its units to the Initiating Member at the Call Price and on the specified payment terms, or to elect to purchase all of the Initiating Member's units at the Call Price, payable in either event on the same payment terms as offered at the Put/Call Closing (subject to the Company's first right of refusal detailed below). If the Other Member does not give written notice of its election hereunder to the Initiating Member within the aforementioned thirty (30) day period, the Other Member shall be deemed to have elected to sell all its units to the Initiating Member at the Call Price, payable in cash or on the provided payment terms of the Call Notice at the Put/Call Closing (subject to the Company's first right of refusal detailed below). Following a decision in writing by the Other Member, or upon the lapse of the thirty (30) day period if no written notice is given, the Company shall have thirty (30) days in which to step into the place of the Other Member or the Initiating Member, as applicable, and close upon the units on the same terms as the Initiating Member offered, or if applicable, the Other Member provided written notice of. If the Company does not give written notice of its election hereunder to the Initiating Member or Other Member within the aforementioned thirty (30) day period, then the Company shall be deemed to have waived its right of first refusal and the Initiating Member or Other Member, as the case may be, shall proceed to the Put/Call Closing. The closing of the purchase and sale required in the event of exercise of the Put/Call Option ("Put/Call Closing") shall take place at the offices of the Company at 10:00 a.m., Arizona time, on or before the one hundred and twentieth (120th) day following the Call Notice. In the event that the Company, Initiating Member or Other Member, as the case may be, does not close by the Put/Call Closing ("Non-Performing Party"), then the Non-Performing Party shall forfeit their right to the purchase and the party that would have had the right to purchase, had the Non-Performing Party never exercised its right to the purchase, shall have thirty (30) days from the Put/Call Closing date in which to complete the transaction. In the event such party does not close the transaction within thirty (30) days, the original Call Notice shall be considered null and void and no units shall be subject to transfer based upon such original Call Notice.

9.7 **Additional Members.** After the formation of the Company, any Person may become an additional Member ("Additional Member") of the Company for such consideration as the Members shall determine, provided that (i) the Members *unanimously* consent to admit the

Additional Member to the Company and (ii) such Additional Member (a) has executed an instrument accepting and adopting the terms and conditions of the Articles and this Operating Agreement and (b) has executed any certificate or other documents and performed any acts that the Members deem appropriate. No Additional Member shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company. The Additional Member's Percentage Interest shall be determined in writing by the Members and such Additional Member.

9.8 **Tag-along Rights.**

(a) **Participation**. If a Member, or group of Members, collectively holding no less than a Majority of Interest (the "Selling Member") proposes to sell any Units to an independent third party (the "Proposed Transferee") and the Selling Member cannot or has not elected to exercise its drag-along rights set forth in Section 9.5, each other Member (each, a "Tag-along Member") shall be permitted to participate in such sale (a "Tag-along Sale") on the terms and conditions set forth in this Section 9.8.

(b) **Sale Notice**. Prior to the consummation of the sale described in Section 9.4, the Selling Member shall deliver to the Company and each other Member a written notice (a "Sale Notice") of the proposed sale subject to this Section 9.8 no more than 10 days after the execution and delivery by all the parties thereto of the definitive agreement entered into with respect to the Tag-along Sale and, in any event, no later than 20 days prior to the closing date of the Tag-along Sale. The Tag-along Notice shall make reference to the Tag-along Members' rights hereunder and shall describe in reasonable detail:

(i) the number of Units to be sold by the Selling Member;

(ii) the name of the Proposed Transferee;

(iii) the per Unit purchase price and the other material terms and conditions of the sale, including a description of any non-cash consideration in sufficient detail to permit the valuation thereof;

(iv) the proposed date, time and location of the closing of the sale; and

(v) a copy of any form of agreement proposed to be executed in connection therewith.

(c) **Units to be Sold.**

(i) Tag-along Member shall exercise its right to participate in a sale of Units by the Selling Member subject to this Section 9.8 by delivering to the Selling Member a written notice (a "Tag-along Notice") stating its election to do so and specifying the number of Units to be sold by it no later than 5 days after receipt of the Sale Notice (the "Tag-along Period"). The offer of each Tag-along Member set forth in a Tag-along Notice shall be irrevocable, and, to the extent such offer is accepted, such Tag-along Member shall be bound and obligated to sell in the proposed sale on the terms and conditions set forth in this Section 9.8.

Each Tag-along Member shall have the right to sell in a sale subject to this Section 9.8 the number of Units equal to the product obtained by multiplying (x) the number of Units held by the Tag-along Member by (y) a fraction (A) the numerator of which is equal to the number of Units the Selling Member proposes to sell or transfer to the Proposed Transferee and (B) denominator of which is equal to the number of Units then owned by such Selling Member.

(ii) The Selling Member shall use its commercially reasonable efforts to include in the proposed sale to the Proposed Transferee all of the Units that the Tag-along Members have requested to have included pursuant to the applicable Tag-along Notices, it being understood that the Proposed Transferee shall not be required to purchase Units in excess of the number set forth in the Sale Notice. In the event the Proposed Transferee elects to purchase less than all of the Units sought to be sold by the Tag-along Members, the number of Units to be sold to the Proposed Transferee by the Selling Member and each Tag-along Member shall be reduced so that each such Member is entitled to sell its Pro Rata Portion of the number of Units the Proposed Transferee elects to purchase (which in no event may be less than the number of Units set forth in the Sale Notice).

(iii) Each Tag-along Member who does not deliver a Tag-along Notice in compliance with clause (i) above shall be deemed to have waived all of such Tag-along Member's rights to participate in such sale, and the Selling Member shall (subject to the rights of any participating Tag-along Member) thereafter be free to sell to the Proposed Transferee its Units at a per Unit price that is no greater than the per Unit price set forth in the Sale Notice and on other same terms and conditions which are not materially more favorable to the Selling Member than those set forth in the Sale Notice, without any further obligation to the non-accepting Tag-along Members.

(d) **Consideration**. Each Member participating in a sale pursuant to this Section 9.8 shall receive the same consideration per Unit after deduction of such Member's proportionate share of the related expenses in accordance with paragraph (f) below.

(e) **Conditions of Sale**. Each Tag-along Member shall make or provide the same representations, warranties, covenants, indemnities and agreements as the Selling Member makes or provides in connection with the Tag-along Sale (except that in the case of representations, warranties, covenants, indemnities and agreements pertaining specifically to the Selling Member, the Tag-along Member shall make the comparable representations, warranties, covenants, indemnities and agreements pertaining specifically to itself); provided, that all representations, warranties, covenants and indemnities shall be made by the Selling Member and each other Tag-along Member severally and not jointly and any indemnification obligation in respect of breaches of representations and warranties that do not relate to such Tag-along Member shall be in an amount not to exceed the aggregate proceeds received by such Tag-along Member in connection with any sale consummated pursuant to this Section 9.8.

(f) **Expenses**. The fees and expenses of the Selling Member incurred in connection with a sale under this Section 9.8 and for the benefit of all Members (it being understood that costs incurred by or on behalf of the Selling Member for its sole benefit will not be considered to be for the benefit of all Members), to the extent not paid or reimbursed by the Company or the Proposed Transferee, shall be shared by all the Members on a pro rata

basis, based on the consideration received by each Member; provided, that no Member shall be obligated to make any out-of-pocket expenditure prior to the consummation of the transaction consummated pursuant to this Section 9.8.

(g) **Cooperation**. Each Member shall take all actions as may be reasonably necessary to consummate the Tag-along Sale, including, without limitation, entering into agreements and delivering certificates and instruments, in each case, consistent with the agreements being entered into and the certificates being delivered by the Selling Member.

(h) **Deadline for Completion of Sale**. The Selling Member shall have 90 days following the expiration of the Tag-along Period in which to sell the Units described in the Sale Notice, on terms not more favorable to the Selling Member than those set forth in the Sale Notice (which such 90 day period may be extended for a reasonable time not to exceed 120 days to the extent reasonably necessary to obtain any regulatory approvals). If at the end of such period the Selling Member has not completed such sale, the Selling Member may not then effect a sale of Units subject to this Section 9.8 without again fully complying with the provisions of this Section 9.8.

(i) **Sales in Violation of the Tag-along Right**. If the Selling Member sells or otherwise transfers to the Proposed Transferee any of its Units in breach of this Section 9.8, then each Tag-along Member shall have the right to sell to the Selling Member, and the Selling Member undertakes to purchase from each Tag-along Member, the number of Units that such Tag-along Member would have had the right to sell to the Proposed Transferee pursuant to this Section 9.8, for a per Unit amount and form of consideration and upon the term and conditions on which the Proposed Transferee bought such Units from the Selling Member, but without indemnity being granted by any Tag-along Member to the Selling Member; provided, that nothing contained in this Section 9.8 shall preclude any Member from seeking alternative remedies against such Selling Member as a result of its breach of this Section 9.8. The Selling Member shall also reimburse each Tag-along Member for any and all reasonable and documented out-of-pocket fees and expenses, including reasonable legal fees and expenses, incurred pursuant to the exercise or the attempted exercise of the Tag-along Member's rights under this paragraph (i).

(j) **Excepted Sales**. This Section 9.8 shall not apply to:

(i) sales to any employee of the Company; or

(ii) sales in a distribution to the public (whether pursuant to a registered public offering, Rule 144 or otherwise).

## ARTICLE X
## DEATH, DISABILITY, BANKRUPTCY OR JEOPARDIZING ACT OF MEMBER

10.1 **Generally.** The death (if an individual), Disability (if an individual), Bankruptcy, the termination of the Member’s employment with the Company (for any reason) or Jeopardizing Act of a Member (or the termination of the existence of a Member who is not an individual) (the “Triggering Event”) will not dissolve the Company provided that the Company continues to have at least one Member and all remaining Members agree to continue the business of the Company.

Notwithstanding the foregoing, the remaining Members agree to vote their Interests to consent to continue the business of the Company upon the occurrence of any Triggering Event. A deceased (if an individual), Disabled (if an individual) or Bankrupt Member of the Company or a Member that has committed a Jeopardizing Act is referred to as a "Former Member". If the occurrence of a Triggering Event would otherwise leave the Company with no remaining Members, the Company will be dissolved unless the Company waives (in writing) its option to purchase the Former Member's interest pursuant to this ARTICLE X and the Former Member's interest is transferred to a Substituted Member, as defined in Section 9.3, including the Former Member's spouse, estate, legal beneficiaries or other assigns.

10.2 **Remaining Members' Option.** Upon the occurrence of a Triggering Event with respect to a Former Member, the remaining Members will have the first option to purchase the Interest of the Former Member by giving notice of their desire to purchase a portion of the Former Member's Interest to the Former Member and all of the other Members within sixty days following the occurrence of the Triggering Event. If any remaining Member elects to give such notice within sixty days, the purchase and sale obligation accrues one hundred twenty days after such Triggering Event. The failure of any Member to submit a notice within the applicable period constitutes an election on the part of that remaining Member not to purchase any of the Former Member's Interest. Each remaining Member will be entitled to purchase a portion of the Former Member's Interest Pro Rata based on the remaining Member's Percentage Interest on the day after the Triggering Event. After one or more of the remaining Members has given notice of such Member's election and prior to the date upon which the purchase and sale obligation accrues, the parties are to take all steps necessary to determine the price and terms of such purchase and sale obligation as provided below.

10.3 **Nonpurchasing Member.** In the event any remaining Member elects to purchase none or less than all of that remaining Member's Pro Rata portion of the Former Member's Interest, the unpurchased portion may be purchased by those remaining Members who elected to purchase their Pro Rata part in such proportion as their Interests bear to each other or in such other proportions as they may agree.

10.4 **Company's Option.** If the remaining Members do not exercise their first option to purchase the Interest of a Former Member within sixty days as provided above, for thirty days after the end of such sixty-day period (that is, between the sixty-first and ninetieth days after the Triggering Event), the Company will have an option to purchase such Interest. Between such sixty-first and ninetieth days, the Company may notify the Former Member and all other Members in writing of its desire to purchase all or a portion of the Former Member's Interest. If the Company elects to make such purchase, the Closing shall take place one hundred-twenty days after the Triggering Event.

10.5 **Lapse.** If the Company or the remaining Members fail to purchase the entire Interest of the Former Member, the Interest will pass by operation of law to any assignee or will remain in the hands of the Former Member or the Former Member's estate.

10.6 **Other Mutual Agreement.** Notwithstanding any provision of this ARTICLE X to the contrary, the Company and the remaining Members may mutually agree to an allocation of the Former Member's Interest to be purchased by each of them.

10.7 **Value.** For any purchase under ARTICLE IX, in the event the Company (or the remaining Members as the case may be) elects to purchase the Interest of a Transferor Member upon a bona fide offer to purchase an Interest by a Person as contemplated by Section 9.4, the purchase price will be the price contained in a written agreement to purchase the Interest (the Transferor Member shall provide a copy of that agreement to each Person entitled to receive an offer from the Transferor Member under this Operating Agreement). For any purchase under ARTICLE X, in the event of a Triggering Event or an attempted Transfer of a Subject Interest other than pursuant to a bona fide sale, the value of the Subject Interest shall be based upon the formula attached as **Exhibit B**.

10.8 **Closing.** The purchase and sale obligation for all purposes under this ARTICLE X shall accrue one hundred twenty days after the Triggering Event (the "Closing"). The Closing may be delayed until the purchase price for the Former Member's Interest is determined pursuant to Section 10.7. In the event the Closing is delayed more than thirty days beyond the last date it should have occurred under this Section 10.8, the purchaser(s) shall pay interest to the seller on the amount of the purchase price, at the rate described in Section 10.9, from the date the Closing should have occurred until the actual date of the Closing.

10.9 **Payment Terms.** Notwithstanding any other provision of this Operating Agreement, if the Subject Interest is purchased under ARTICLE IX or this ARTICLE X, the purchase price shall be paid by the Company or the remaining Member(s), as the case may be, in the following manner: (a) on the same terms as the bona fide offer to purchase an Interest by a Person as contemplated by Section 9.4 or, (b) in the event of a Triggering Event or an attempted Transfer of a Subject Interest other than pursuant to a bona fide sale, either (i) twenty percent (20%) of the purchase price paid at the Closing and the balance in four (4) equal annual installments of principal together with interest, commencing to accrue from the date of Closing, at the then current Mid-Term Applicable Federal Rate (the "AFR") under Section 1274(d) of the Code for the month in which the first payment is made (or a rate per annum equal to what the AFR would be for such month under Section 1274(d) of the Code if the AFR is no longer published) to fully amortize such purchase price over such four (4) payments, with the first payment being due and payable on the first anniversary date after the Closing, or (ii) in full, without interest, at the Closing, as the Company and/or the remaining Member(s), as the case may be, may elect in their sole discretion.

10.10 **Closing Procedures.** Closing of any sale transaction under this ARTICLE X will occur on the date the purchase and sale obligation is to accrue as provided under this Operating Agreement, or the next business day if the same shall fall on a weekend or holiday. At the Closing, promissory notes evidencing the payment obligation(s) are to be delivered by the purchasers, and an assignment agreement or certificates, if any, duly endorsed, are to be delivered by the Former Member or the representatives of the Former Member.

## ARTICLE XI
## DISSOLUTION AND TERMINATION

11.1 **Events Causing Dissolution.** Except as otherwise agreed upon in this Operating Agreement, the Company will be dissolved upon the first to occur of the following events:

(a) The affirmative vote of a Majority-in-Interest to dissolve; or

(b) Any other event causing a dissolution of the Company under the provisions of the Act.

11.2 **Cash Distributions Upon Dissolution.**

(a) Upon the dissolution of the Company as a result of the occurrence of any of the events set forth in Section 11.1, the Board of Managers shall proceed to liquidate the Company and the liquidation proceeds will be applied and distributed in the following order of priority:

(i) First, to the payment of debts and liabilities of the Company in the order of priority as provided by law (other than any loans or advances that may have been made by any of the Members to the Company) and the expenses of liquidation.

(ii) Second, to the establishment of any reserve that the Board of Managers may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company. This reserve may be paid over by the Board of Managers to any attorney at law, or other party acceptable to the Board of Managers, as escrow agent to be held for disbursement in payment of any of the aforementioned liabilities and, at the expiration of such period as is deemed advisable by the Board of Managers, for distribution of the balance, in the manner provided in Section 11.2(a)(iii)-(v).

(iii) Third, to the repayment of any loans or advances that may have been made by the Members to the Company, but if the amount available for that repayment is insufficient, then Pro Rata to the Members based on the amount owed to each Member.

(iv) Fourth, to the Members in proportion to their respective Capital Accounts, until those Capital Accounts have been reduced to zero.

(v) Fifth, Pro Rata to the Members.

11.3 **Distributions In Kind.** For purposes of adjusting the Capital Accounts, if property is distributed in kind to the Members pursuant to this ARTICLE XI, the Company shall treat such distribution as the sale of such property to a Person not Affiliated with the Company, followed by the distribution of the proceeds of the sale to the Members in accordance with Section 4.4.

## ARTICLE XII
## ACCOUNTING AND BANK ACCOUNTS

12.1 **Fiscal Year and Accounting Method.** The fiscal year end and taxable year end of the Company shall be December 31. The Company shall use the cash basis of accounting for financial and tax accounting purposes.

12.2 **Books and Records.**

(a) The books and records of the Company are to be maintained at the principal office of the Company.

(b) Each Member (or such Member's designated representative) has the right during ordinary business hours and upon reasonable notice to make a reasonable request to inspect and copy (at such Member's own expense) all books and records of the Company, as specified in Section 605.0410 of the Act.

12.3 **Financial Reports.** Prior to the completion of the subsequent calendar month, the Company will cause to be prepared and delivered to each Member monthly financial statements, prepared in accordance with generally accepted accounting principles.

12.4 **Tax Returns and Elections.** The Company will cause to be prepared and timely filed all federal, state and local income tax returns or other returns or statements required by applicable law. The Company shall claim all deductions and make such elections for federal or state income tax purposes, including, without limitation, any election required pursuant to Section 12.6, that the Members reasonably determine will produce the most favorable tax results for the Members.

12.5 **Bank Accounts.** All funds of the Company are to be deposited in a separate bank, money market or similar account(s) approved by the Members and in the Company's name. Withdrawals from such account(s) may be made only by Persons authorized to do so by the Members.

12.6 **Tax Election.** The Members agree that the Company should be taxed as a partnership for tax purposes, and the Members shall take any and all action necessary to effectuate partnership tax treatment.

12.7 **Section 754 Election.** The Board of Managers may make on behalf of the Company the election permitted by Section 754 of the Code with respect to adjustments to basis of Company property. If the Company is not required to make a Section 754 election, the transferee of a Member's Interest will be liable for his or her pro rata share of gains, based on the basis of the Company assets rather than the price paid for the purchased interest.

12.8 **Tax Matters Partner.** **JAMIN RUARK** is designated as the Tax Matters Partner of the Company, within the meaning of that term in Code Section 6231, and for the purposes specified in that section.

## ARTICLE XIII
## MISCELLANEOUS

13.1 **Title to Assets.** Title to the assets acquired by the Company will be held in the name of the Company. No Member individually has any ownership interest or rights in assets of the Company, except indirectly by virtue of such Member's ownership of an Interest. No

Member has any right to seek or obtain a partition of the assets of the Company, nor does any Member have the right to any specific assets of the Company upon the liquidation of or any distribution from the Company.

13.2 **Complete Agreement.** This Operating Agreement, including the attached Exhibits, and the Articles constitute the complete and exclusive statement of agreement among the Members with respect to its subject matter. This Operating Agreement and the Articles replace and supersede all prior agreements by and among the Members, or any of them.

13.3 **Terms.** Common nouns and pronouns will be deemed to refer to the masculine, feminine, neuter, singular, and plural, as the identity of the Person or Persons, firm, or corporation may in the context require. Any reference to the Code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

13.4 **Nature of Interest in the Company.** A Member's Interest is considered personal property for all purposes.

13.5 **Waiver of Default.** No consent or waiver, express or implied, by the Company or a Member with respect to any breach or default by another Member under this Operating Agreement shall be deemed or construed to be a consent or waiver with respect to any other breach or default by such Member of the same provision or any other provision of this Operating Agreement. Failure on the part of the Company or a Member to complain of any act or failure to act of another Member or to declare such other Member in default shall not be deemed or constitute a waiver by the Company or the Member of any rights under this Operating Agreement.

13.6 **Amendment.** Except as otherwise expressly provided elsewhere in this Operating Agreement, this Operating Agreement may not be altered, modified or changed except by a written document duly executed by *unanimous* affirmative vote of the Members at the time of such alteration, modification or change.

13.7 **Amendment of Articles of Organization.** Except as otherwise provided in the Act, the Articles of Organization of the Company may not be altered, modified or changed except by the *unanimous* written consent of the Members. Upon execution of such consent, any Member shall execute all written documents necessary, appropriate or convenient to comply with such consent.

13.8 **No Third Party Rights.** None of the provisions contained in this Operating Agreement is for the benefit of or enforceable by any third parties, including creditors of the Company. The parties to this Operating Agreement expressly retain any and all rights to amend this Operating Agreement as provided above, notwithstanding any interest in this Operating Agreement or in any party to this Operating Agreement held by any other Person.

13.9 **Severability.** In the event any provision of this Operating Agreement is held to be illegal, invalid or unenforceable to any extent, the legality, validity and enforceability of the remainder of this Operating Agreement will not be affected by such holding and will remain in full force and effect and will be enforced to the greatest extent permitted by law.

13.10 **Binding Agreement.** Subject to the restrictions on the disposition of Interests, the provisions of this Operating Agreement will be binding upon, and inure to the benefit of, the parties to this Operating Agreement and their respective heirs, personal representatives, successors and permitted assigns.

13.11 **Headings.** The headings of the Articles and sections of this Operating Agreement are for convenience only and are not to be considered in construing or interpreting any of the terms or provisions of this Operating Agreement.

13.12 **Interpretation.** Except as otherwise provided in this Operating Agreement, to the extent provisions or terms of this Operating Agreement are subject to varying interpretations or constructions, the parties intend that such provisions and terms be interpreted consistent and in accordance with any similar provisions and terms set forth in Chapter 605, Arizona Statutes, Chapter 608, Arizona Statutes, Chapter 607, Arizona Statutes, or Chapter 620, Arizona Statutes, as the case may be, and successor laws. In the event of any conflict between the provisions of Arizona law with respect to any term, the provisions of Chapter 605, Arizona Statutes, shall take precedence.

13.13 **Governing Law.** This Operating Agreement is to be construed according to and governed by the laws of Arizona, without regard to any applicable conflicts or choice of laws, rules or principles.

13.14 **Venue and Jurisdiction.** The parties specifically consent to sole and proper venue and jurisdiction of the courts located in Hillsborough County, Arizona for any action hereunder.

13.15 **Multiple Counterparts.** This Operating Agreement may be executed in several counterparts, including by facsimile signature, each of which will be deemed original but all of which will constitute one and the same instrument. Any proof of execution, however will require production of only one copy signed by the party to be charged.

13.16 **Additional Documents and Acts.** Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary, appropriate or convenient to effectuate, carry out, and perform all of the terms, provisions, and conditions of this Operating Agreement and the transactions contemplated by this Operating Agreement.

13.17 **References to this Operating Agreement.** Numbered or lettered articles, sections, subsections, paragraphs and subparagraphs contained in this Operating Agreement refer to articles, sections, subsections, paragraphs and subparagraphs of this Operating Agreement unless otherwise expressly stated.

13.18 **Notices.** Any notice to be given or to be served upon the Company or any party to this Operating Agreement in connection with this Operating Agreement must be in writing and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice. Those notices will be given to a Member at the address specified in **Exhibit A**. Any Member or the Company may, at any time by giving five days prior written notice to the other Members and the Company, designate any other address in substitution of the

foregoing address to which that notice will be given.

13.19 **Operating Agreement prepared by Company's Attorney.** The parties acknowledge that Macfarlane, Ferguson & McMullen, P.A. prepared this Operating Agreement on behalf of, and in accordance with, its representation of the Company, and that:

(a) The books and records of the Company are to be maintained at the principal office of the Company.

(b) The Members and Managers have been advised that a conflict of interest may exist among their interests and relative to one another; and

(c) The Members and Managers have had the opportunity to seek the advice of independent legal counsel prior to executing this Operating Agreement, and represent that they have reviewed this Operating Agreement, understand its impact and content, and have had the opportunity to receive appropriate advice as to its legal, tax, and accounting effects.

13.20 **Waiver of Dissenter or Appraisal Rights.** The Minority Member hereby expressly waives any and all of his, her or its statutory or common law dissenter or appraisal rights, including but not limited to waiving his, her or its rights under the following Sections of the Act: 605.1061; 605.1006; 605.1072; 605.1062; 605.1063; 605.1064; 605.1065; 605.1066; 605.1067; 605.1068; 605.1069; 605.1070; and 605.1071.

13.21 **Tenants by the Entireties Ownership.** If and when any Interest is owned by and between a husband and wife as tenants by the entireties, then the Arizona law of tenants by the entireties shall be controlling as between such husband and wife, in that upon the death of one spouse, the Interest shall be automatically owned by the other spouse, and it shall require the joinder of both spouses to act with respect to any Interest that is owned as tenants by the entireties, notwithstanding any provision under this Operating Agreement to the contrary. Further, notwithstanding any provision under this Operating Agreement to the contrary, the Arizona rules of tenancy by the entireties, and not the provisions under this Operating Agreement, shall apply with respect to any obligation herein imposed, such that any Arizona resident married couple owning their Interest as tenants by the entireties are considered as one entity until after the death of one of them. Therefore, such couple shall be considered one Member for all voting purposes, it shall require joint approval of married Members owning their interests as tenants by the entireties to take any action with respect to such Interest, and this Operating Agreement shall be construed accordingly. If one spouse is referred to as a "Managing Member" and the other spouse is not referred to as "Managing Member" under this Operating Agreement or by subsequent agreement or designation, then the spouse that is referred to as a "Managing Member" shall be considered a Manager, with the Manager designation being separate and apart from the tenancy by the entireties common membership status of both spouses.

13.22 **Waiver of Jury Trial. Each of the parties hereto hereby irrevocably waives any and all rights such party may otherwise have to trial by jury in any legal proceeding arising out of or relating to this Note or the transactions contemplated hereby.**

[Remainder of Page Intentionally Left Blank]

The undersigned have caused this Operating Agreement to be duly executed effective as of the Effective Date.

**COMPANY:**

**ATLANTIC HOME HEALTH CARE, LLC:**

_________________________________________________
JAMIN RUARK, Director Board of Managers

**MEMBERS:**

**HAVEN HOLDINGS MI, LLC:**

_________________________________________________
JAMIN RUARK, Director Board of Managers

**ACT NOW MANAGEMENT, LLC,**
**i.e. KIRK TJALAS et al:**

PhD RN
_________________________________________________
KIRK TJALAS, Director Board of Managers

**EXHIBIT A**
**TO AMENDED AND RESTATED OPERATING AGREEMENT**
**OF**
**ATLANTIC HOME HEALTH CARE, LLC**

| Name(s) | Number | Consideration | Percentage Interest |
|---|---|---|---|
| **HAVEN HOLDINGS MI, LLC** | 80 | Company Loan Up to $250,000.00 and Services | 80% |
| **KIRK TAJLAS** | 20 | Development Services | 20% |

**EXHIBIT B**
**TO OPERATING AGREEMENT**
**OF**
**ATLANTIC HOME HEALTH CARE, LLC**

See attached formula.

**Exhibit B**

Exhibit B - Fair Market Calculation

Fair Market Value (FMV) shall mean the amount at which property would change hands between a willing buyer and will seller, when neither is acting under compulsion to buy or sell, and both having reasonable knowledge of relevant facts. The Income Approach shall be used to determine the FMV of the units. Income Approach shall mean the analysis of historical revenue, earnngs and finacial conditions which serve to place the Company's financial performance in a historical context and provides a reference for estimating it's future performance. The FMV of the units deemed to be offered for sale shall be determioned by the CPA firm which regularly services the Corporation, utilizing the formula illustrated below. The following illustration shall demonstrate the calculation, and shall always utilize data from the previous 24 months trailing the valuation date.

| | As per Company books and records, maintained per GAAP. | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Fiscal Year | Net Earnings | Depreciation | Amortization | Principal Reductions | Purchase Property & Equipment | Income Taxes (40%) | | Net Cash Flow |
| | | (+) | (+) | (-) | (-) | (-) | | |
| 20XX | 245,000 | 8,500 | 1,000 | (25,000) | (7,500) | (98,000) | | 124,000 |
| 20XY | 650,000 | 9,500 | 1,000 | (275,000) | (15,000) | (260,000) | | 110,500 |
| | | | | | | | | 234,500 |
| | | | | | | | | 2 |
| | | | | Straight Average | | | | 117,250 |
| | | | | Multiple | | | | 4 |
| | | | | Enterprise Value for 100% | | | | $469,000 |
| | | | | Discount for Lack of Marketability | | | 20% | (93,800) |
| | | | | Enterprise Value on non-marketable basis | | | | $375,200 |
| | | | | Discount for Minority Interest (if applicable) | | | 15% | (56,280) |
| | | | | Enterprise Value on minority, non-marketable basis | | | | $318,920 |

TJALAS PARTIES 000043

RYAN RAPP
PACHECO
SORENSEN PLC

# <u>EXHIBIT 2</u>

# CONSULTING AGREEMENT

THIS AGREEMENT is made and entered into this _____ day of January, 2018, by and between Atlantic Home Health Care, LLC, an Arizona limited liability company, hereinafter referred to as the "Company," and Tjalas Healthcare Consulting, LLC, an Arizona limited liability company, hereinafter referred to as the "Consultant."

## R E C I T A L S

1. The Company is a home health care company, rendering services in the State of Arizona and elsewhere, relating to home health and hospice care with a diverse mix of payors, through those of its employees and others who are duly licensed to render those services in the State of Arizona and in the other states where the services are rendered.

2. Kirk Tjalas ("Tjalas"), the sole member of Consultant, is a licensed registered nurse with more than fifteen (15) years of health care management experience, and Consultant has several years of experience in managing home and other health care provider organizations in the State of Arizona and throughout the United States.

3. The Company wishes to engage the services of Consultant as an independent contractor to provide outside management and consulting services to the Company on the terms and conditions contained in this Agreement, and Consultant wishes to provide such services to the Company.

## A G R E E M E N T

NOW THEREFORE, in consideration of the foregoing recitals, which are included in and made a part of this Agreement, and in further consideration of the mutual and several covenants hereinafter contained, and for other good and valuable consideration by each party to the other delivered, the receipt and sufficiency of which are hereby acknowledged, the parties do hereby freely and voluntarily agree by and between themselves as follows:

1. Services.

The Company hereby engages Consultant as an independent consultant to render outside management and consulting services to the Company in connection with the operation of its business. The Consultant shall render such services for not less than twenty-five (25) hours per week and not more than thirty (30) hours per week during forty-eight weeks per year, as determined by Consultant. Consultant shall determine the manner in which such services are to be performed, and it shall do so in accordance with all rules, regulations and requirements of all licensing and governing agencies and such other federal, state and local laws as may be applicable. The Company shall cooperate fully with Consultant in the performance of its services under this Agreement, and the Company shall cause all employees of the Company to likewise cooperate with Consultant. It is mutually understood and agreed by and between the parties that Consultant

shall at all times act and perform as an independent contractor without the Company's exercise of control, supervision or direction over the method or manner by which such services are performed. The parties intend that the relationship between the Company and Consultant under this Agreement shall be that of an independent contractor, and accordingly, the Company shall not have, and shall not exercise, such control and/or supervision over the manner in which Consultant performs the services required under this Agreement so as to jeopardize Consultant's status as an independent contractor.

2. Term.

The term of this Agreement shall commence on January 1, 2018, and it shall continue until December 31, 2020 or until it is otherwise terminated in accordance with the terms and conditions of this Agreement. Unless this Agreement is terminated as provided herein, it shall be automatically renewed each year on the date immediately following the last day of the "Initial Consulting Period," as defined in Paragraph 3 below.

3. Fees and Charges.

In consideration of the services rendered by Consultant under this Agreement, the Company shall pay Consultant the sum of One Million ~~Five~~**One** Hundred~~ Thirty Five~~ Thousand Five Hundred and No/100 ($~~1,535,500.00~~**1,100,500.00**) Dollars for the period from January 1, 2018 to ~~July~~**October** 31, ~~2020~~**2019** (the "Initial Consulting Period"). The Company shall pay the foregoing sum to Consultant in ~~thirty (30~~**twenty-one (21**) monthly installments of Fifty Thousand and No/100 ($50,000.00) Dollars **each** and one final monthly installment of ~~Thirty Five~~**Fifty** Thousand Five Hundred and No/100 ($~~35,500.00~~**50,500.00**) Dollars, commencing on January 31, 2018 and continuing on the last day of each month thereafter during the Initial Consulting Period until ~~July~~**October** 31, ~~2020.~~**2019.** Upon the expiration of the Initial Consulting Period, the Company shall pay Consultant the sum of Eighteen Thousand Seven Hundred Fifty and No/100 ($18,750.00) Dollars per month for all services rendered thereafter (the "Subsequent Consulting Period"). Consultant shall be solely responsible and liable for the payment of any and all taxes which may be due in connection with the services provided by it under this Agreement, including, but not limited to, self-employment taxes, Social Security and Medicare taxes, payroll taxes, workers' compensation and unemployment insurance, as well as any income taxes payable thereon, and the Company shall withhold no amounts from the fee payable to Consultant for any purpose in return for the services render under this Agreement.

4. Reimbursement of Advances, Costs and Expenses.

The Company shall reimburse Consultant for all advances, costs and expenses paid by Consultant in connection with the performance of its services under this Agreement, all of which must be approved by the Company and for which Consultant shall provide appropriate receipts.

5. Facilities, Equipment, Supplies and Support Personnel.

The Company shall provide all facilities, equipment, supplies and support personnel as requested by Consultant to properly perform the services it is to render under this Agreement in an efficient and effective manner, including, but not limited to, office space and facilities, furniture and equipment. Consultant may provide services to the Company at the Company's place of business or elsewhere, as Consultant may determine reasonable and appropriate for the services to be rendered under this Agreement.

6. Insurance.

During the term of this Agreement, Consultant shall provide commercial general liability insurance providing coverage in connection with the services performed by Consultant under this Agreement, including, but not limited to, loss of or damage to the Company's real and personal property in the full amount of their replacement cost and general public liability insurance against claims for personal injury, death or property damage (including loss of use of property) with limits of liability of not less than One Million ($1,000.00.00) Dollars combined single limit for the injury or death of one person or more, or property damage, in any one accident and Two Million ($2,000,000.00) Dollars aggregate coverage. In addition to the foregoing, Consultant shall carry and maintain workers' compensation insurance in accordance with the requirements of applicable law. All such insurance required by Consultant under this Agreement shall be provided by insurers and policies reasonably acceptable to the Company. Consultant shall provide proof of such insurance to the Company on or prior to the Effective Date and at any time thereafter upon the Company's request therefor.

7. Documents, Records and Papers.

It is understood and agreed by the parties hereto that all documents, records and papers prepared by Consultant in connection with the services rendered by it under this Agreement shall be the permanent and exclusive property of Consultant and for Consultant's exclusive benefit and use. Consultant shall provide copies of any and all documents, records and papers, including in electronic format, to the Company as Consultant deems necessary in rendering its services under this Agreement.

8. Confidential and Proprietary Information and Intellectual Property.

(a) Confidential and Proprietary Information. Consultant acknowledges that during the term of this Agreement, it will be entrusted with and acquire confidential and proprietary information belonging to the Company or to which the Company has certain rights, including, but not limited to, intellectual property (as defined in Subparagraph (b) below), trade secrets, inventions, methods, data, manuals, proprietary commercial and financial information, patient lists, supplier lists, business processes, marketing information, computer software and programs and confidential sales and patient information. The parties agree that all confidential and proprietary information owned by the Company and provided to Consultant in rendering services under this Agreement shall continue to be owned by the Company, and Consultant shall acquire no rights or interest therein. The parties further agree that all confidential and proprietary information currently owned by Consultant and used by it in connection with the services provided

under this Agreement shall continue to be owned by Consultant, and the Company shall acquire no rights or interest therein under this Agreement.

(b) Intellectual Property. All intellectual property developed and created by Consultant while performing services under this Agreement shall be owned by Consultant, and the Company shall have no interest therein. "Intellectual Property" means patents, copyrights, trademarks, service marks and related property. Trademarks, trade names and service marks include those registered nationally and with any appropriate state office, as well as any distinctive mark, symbol, emblem or name used in commerce to identify and distinguish goods or services.

(c) Nondisclosure. Neither party shall disclose any confidential and proprietary information belonging to the other party to any person except under and pursuant to the terms of this Agreement or except to such of the party's principals, employees, contractors, suppliers and agents as may be necessary in connection with the performance of its services and/or obligations under this Agreement, or as otherwise required by law. Each party shall be responsible to the other party for any unauthorized disclosure of confidential and proprietary information owned by the other party.

9. Indemnification.

Consultant shall hold harmless and indemnify the Company, its members, employees, agents, successors and assigns from and against any and all liabilities, damages, expenses and claims, including attorneys' fees, from or attributable to any and all acts and/or omissions of Consultant, its owners, members, managers, employees, agents or contractors, relating to the services performed by Consultant under this Agreement. In case any action is brought against the Company by reason of any such claim, Consultant shall, upon notice from the Company, defend the same at Consultant's expense by counsel reasonably satisfactory to the Company.

10. Termination.

(a) Termination. Consultant may terminate this Agreement for any reason by providing written notice to the Company not less than sixty (60) days prior to such termination. The Company may terminate this Agreement for cause upon the occurrence of any of the following events: (i) Consultant's unauthorized attempted assignment or unauthorized attempted delegation of any of Consultant's rights or obligations under this Agreement; or (ii) Consultant or Tjalas' conviction of a felony or other crime involving moral turpitude, any criminal liability involving third party reimbursement or billing, or any conduct involving submission of a false claim to a third party payor. For any reason except Tjalas' death or disability, as described below, the Company shall provide Consultant with not less than ten (10) days' notice of its election to terminate this Agreement. This Agreement may also be terminated by either party if the other party is in any material respect in breach, default or violation of any provision of this Agreement and fails to cure such material breach, default or violation within thirty (30) days after the defaulting party's receipt of written notice thereof from the non-defaulting party, or if such breach, default or violation is of a type which cannot be cured within thirty (30) days, if during such

30-day period, the defaulting party fails to commence to cure such breach, default or violation and thereafter to diligently prosecute such cure to completion. This Agreement shall also terminate on the death or permanent disability of Tjalas. The term “permanent disability” shall be defined as the failure of Tjalas to render services for Consultant in the performance of Consultant’s duties and responsibilities hereunder for a total of 180 days or more during any 360-day period or for a period of 180 days or more during the entire term of this Agreement.

(b) Rights and Obligations. Upon termination of this Agreement for any reason, Consultant shall cease rendering the services described herein. Upon termination as a result of a breach, default or violation of this Agreement, the non-defaulting party may pursue whatever remedies may be available to it as a result, at law or in equity. Termination of this Agreement shall not release or discharge either party from any obligation, debt or liability which shall have previously accrued and which remains to be performed under this Agreement on or after the date of termination.

11. Relationship of Parties.

Consultant is rendering services to the Company as an independent contractor, and as such, it retains sole and absolute discretion and judgment in the manner and means to carry out its duties hereunder, subject to the terms and provisions of Paragraph 1. Consultant is under the control of the Company only as provided herein as to the nature of the services to be performed by Consultant under this Agreement. The parties shall not in any manner whatsoever be considered partners or co-venturers in any business enterprise. Consultant shall be solely responsible for all taxes of whatever nature whatsoever, federal, state, municipal and foreign, payable in connection with the performance of services under this Agreement. In addition, Consultant shall provide the Company with an appropriate certificate of workers’ compensation insurance, if required, or a waiver therefor, in accordance with applicable law. Neither the Company nor Consultant shall take any action whatsoever, nor shall the Company have or exercise such control over the manner in which Consultant performs services under this Agreement, so as to jeopardize Consultant’s independent contractor status.

12. Other Businesses and Activities.

Consultant may, for its own profit or advantage, and without the consent of the Company, render services to others during the term of this Agreement and may engage in other business activities relating thereto as it may determine.

13. Notices.

"Notice", as used in this Agreement, shall be deemed to mean and refer to the receipt of notice by the party to whom notice is sent, and any provision hereof requiring notice shall require receipt of notice by the party to whom notice is sent by the date and/or time specified. Any notice required hereunder shall be in writing and shall be delivered to the party or parties to whom it is directed, or shall be sent to such party or parties by first class mail, postage prepaid, in an envelope addressed to the party to receive notice, or by overnight delivery service, or by facsimile transmission to the facsimile number designated in this paragraph, or by email. So long

as notice is given as provided herein, it shall be deemed received by the party to whom it is sent on the date of delivery, in the case of delivery, or three (3) days after the date it is deposited in the United States mail, postage prepaid, in the case of mailing, or on the date of receipt as shown by the overnight delivery service receipt, in the case of overnight delivery, but not later than three (3) days after having been deposited with the overnight delivery service, delivery charges prepaid, or on the next business day after facsimile transmission to the recipient where confirmation of transmission thereof has been received by the sending party, in the case of facsimile transmission, or on the next business day following the date of email transmission to the appropriate email address set forth below where the email has been received by the recipient, in the case of email transmission. Notices to the parties shall be sent to:

If to Consultant:

Kirk Tjalas
____________________________
____________________________
520-334-0100
kirk@tjalashc.net

With a copy to:

Patrick J. Farrell, Esq.
GUST ROSENFELD P.L.C.
One South Church Avenue
Suite 1900
Tucson, Arizona 85701-1627
(520) 388-4789
(520) 624-3849
pfarrell@gustlaw.com

If to the Company:

Atlantic Home Health Care, LLC
____________________________
____________________________
____________________________
____________________________

With a copy to:

Scott MacDonald
DIXON & MacDONALD, P.C.
24901 Northwestern Highway
Suite 200
Southfield, Michigan 48075
(248) 865-8866
scottmac@dixon-macdonald.com

14. Entire Agreement.

This Agreement constitutes the entire agreement between the parties hereto pertaining to the subject matter herein and supersedes all prior and contemporaneous agreements, representations and understandings of the parties. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the party making the waiver.

15. Modification.

This Agreement may not be modified except by a written instrument signed by all the parties hereto.

16. Additional Documents.

Each of the parties hereto agrees to execute any and all additional documents as may be necessary to give full force and effect to the intent of the parties as provided herein.

17. Attorneys' Fees.

Should it be necessary for either party to this Agreement to employ the services of an attorney for the enforcement of the provisions contained herein, whether in a court proceeding or otherwise, including all services preceding any such proceeding, then the prevailing party to such enforcement action shall be entitled to recover from the other party all costs and expenses of whatever nature, including reasonable attorneys' fees, incurred as a result thereof.

18. Time of Essence.

Time is of the essence of all of the terms and provisions of this Agreement.

19. Effective Date.

The effective date ("Effective Date") of the Agreement shall be January 1, 2018.

20. Counterparts.

This Agreement may be executed in counterparts, and all counterparts so executed shall constitute one agreement, binding on all of the parties hereto, notwithstanding that all the parties are not signatories to the original or same counterpart. In addition, this Agreement may be executed by facsimile or electronic signatures of the parties thereto, and such signatures shall constitute valid and binding signatures for the purposes hereof.

21. Interpretation.

The terms of this Agreement shall be construed according to their fair meaning and not strictly for or against either party. The paragraph headings of this Agreement are inserted as a matter of convenience and reference only, and shall in no way define, limit or describe the scope or intent of this Agreement or in any way affect the terms and provisions hereof. Where the context of this Agreement requires, the use herein of the singular number shall be deemed to mean the plural, the plural shall be deemed to mean the singular, the masculine gender shall be deemed to mean the feminine or neuter, the feminine gender shall be deemed to mean the masculine or neuter, and the neuter gender shall be deemed to mean the masculine or feminine. The term "days," as used in this Agreement, shall mean calendar days.

22. Severability.

The invalidity of any provision of this Agreement, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

23. Governing Law, Jurisdiction & Venue.

This Agreement shall be deemed a contract under the laws of the State of Arizona, and the rights and obligations of the parties hereto shall be governed and interpreted by the laws of the State of Arizona without regard to conflicts of law provisions. The parties acknowledge,

understand and agree to jurisdiction of the State of Arizona in any dispute or enforcement proceeding involving this Agreement or arising in any manner hereunder, and the parties consent to personal jurisdiction in connection therewith, and agree that any such dispute and/or enforcement action shall be heard solely in the Superior Court of the State of Arizona in Pima County, Arizona.

24. Binding Effect.

The covenants herein contained shall extend to and be binding upon the heirs, assigns, successors, personal representatives, executors and administrators of the parties to this Agreement.

25. Governing Law.

This Agreement is being entered into in accordance with and shall be governed and interpreted by the laws of the State of Arizona.

26. Binding Effect.

The covenants herein contained shall extend to and be binding upon the heirs, assigns, successors, personal representatives, executors and administrators of the parties to this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement for the purposes herein expressed the day and year first above written.

| **COMPANY** | **CONSULTANT** |
|---|---|
| ATLANTIC HOME HEALTH CARE, LLC | TJALAS HEALTH CARE CONSULTING, LLC |
| By:______________________________ | By:________________________________ |
| JAMIN RUARK, Manager | KIRK TJALAS, Manager |

RYAN RAPP
PACHECO
SORENSEN PLC

# EXHIBIT 3

# ADDENDUM TO OPERATING AGREEMENT

THIS ADDENDUM is made and entered into this ______ day of January, 2018, by and among ACT NOW MANAGEMENT, LLC, an Arizona Limited Liability Company ("Act Now"), and HAVEN HOLDINGS MI, LLC, a Florida limited liability company ("Haven"), who are all of the Members (the "Members") of ATLANTIC HOME HEALTH CARE, LLC (the "Company"), and JAMIN RUARK, a ______ man, (the "Manager"), who is the Manager of the Company.

## RECITALS

1. Act Now and Haven are all of the Members of the Company with each of them owning a fifty (50%) percent member interest therein.

2. The parties wish to amend the Operating Agreement of the Company (the "Operating Agreement") in certain particulars, according to the terms and conditions contained in this Addendum.

## AGREEMENT

NOW THEREFORE, in consideration of the foregoing recitals, which are incorporated in and made a part of this Agreement, and in further consideration of the mutual and several covenants hereinafter contained, and for other good and valuable consideration by each party to the other delivered, the receipt and sufficiency of which are hereby acknowledged, the parties do hereby freely and voluntarily agree that the terms and provisions of the Operating Agreement are hereby amended as follows:

**1. Management.**

Management of the Company was changed to a member-managed limited liability company as provided in the Articles of Amendment of the Company filed with the Arizona Corporation Commission on October 6, 2014, but the Company has filed subsequent Articles of Amendment, changing the management of the Company to be manager-managed. Section 1.5 of the Operating Agreement is therefore hereby confirmed.

**2. Definitions.**

Sections 2.1 of the Operating Agreement is hereby amended to delete the word "Revised" in the definition of "Act."

**3. Number, Tenure and Qualifications of Managers.**

Section 6.2 of the Operating Agreement is hereby amended to state that as of the date of this Addendum, there shall be one Manager of the Company, and the Manager shall be Jamin Ruark.

**4. Fiduciary Duties.**

Section 6.3 of the Operating Agreement is hereby deleted in its entirety.

**5. Indemnification.**

Section 8.2 of the Operating Agreement is hereby amended by deleting items (iii) and (iv), and the second to the last sentence in that section is hereby amended to delete the reference to "(v)" and to substitute "(ii)" in its place.

**6. Substituted Members.**

Section 9.3(a) of the Operating Agreement is hereby amended by inserting the following clause at the beginning of the first sentence: "Except as otherwise provided in this Agreement."

**7. Option to Purchase Interest.**

Section 9.4 of the Operating Agreement is hereby amended by deleting the heading of that section in its entirety and substituting the following in its place: "**Right of First Refusal**."

**8. Death, Disability, Bankruptcy or Jeopardizing Act of Member - Generally.**

The following clause in the first sentence of Section 10.1 of the Operating Agreement: "the termination of the Member's employment with the Company (for any reason)" is hereby amended to provide as follows: "the termination of a Member's employment with the Company (for any reason if so employed by the Company)."

**9. Cash Distributions upon Dissolution.**

Section 11.2(iv) of the Operating Agreement is hereby deleted in its entirety, and the following is substituted in its place:

"Fifth, to the Members in proportion to their Percentage Interests."

**10. Books and Records.**

Section 12.2(b) of the Operating Agreement is hereby amended to delete the last clause in that sentence that provides as follows: "as specified in Section 605.0410 of the Act."

**11. Interpretation.**

Section 13.12 of the Operating Agreement is hereby deleted in its entirety, and the following is substituted in its place:

"The terms of this Agreement shall be construed according to their fair meaning and not strictly for or against either party. The paragraph headings of this Agreement are inserted as a matter of convenience and reference only, and shall in no way define, limit or describe the scope or intent of this Agreement or in any way affect the terms and provisions hereof. Where the context of this Agreement requires, the use herein of the singular number shall be deemed to mean the plural, the plural shall be deemed to mean the singular, the masculine gender shall be deemed to mean the feminine or neuter, the feminine gender shall be deemed to mean the masculine or

neuter and the neuter gender shall be deemed to mean the masculine or feminine. The term "days," as used in this Agreement, shall mean calendar days.

**12. Venue and Jurisdiction.**

Section 13.14 of the Operating Agreement is hereby deleted in its entirety, and the following is substituted in its place:

"This Agreement shall be deemed a contract under the laws of the State of Arizona, and the rights and obligations of the parties hereto shall be governed and interpreted by the laws of the State of Arizona. The parties acknowledge, understand and agree to jurisdiction of the State of Arizona in any dispute or enforcement proceeding involving this Agreement or arising in any manner hereunder, and the parties consent to personal jurisdiction in connection therewith, and agree that any such dispute and/or enforcement action shall be heard only in the United States District Court of Arizona, Tucson Division, or in the Superior Court of the State of Arizona in Pima County, Arizona."

**13. Notices.**

Section 13.18 of the Operating Agreement is hereby deleted in its entirety, and the following is substituted in its place:

"'Notice,' as used in this Agreement, shall be deemed to mean and refer to the receipt of notice by the party to whom notice is sent, and any provision hereof requiring notice shall require receipt of notice by the party to whom notice is sent by the date and/or time specified. Any notice required hereunder shall be in writing and shall be delivered to the party or parties to whom it is directed, or shall be sent to such party or parties by first class mail, postage prepaid, in an envelope addressed to the party to receive notice, or by overnight delivery service, or by facsimile transmission to the facsimile number designated in this paragraph, or by email. So long as notice is given as provided herein, it shall be deemed received by the party to whom it is sent on the date of delivery, in the case of delivery, or three (3) days after the date it is deposited in the United States mail, postage prepaid, in the case of mailing, or on the date of receipt as shown by the overnight delivery service receipt, in the case of overnight delivery, but not later than three (3) days after having been deposited with the overnight delivery service, delivery charges prepaid, or on the next business day after facsimile transmission to the recipient where confirmation of transmission thereof has been received by the sending party, in the case of facsimile transmission, or on the next business day following the date of email transmission to the appropriate email addresses set forth below where the email has been received by the recipient, in the case of email transmission. Notices to the parties shall be sent to:

| | |
|---|---|
| If to the Company: | Haven Holdings MI, LLC<br>Attn: Jamin Ruark<br>408 South Main Street<br>Plymouth, MI 48170<br>(734) 560-8953<br>(954) 337-3112 (facsimile)<br>jamin@havenhhc.com |
| If to Haven: | Jamin Ruark<br>408 South Main Street<br>Plymouth, MI 48170<br>(734) 560-8953<br>(954) 337-3112 (facsimile) |

With a copy to:

Scott McDonald
DIXON & McDONALD PC
24901 Northwestern Highway
Suite 200
South Field, MI 48075
(248) 865-8866
scottmac@dixon-mcdonald.com

If to Act Now:

Act Now Management, LLC
Attn: Kirk Tjalas
7620 North Hartman Lane
Suite 122
Tucson, Arizona 85743
(520)334-0100
kirk@tjalashc.net

With a copy to:

Patrick J. Farrell, Esq.
GUST ROSENFELD P.L.C.
One South Church Avenue
Suite 1900
Tucson, Arizona 85701-1627
(520) 388-4789
(520) 624-3849 (facsimile)
pfarrell@gustlaw.com

**14. Waiver of Dissenter or Appraisal Rights.**

Section 13.20 of the Operating Agreement is hereby deleted in its entirety.

**15. Tenants by the Entireties Ownership.**

Section 13.21 of the Operating Agreement is hereby deleted in its entirety.

**16. Attorneys' Fees**

Article 13 of the Operating Agreement is hereby amended by adding an additional section thereto as Section 13.23, entitled "Attorneys' Fees," to provide as follows:

"13.23 **Attorneys' Fees.** Should it be necessary for any party to this Agreement to employ the services of an attorney for the enforcement of the provisions contained herein, whether in a court proceeding or otherwise, including all services preceding any such proceeding, then the prevailing party to such enforcement action shall be entitled to recover from the other party all costs and expenses of whatever nature, including reasonable attorneys' fees, incurred as a result thereof."

**17. Remaining Terms and Provisions and Conflicts.**

All other terms and provisions of the Operating Agreement shall remain in full force and effect except as specifically modified by this Addendum. In the event of a conflict between the terms and provisions of this Addendum and the terms and provisions of the Operating Agreement, the terms and provisions of this Addendum shall control.

IN WITNESS WHEREOF, the parties hereto have executed this Addendum for the purposes herein expressed, the day and year first above written.

**COMPANY**

ATLANTIC HOME HEALTH CARE, LLC

By:______________________________
JAMIN RUARK, Manager

**MEMBERS**

ACT NOW MANAGEMENT, LLC

By:______________________________
KIRK TJALAS, Member

HAVEN HOLDINGS MI, LLC

By:______________________________

**SPOUSAL CONSENT TO ADDENDUM TO OPERATING AGREEMENT OF ATLANTIC HOME HEALTH CARE, LLC**

I, Yvette Tjalas, the undersigned, being the spouse of Kirk Tjalas, a Member of Act Now Management, LLC, an Arizona limited liability company, which is a Member of Atlantic Home Health Care, LLC, an Arizona limited liability company (the "Company"), have read the foregoing Addendum to Operating Agreement of the Company and the Operating Agreement of the Company, and I am fully informed of the covenants, agreements, terms, conditions and provisions contained therein, and affirmatively agree that such provisions shall be binding upon me during the term of and while the Operating Agreement, as amended, remains in effect, including in the event of divorce, the death of my spouse and the dissolution of the Company, including, but not limited to, the provisions thereof relating to the sale and purchase of the Interests of the Members of the Company and the ownership interests in the Company. Further, I agree that any interest I have in the Company, if any, whether in the nature of community, marital or other property interest, shall be governed by the terms and conditions of the Operating Agreement, as amended. In the event of the dissolution of my marriage to my spouse, I agree that any interest I may have in the Company shall be distributed to my spouse as part of the dissolution proceeding. I further acknowledge that the agreement of the other Member and the Company to the provisions of the Operating Agreement, as amended, is being given, in part, based upon the consideration of my execution of this Consent.

This Consent is executed by me concurrently with my spouse's execution of the Addendum to Operating Agreement of Atlantic Home Health Care, LLC, on this ______ day of January, 2018.

______________________________
YVETTE TJALAS

933052

**SPOUSAL CONSENT TO ADDENDUM TO OPERATING AGREEMENT OF ATLANTIC HOME HEALTH CARE, LLC**

I, ______________________, the undersigned, being the spouse of Jamin Ruark, a Member of Haven Holdings MI, LLC, a Florida limited liability company, which is a Member of Atlantic Home Health Care, LLC, an Arizona limited liability company, (the "Company"), have read the foregoing Addendum to Operating of the Company and the Operating Agreement of the Company, and I am fully informed of the covenants, agreements, terms, conditions and provisions contained therein, and affirmatively agree that such provisions shall be binding upon me during the term of and while the Operating Agreement, as amended, remains in effect, including in the event of divorce, the death of my spouse and the dissolution of the Company, including, but not limited to, the provisions thereof relating to the sale and purchase of the Interests of the Members of the Company and the ownership interests in the Company. Further, I agree that any interest I have in the Company, if any, whether in the nature of community, marital or other property interest, shall be governed by the terms and conditions of said the Operating Agreement, as amended. In the event of the dissolution of my marriage to my spouse, I agree that any interest I may have in the Company shall be distributed to my spouse as part of the dissolution proceeding. I further acknowledge that the agreement of the other Member and the Company to the provisions of the Operating Agreement, as amended, is being given, in part, based upon the consideration of my execution of this Consent.

This Consent is executed by me concurrently with my spouse's execution of the Addendum to Operating Agreement of Atlantic Home Health Care, LLC, on this ______ day of January, 2018.

______________________________
SPOUSE

RYAN RAPP
PACHECO
SORENSEN PLC

# EXHIBIT 4

**SECOND AMENDMENT TO REVISED AND RESTATED OPERATING AGREEMENT**

**OF**

**ATLANTIC HOME HEALTH CARE, LLC**
**An Arizona Limited Liability Company**

**THIS SECOND AMENDMENT TO REVISED AND RESTATED OPERATING AGREEMENT** ("Second Amendment") is made and entered into on this November ___, 2018, by and among ***Haven Holdings MI, LLC***, a Florida limited liability company, and Act Now Management, LLC, an Arizona limited liability company (the "Members"), and ***Atlantic Home Health Care, LLC***, an Arizona limited liability company (the "Company"), with reference to the following facts and circumstances, all of which are true and incorporated into this Second Amendment:

A. The Company is governed by a certain Revised and Restated Operating Agreement executed by the Company and its Members with an effective date of July 1, 2017, which identified the members of the Company as ***Haven Holdings MI, LLC*** and "***Act Now Management, LLC i.e. Kirk Tjalas et al***";

B. The Revised and Restated Operating Agreement was further amended by that certain Addendum to Operating Agreement with an effective date of April 1, 2018 (the "Revised and Restated Operating Agreement");

C. ***Kirk Tjalas*** executed a certain Assignment of membership interest to ***Act Now Management, LLC*** with an effective date of April 1, 2018, assigning all of his twenty percent (20%) membership interest in the Company to ***Act Now Management, LLC***;

D. ***Haven Holdings MI, LLC*** executed a certain Assignment of membership interest to ***Act Now Management, LLC*** with an effective date of April 1, 2018, assigning a thirty percent (30%) membership interest in the Company to ***Act Now Management, LLC***;

E. ***Jamin Ruark*** executed a certain Assignment of membership interest to ***Haven Holdings MI, LLC*** with an effective date of April 1, 2018, assigning all of his membership interest in the Company to ***Haven Holdings MI, LLC***; and

F. The Company and its Members have executed this Second Amendment to amend the schedule of membership attached as ***Exhibit A*** to the Amended and Restated Operating Agreement consistent with the above-described transactions.

**NOW, THEREFORE,** the Company and its Members do hereby covenant and agree as follows:

1. The terms used in this Second Amendment shall have the same meaning as in the Revised and Restated Operating Agreement unless otherwise specifically provided herein.

2. The schedule of membership attached as ***Exhibit A*** to the Revised and Restated Operating Agreement is hereby amended to reflect the transactions described in the above recitals, and to confirm, ratify and redeclare that, as of April 1, 2018, (a) ***Haven Holdings MI, LLC*** holds a fifty percent (50%) membership interest in the Company, and (b) ***Act Now Management, LLC*** holds a fifty percent (50%) membership interest in the Company. The amended schedule of membership ("***Schedule of Membership***") is attached as ***Exhibit A*** to this Second Amendment and made a part hereof.

3. This Second Amendment shall govern to the extent that it differs from or contradicts any terms or provisions of the Revised and Restated Operating Agreement. Notwithstanding anything herein to the contrary, however, all other terms and conditions of the Revised and Restated Operating Agreement are hereby ratified and redeclared. This Second Amendment may be executed in several counterparts, each of which will be deemed an original, but all of which will constitute one and the same. An electronic signature shall have the same force and effect as an original signature.

IN WITNESS WHEREOF, the parties hereunto have executed this Second Amendment and affixed their seals on the day and year first written above.

**COMPANY:**

***Atlantic Home Health Care, LLC***
An Arizona Limited Liability Company

By: [signature] Date: 4/1/19
Jamin Ruark
Its: Manager

**MEMBERS:**

***Haven Holdings MI, LLC***
A Florida Limited Liability Company

By: [signature] Date: 4/1/19
Jamin Ruark
Its: Manager

***Act Now Management, LLC***
An Arizona Limited Liability Company

By: [signature] PhD RN Date: 4-1-2019
Kirk Tjalas
Its: Member

## EXHIBIT A

## AMENDED SCHEDULE OF MEMBERSHIP

## ATLANTIC HOME HEALTH CARE, LLC

AS OF APRIL 1, 2018

| Members | Units | Percentage |
|---|---|---|
| Haven Holdings MI, LLC | 50 | 50% |
| Act Now Management, LLC | 50 | 50% |
| **Totals:** | **100** | **100%** |

RYAN RAPP
PACHECO
SORENSEN PLC

# **EXHIBIT 5**

# ASSIGNMENT

Jamin Ruark ("Assignor"), hereby assigns, transfers, sets over, grants and conveys to Haven Holdings MI, LLC ("Assignee"), a Florida limited liability company, all of Assignor's right, title and interest, including all voting, managerial and control rights, in and to all of Assignor's membership interests (the "Interest") in Atlantic Home Health Care, LLC, an Arizona limited liability company (the "Company"). The effective date of this Assignment shall be April 1, 2018.

DATED this _____ day of November, 2018.

JAMIN RUARK

## ACCEPTANCE AND ACKNOWLEDGMENT

Assignee hereby accepts the terms of this Assignment and the Interest transferred to it hereunder, and acknowledges and agrees to the terms and provisions of the Revised and Restated Operating Agreement of the Company, dated July 1, 2017, as amended (the "Operating Agreement"), and Assignee agrees to become a Substitute Member of the Company, as to the Interest transferred hereby, pursuant to the terms of the Operating Agreement, and to be bound by all the terms and conditions thereof.

DATED this _____ day of November, 2018.

HAVEN HOLDINGS MI, LLC

By: ______________________
JAMIN RUARK, Director, Board of Managers

///

///

///

956643

///

**APPROVAL AND CONSENT**

The Company and the other members hereby approve and consent to the above assignment as to the Interest assigned hereunder, effective as of April 1, 2018.

DATED this _____ day of November, 2018.

**COMPANY**

ATLANTIC HOME HEALTH CARE, LLC

By:_______________________
JAMIN RUARK, Manager

**MEMBERS**

HAVEN HOLDINGS MI, LLC

By:_______________________
JAMIN RUARK, Director, Board of Managers

ACT NOW MANAGEMENT, LLC

By: PhD RN
KIRK TJALAS, Member

956643

RYAN RAPP
PACHECO
SORENSEN PLC

# EXHIBIT 6

Arizona Corporation Commission - RECEIVED: 6/26/2018
Arizona Corporation Commission - FILED: 6/26/2018

18062606444628

DO NOT WRITE ABOVE THIS LINE; RESERVED FOR ACC USE ONLY.

# APPLICATION FOR REGISTRATION OF FOREIGN LIMITED LIABILITY COMPANY

*Please read Instructions L025i*

1. **ENTITY TYPE** – **check only one** to indicate the type of entity applying for registration:

   [■] LIMITED LIABILITY COMPANY    [ ] PROFESSIONAL LIMITED LIABILITY COMPANY

2. **NAME IN STATE OR COUNTRY OF FORMATION (FOREIGN NAME)** – enter the exact, true name of the foreign LLC:

   Atlantic Home Health Care, LLC

3. **NAME TO BE USED IN ARIZONA (ENTITY NAME)** – identify the name the foreign LLC will use in Arizona by checking 3.1 *or* 3.2 (check only one), and follow instructions:

   3.1 [ ] **Name in state or country of formation**, with no changes or additions – go to number 4 and continue.

   3.2 [■] **Fictitious name** – check this if the foreign LLC's name in its state or country of formation is not available for use in Arizona or if that name does not contain an LLC identifier, and enter the name in number 3.3 below. **NOTE** – a resolution of the company adopting the fictitious name must be attached to and submitted with this form.

   3.3 **If you checked 3.2**, enter or print the name to be used in Arizona:

   Haven Home Health Care, LLC

4. **PROFESSIONAL LIMITED LIABILITY COMPANY SERVICES** – if professional LLC is checked in number 1 above, describe the professional services that the professional LLC will provide (examples: law firm, accounting, medical):

5. **FOREIGN DOMICILE** – list the state or country in which the foreign LLC was formed:

   Delaware

6. **DATE OF FORMATION IN FOREIGN DOMICILE:** 05/15/2018

7. **PURPOSE OR GENERAL CHARACTER OF BUSINESS** – describe or state the purpose of the foreign LLC or the general character of the business it proposes to transact in Arizona:

   Home health care

**8. STATUTORY AGENT IN ARIZONA:**

| **8.1** *REQUIRED* – give the **name** (can be an individual or an entity) **and *physical or street address*** (not a P.O. Box) in Arizona of the statutory agent: | **8.2** *OPTIONAL* – mailing address in Arizona of statutory agent, if different from street address (can be a P.O. Box): |
|---|---|
| Jamin Ruark<br>Statutory Agent Name (required) | |
| Attention (optional) | Attention (optional) |
| 15551 N Greenway Hayden Loop, Suite 155<br>Address 1 | Address 1 |
| Address 2 (optional) | Address 2 (optional) |
| City Scottsdale / State AZ / Zip 85260 | City / State / Zip |

**8.3** *REQUIRED* – the Statutory Agent Acceptance form M002 must be submitted along with this Application For Registration.

**9. PRINCIPAL OFFICE ADDRESS - FOREIGN DOMICILE STREET ADDRESS –** *see Instructions L025I* – give the **physical or street address** (not a P. O. Box) of the foreign LLC required to be maintained in its state of organization, or, if not so required, of the foreign LLC's statutory agent in its state or country of organization:

| | | |
|---|---|---|
| Atlantic Home Health Care, LLC | | |
| Attention (optional): 1209 Orange Street | | |
| Address 1: Corporation Trust Center | | |
| Address 2 (optional): Wilmington | DE | 19801 |
| City / Country: UNITED STATES | State or Province | Zip |

**10. OPTIONAL – ARIZONA KNOWN PLACE OF BUSINESS ADDRESS:**

**10.1** Is the Arizona known place of business street address the same as the **street address** of the statutory agent?
- ☑ Yes - go to the next page and continue.
- ☐ No - complete number 10.2 and continue.

**10.2** If you answered "no" to number 10.1, give the physical or street address (not a P.O. Box) of the known place of business of the LLC in Arizona:

| | | |
|---|---|---|
| Attention (optional) | | |
| Address 1 | | |
| Address 2 (optional) | | |
| City / Country | State or Province | Zip |

18062606444628

***COMPLETE NUMBER 11 OR NUMBER 12 – NOT BOTH.***

**11. MANAGER-MANAGED LLC** – *see Instructions L025i* – check this box ☐ if management of the LLC is vested in a manager or managers, and complete and attach the Manager Structure Attachment form L040. *The filing will be rejected if it is submitted without the attachment.*

**12. MEMBER-MANAGED LLC** – *see Instructions L025i* – check this box ☒ if management of the LLC is reserved to the members, and complete and attach the Member Structure Attachment form L041. *The filing will be rejected if it is submitted without the attachment.*

**13. SIGNATURE:** By checking the box marked "I accept" below, I acknowledge *under penalty of law* that this document together with any attachments is submitted in compliance with Arizona law.

☑ I ACCEPT

| [signature] | Matthew Saagman | 6-14-18 |
|---|---|---|
| Signature | Printed Name | Date |

**REQUIRED** – check only one and fill in the corresponding blank if signing for an entity:

| | | |
|---|---|---|
| ☐ I am the individual **Manager** of this manager-managed LLC **or** I am signing for an **entity manager named:** | ☒ I am a **Member** of this member-managed LLC **or** I am signing for an **entity member named:** | ☐ I am a duly **authorized agent** for this LLC. |

| | |
|---|---|
| Filing Fee: $150.00 (regular processing)<br>Expedited processing – add $35.00 to filing fee.<br>All fees are nonrefundable - see Instructions. | Mail: Arizona Corporation Commission - Corporate Filings Section<br>1300 W. Washington St., Phoenix, Arizona 85007<br>Fax: 602-542-4100 |

Please be advised that A.C.C. forms reflect only the minimum provisions required by statute. You should seek private legal counsel for those matters that may pertain to the individual needs of your business.
All documents filed with the Arizona Corporation Commission are public record and are open for public inspection.
If you have questions after reading the Instructions, please call 602-542-3026 or (within Arizona only) 800-345-5819.

## COMPANY RESOLUTION

The undersigned Member, representing one hundred percent (100%) of the outstanding membership interests in ATLANTIC HOME HEALTH CARE, LLC, a Delaware limited liability company (the "Company"), consents in writing to the following action of the Company:

**WHEREAS**, due to the unavailability of its legal name in the State of Arizona, it is hereby:

> **RESOLVED**, that ATLANTIC HOME HEALTH CARE, LLC, organized and existing in the State of Delaware, hereby adopts the fictitious name of HAVEN HOME HEALTH CARE, LLC, for use in the State of Arizona for all purposes, and that all business and activities of the Company within the State of Arizona shall be carried out under such name.

This action would otherwise have been required or permitted to be taken pursuant to authorization voted at a meeting of the Members; and this written consent shall be filed with the minutes, and shall have the same effect as a vote of the Members for all purposes.

Signed this June 14, 2018.

**MEMBER:**

______________________ Dated: 6-14-18
Matthew Saagman

18062606444628

Clear Form Print Form

DO NOT WRITE ABOVE THIS LINE; RESERVED FOR ACC USE ONLY.

# STATUTORY AGENT ACCEPTANCE

*Please read Instructions M002i*

1. **ENTITY NAME** – give the **exact** name in Arizona of the corporation or LLC that has appointed the Statutory Agent (this must match exactly the name as listed on the document appointing the statutory agent, e.g., Articles of Organization or Article of Incorporation):

   Atlantic Home Health Care, LLC

2. **STATUTORY AGENT NAME** – give the exact name of the Statutory Agent appointed by the entity listed in number 1 above (this will be *either* an individual or an entity). *NOTE* - the name must match **exactly** the statutory agent name as listed in the document that appoints the statutory agent (e.g. Articles of Incorporation or Articles of Organization), including any middle initial or suffix:

   Jamin Ruark

3. **STATUTORY AGENT SIGNATURE:**

   By the signature appearing below, the individual or entity named in number 2 above accepts the appointment as statutory agent for the entity named in number 1 above, and acknowledges that the appointment is effective until the appointing entity replaces the statutory agent or the statutory agent resigns, whichever occurs first.

   The person signing below declares and certifies *under penalty of perjury* that the information contained within this document together with any attachments is true and correct, and is submitted in compliance with Arizona law.

[signature] Signature — Jamin Ruark Printed Name — 6/15/18 Date

**REQUIRED** – check only one:

| | |
|---|---|
| ☒ **Individual as statutory agent:** I am signing on behalf of myself as the individual (natural person) named as statutory agent. | ☐ **Entity as statutory agent:** I am signing on behalf of the entity named as statutory agent, and I am authorized to act for that entity. |

| | |
|---|---|
| Filing Fee: none (regular processing)<br>Expedited processing – not applicable.<br>All fees are nonrefundable - see Instructions. | Mail: Arizona Corporation Commission - Corporate Filings Section<br>1300 W. Washington St., Phoenix, Arizona 85007<br>Fax: 602-542-4100 |

Please be advised that A.C.C. forms reflect only the **minimum** provisions required by statute. You should seek private legal counsel for those matters that may pertain to the individual needs of your business.
All documents filed with the Arizona Corporation Commission are **public record** and are open for public inspection.
If you have questions after reading the Instructions, please call 602-542-3026 or (within Arizona only) 800-345-5819.

18062606444628

DO NOT WRITE ABOVE THIS LINE; RESERVED FOR ACC USE ONLY.

# MEMBER STRUCTURE ATTACHMENT

1. **ENTITY NAME** – give the exact name of the LLC (foreign LLCs – give name in domicile state or country):
Atlantic Home Health Care, LLC

2. **A.C.C. FILE NUMBER** (if known): ______
Find the A.C.C. file number on the upper corner of filed documents OR on our website at: http://www.azcc.gov/Divisions/Corporations

3. **Check one box only to indicate what document the Attachment goes with:**
- ☐ Articles of Organization
- ☒ Application for Registration
- ☐ Articles of Amendment
- ☐ Articles of Amendment to Application for Registration

4. **MEMBERS** – give the name and address of all **Members.** If more space is needed, use another Member Structure Attachment form.

| | |
|---|---|
| Name: Matthew Saagman<br>Address 1: 855 Penniman Ave., Suite 6426<br>Address 2 (optional):<br>City: Plymouth State or Province: MI Zip: 48170<br>Country: UNITED STATES | Name:<br>Address 1:<br>Address 2 (optional):<br>City: State or Province: Zip:<br>Country: |
| Name:<br>Address 1:<br>Address 2 (optional):<br>City: State or Province: Zip:<br>Country: | Name:<br>Address 1:<br>Address 2 (optional):<br>City: State or Province: Zip:<br>Country: |
| Name:<br>Address 1:<br>Address 2 (optional):<br>City: State or Province: Zip:<br>Country: | Name:<br>Address 1:<br>Address 2 (optional):<br>City: State or Province: Zip:<br>Country: |

18062606444628

# Delaware

The First State

Page 1

*I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "ATLANTIC HOME HEALTH CARE, LLC" IS DULY FORMED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE THIRTEENTH DAY OF JUNE, A.D. 2018.*

*AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL TAXES HAVE BEEN ASSESSED TO DATE.*

Jeffrey W. Bullock, Secretary of State

6886353 8300

SR# 20185130423

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 202875798

Date: 06-13-18

RYAN RAPP
PACHECO
SORENSEN PLC

# EXHIBIT 7

651121

**Schedule K-1 (Form 1065)** **2022**
Department of the Treasury
Internal Revenue Service

For calendar year 2022, or tax year beginning ______ ending ______

## Partner's Share of Income, Deductions, Credits, etc.

See separate instructions.

☐ Final K-1 ☐ Amended K-1 OMB No. 1545-0123

### Part I Information About the Partnership

A Partnership's employer identification number
36-[redacted]

B Partnership's name, address, city, state, and ZIP code

ATLANTIC HOME HEALTH CARE LLC
15551 N GREENWAY-HAYDEN LOOP
SCOTTSDALE, AZ 85260

C IRS center where partnership filed return:
E-FILE

D ☐ Check if this is a publicly traded partnership (PTP)

### Part II Information About the Partner

E Partner's SSN or TIN (Do not use TIN of a disregarded entity. See instructions.)
522-41-[redacted]

F Name, address, city, state, and ZIP code for partner entered in E. See instructions.

KIRK TJALAS
7620 N HARTMAN LN STE 180
TUCSON, AZ 85743

G ☐ General partner or LLC member-manager ☒ Limited partner or other LLC member

H1 ☒ Domestic partner ☐ Foreign partner

H2 ☒ If the partner is a disregarded entity (DE), enter the partner's:
TIN 92-[redacted] Name ACT NOW HEALTHCARE SOL

I1 What type of entity is this partner? INDIVIDUAL

I2 If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

J Partner's share of profit, loss, and capital:

| | Beginning | Ending |
|---|---|---|
| Profit | 50.0000000 % | 50.0000000 % |
| Loss | 50.0000000 % | 50.0000000 % |
| Capital | 50.0000000 % | 50.0000000 % |

Check if decrease is due to sale or exchange of partnership interest ☐

K Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse | $ 2,160,851. | $ 3,845,653. |
| Qualified nonrecourse financing | $ | $ |
| Recourse | $ 199,129. | $ 0. |

Check this box if Item K includes liability amounts from lower-tier partnerships ☐

L **Partner's Capital Account Analysis**

| | |
|---|---|
| **Beginning capital account** | $ 619,678. |
| Capital contributed during the year | $ |
| Current year net income (loss) | $ -41,065. |
| Other increase (decrease) (attach explanation) | $ 708,954. |
| Withdrawals and distributions | $( ) |
| **Ending capital account** | $ 1,287,567. |

M Did the partner contribute property with a built-in gain (loss)?
☐ Yes ☒ No If "Yes," attach statement. See instructions.

N **Partner's Share of Net Unrecognized Section 704(c) Gain or (Loss)**
Beginning $
Ending $

### Part III Partner's Share of Current Year Income, Deductions, Credits, and Other Items

| Box | Amount | Box | Code | Amount |
|---|---|---|---|---|
| 1 Ordinary business income (loss) | -41,065. | 14 Self-employment earnings (loss) | A | 0. |
| 2 Net rental real estate income (loss) | | 15 Credits | | |
| 3 Other net rental income (loss) | | 16 Schedule K-3 is attached if checked ☒ | | |
| 4a Guaranteed payments for services | | 17 Alternative min tax (AMT) items | | |
| 4b Guaranteed payments for capital | | | | |
| 4c Total guaranteed payments | | 18 Tax-exempt income and nondeductible expenses | | |
| 5 Interest income | | | | |
| 6a Ordinary dividends | | | | |
| 6b Qualified dividends | | 19 Distributions | | |
| 6c Dividend equivalents | | | | |
| 7 Royalties | | 20 Other information | N | * 28,134. |
| 8 Net short-term capital gain (loss) | | | Z | * STMT |
| | | | AG | * 45,389,338. |
| 9a Net long-term capital gain (loss) | | | | |
| 9b Collectibles (28%) gain (loss) | | | | |
| 9c Unrecaptured section 1250 gain | | | | |
| 10 Net section 1231 gain (loss) | | | | |
| 11 Other income (loss) | | | | |
| 12 Section 179 deduction | | 21 Foreign taxes paid or accrued | | |
| 13 Other deductions | | | | |

22 ☐ More than one activity for at-risk purposes*
23 ☐ More than one activity for passive activity purposes*
*See attached statement for additional information.

For IRS Use Only

SCHEDULE K-1 BUSINESS INTEREST EXPENSE, BOX 20, CODE N

| DESCRIPTION | PARTNER FILING INSTRUCTIONS | AMOUNT |
|---|---|---|
| BUSINESS INTEREST EXPENSE (INCLUDED IN ORDINARY BUSINESS INCOME (LOSS)) | SEE PARTNERS INSTRUCTIONS | 28,134. |
| TOTAL TO SCHEDULE K-1, BOX 20, CODE N | | 28,134. |

SCHEDULE K-1 SECTION 199A INFORMATION, BOX 20, CODE Z

| DESCRIPTION | AMOUNT |
|---|---|
| TRADE OR BUSINESS - X - SSTB | |
| ORDINARY INCOME (LOSS) | -41,065. |
| W-2 WAGES | 9,864,711. |
| UNADJUSTED BASIS OF ASSETS | 38,305. |

SCHEDULE K-1 SECTION 199A ADDITIONAL INFORMATION

THE SECTION 199A AMOUNTS TO BE USED IN THE CALCULATION OF QUALIFIED BUSINESS INCOME DEDUCTION ON YOUR 1040/1041 RETURN ARE REPORTED ON LINE 20, UNDER CODE Z. PLEASE CONSULT YOUR TAX ADVISOR REGARDING THE CALCULATION OF THE QUALIFIED BUSINESS INCOME DEDUCTION, INCLUDING THE POSSIBLE AGGREGATIONS AND LIMITATIONS THAT MAY APPLY AND THE FILING OF THE 1.199A-4(C)(2)(I) ANNUAL DISCLOSURE STATEMENT.

SCHEDULE K-1 GROSS RECEIPTS FOR SECTION 448(C), BOX 20, CODE AG

| DESCRIPTION | PARTNER FILING INSTRUCTIONS | AMOUNT |
|---|---|---|
| GROSS RECEIPTS - CURRENT YEAR | SEE IRS SCH. K-1 INSTRUCTIONS | 14,929,564. |
| GROSS RECEIPTS FIRST PRECEDING YEAR | | 11,464,802. |
| GROSS RECEIPTS SECOND PRECEDING YEAR | | 11,498,809. |
| GROSS RECEIPTS THIRD PRECEDING YEAR | | 7,496,163. |
| TOTAL TO SCHEDULE K-1, LINE 20 AG | | 45,389,338. |

SCHEDULE K-1 IRC SEC. 163(J) ADJUSTED TAXABLE INCOME CALCULATION

| DESCRIPTION | AMOUNT |
|---|---|
| TAXABLE INCOME | -41,065. |
| BUSINESS INTEREST EXPENSE NOT FROM A PASS-THROUGH | 28,134. |
| ADJUSTED TAXABLE INCOME | -12,931. |

SCHEDULE K-1 IRC SEC. 163(J) BUSINESS INTEREST EXPENSE LIMITATION

THE ENTITY IS A SMALL BUSINESS AND UNDER IRC SEC. 163(J)(3) IT IS EXEMPT FROM THE IRC SEC. 163(J) BUSINESS INTEREST EXPENSE LIMITATION.

| DESCRIPTION | AMOUNT |
|---|---|
| ADJUSTED TAXABLE INCOME | -12,931. |
| BUSINESS INTEREST EXPENSE | 28,134. |
| BUSINESS INTEREST INCOME | 0. |

## List of Codes and References Used in Schedule K-1 (Form 1065)

| Box Number / Item | | Where to report or where to find further reporting information. Page numbers refer to these instructions. |
|---|---|---|
| 1. Ordinary business income (loss). Determine whether the income (loss) is passive or nonpassive and enter on your return as follows. | | |
| | Passive loss | See page 8 |
| | Passive income | Schedule E (Form 1040), line 28, column (h) |
| | Nonpassive loss | See page 8 |
| | Nonpassive income | Schedule E (Form 1040), line 28, column (k) |
| 2. Net rental real estate income (loss) | | See page 8 |
| 3. Other net rental income (loss) | | |
| | Net income | Schedule E (Form 1040), line 28, column (h) |
| | Net loss | See Instructions for Form 8582 |
| 4a. Guaranteed payment services | | See Instructions for Schedule E (Form 1040) |
| 4b. Guaranteed payment capital | | See Instructions for Schedule E (Form 1040) |
| 4c. Guaranteed payment total | | See page 8 |
| 5. Interest income | | Form 1040 or 1040-SR, line 2b |
| 6a. Ordinary dividends | | Form 1040 or 1040-SR, line 3b |
| 6b. Qualified dividends | | Form 1040 or 1040-SR, line 3a |
| 6c. Dividend equivalents | | See page 9 |
| 7. Royalties | | Schedule E (Form 1040), line 4 |
| 8. Net short-term capital gain (loss) | | Schedule D (Form 1040), line 5 |
| 9a. Net long-term capital gain (loss) | | Schedule D (Form 1040), line 12 |
| 9b. Collectibles (28%) gain (loss) | | 28% Rate Gain Worksheet, line 4 (Schedule D instructions) |
| 9c. Unrecaptured section 1250 gain | | See page 9 |
| 10. Net section 1231 gain (loss) | | See page 9 |
| 11. Other income (loss) | | |
| | Code A. Other portfolio income (loss) | See page 9 |
| | Code B. Involuntary conversions | See page 9 |
| | Code C. Section 1256 contracts & straddles | Form 6781, line 1 |
| | Code D. Mining exploration costs recapture | See Pub. 535 |
| | Code E. Cancellation of debt | See page 10 |
| | Code F. Section 743(b) positive adjustments | See page 10 |
| | Code G. Reserved for future use | |
| | Code H. Section 951(a) income inclusions | See page 10 |
| | Code I. Other income (loss) | See page 10 |
| 12. Section 179 deduction | | See page 11 |
| 13. Other deductions | | |
| | Code A. Cash contributions (60%) | See page 11 |
| | Code B. Cash contributions (30%) | See page 11 |
| | Code C. Noncash contributions (50%) | See page 11 |
| | Code D. Noncash contributions (30%) | See page 12 |
| | Code E. Capital gain property to a 50% organization (30%) | See page 12 |
| | Code F. Capital gain property (20%) | See page 12 |
| | Code G. Contributions (100%) | See page 12 |
| | Code H. Investment interest expense | Form 4952, line 1 |
| | Code I. Deductions - royalty income | Schedule E (Form 1040), line 19 |
| | Code J. Section 59(e)(2) expenditures | See page 12 |
| | Code K. Excess business interest expense | See page 12 |
| | Code L. Deductions - portfolio income (other) | Schedule A (Form 1040), line 16 |
| | Code M. Amounts paid for medical insurance | Schedule A (Form 1040), line 1; or Schedule 1 (Form 1040), line 17 |
| | Code N. Educational assistance benefits | See page 12 |
| | Code O. Dependent care benefits | Form 2441, line 12 |
| | Code P. Preproductive period expenses | See page 12 |
| | Code Q. Reserved for future use | |
| | Code R. Pensions and IRAs | See page 12 |
| | Code S. Reforestation expense deduction | See page 13 |
| | Codes T through U. Reserved for future use | |
| | Code V. Section 743(b) negative adjustments | See page 13 |
| | Code W. Other deductions | See page 13 |
| 14. Self-employment earnings (loss) | | |
| | **Note.** If you have a section 179 deduction or any partner-level deductions, see page 13 before completing Schedule SE (Form 1040). | |
| | Code A. Net earnings (loss) from self-employment | Schedule SE (Form 1040) |
| | Code B. Gross farming or fishing income | See page 13 |

| Box Number / Item | | Where to report or where to find further reporting information. Page numbers refer to these instructions. |
|---|---|---|
| 15. Credits | | |
| | Code A. Reserved for future use | |
| | Code B. Reserved for future use | |
| | Code C. Low-income housing credit (section 42(j)(5)) from post-2007 buildings | See page 13 |
| | Code D. Low-income housing credit (other) from post-2007 buildings | See page 13 |
| | Code E. Qualified rehabilitation expenditures (rental real estate) | See page 14 |
| | Code F. Other rental real estate credits | See page 14 |
| | Code G. Other rental credits | See page 14 |
| | Code H. Undistributed capital gains credit | Schedule 3 (Form 1040), line 13a |
| | Code I. Biofuel producer credit | See page 14 |
| | Code J. Work opportunity credit | See page 14 |
| | Code K. Disabled access credit | See page 14 |
| | Code L. Empowerment zone employment credit | See page 14 |
| | Code M. Credit for increasing research activities | See page 14 |
| | Code N. Credit for employer social security and Medicare taxes | See page 14 |
| | Code O. Backup withholding | See page 14 |
| | Code P. Other credits | See page 14 |
| 17. Alternative minimum tax (AMT) items | | |
| | Code A. Post-1986 depreciation adjustment | See Instructions for Form 6251 |
| | Code B. Adjusted gain or loss | See Instructions for Form 6251 |
| | Code C. Depletion (other than oil & gas) | See Instructions for Form 6251 |
| | Code D. Oil, gas, and geothermal - gross income | See Instructions for Form 6251 |
| | Code E. Oil, gas, and geothermal - deductions | See Instructions for Form 6251 |
| | Code F. Other AMT items | See Instructions for Form 6251 |
| 18. Tax-exempt income and nondeductible expenses | | |
| | Code A. Tax-exempt interest income | Form 1040 or 1040-SR, line 2a |
| | Code B. Other tax-exempt income | See page 15 |
| | Code C. Nondeductible expenses | See page 15 |
| 19. Distributions | | |
| | Code A. Cash and marketable securities | See page 15 |
| | Code B. Distribution subject to section 737 | See page 15 |
| | Code C. Other property | See page 15 |
| 20. Other information | | |
| | Code A. Investment income | Form 4952, line 4a |
| | Code B. Investment expenses | Form 4952, line 5 |
| | Code C. Fuel tax credit information | Form 4136 |
| | Code D. Qualified rehabilitation expenditures (other than rental real estate) | See page 16 |
| | Code E. Basis of energy property | See page 16 |
| | Code F. Recapture of low-income housing credit for section 42(j)(5) partnerships | See page 16 |
| | Code G. Recapture of low-income housing credit for other partnerships | See page 16 |
| | Code H. Recapture of investment credit | See Form 4255 |
| | Code I. Recapture of other credits | See page 16 |
| | Code J. Look-back interest-completed long-term contracts | See Form 8697 |
| | Code K. Look-back interest-income forecast method | See Form 8866 |
| | Code L. Dispositions of property with section 179 deductions | See page 16 |
| | Code M. Recapture of section 179 deduction | See page 16 |
| | Code N. Business interest expense (information item) | See page 16 |
| | Code O. Section 453(l)(3) information | Schedule 2 (Form 1040), line 14 |
| | Code P. Section 453A(c) information | Schedule 2 (Form 1040), line 15 |
| | Code Q. Section 1260(b) information | Schedule 2 (Form 1040), line 17z |
| | Code R. Interest allocable to production expenditures | See Regulations sections 1.263A-8 through -15 |
| | Code S. Capital construction fund (CCF) nonqualified withdrawals | Schedule 2 (Form 1040), line 17z |
| | Code T. Depletion deduction | See Pub. 535 |
| | Code U. Section 743(b) basis adjustment | See page 17 |
| | Code V. Unrelated business taxable income | See page 17 |
| | Code W. Precontribution gain (loss) | Form 8949 and/or Schedule D (Form 1040); or Form 4797 |
| | Code X. Reserved for future use | |
| | Code Y. Net investment income | See Instructions for Form 8960 |

| Box Number / Item | | Where to report or where to find further reporting information. Page numbers refer to these instructions. |
|---|---|---|
| | Code Z. Section 199A information | Form 8995 or Form 8995-A |
| | Code AA. Section 704(c) information | See page 18 |
| | Code AB. Section 751 gain (loss) | See page 18 |
| | Code AC. Section 1(h)(5) gain (loss) | See page 18 |
| | Code AD. Deemed section 1250 unrecaptured gain | See page 18 |
| | Code AE. Excess taxable income | See Instructions for Form 8990 |
| | Code AF. Excess business interest income | See page 18 |
| | Code AG. Gross receipts for section 448(c) | See page 18 |
| | Code AH. Other information | See page 18 |
| 21. Foreign taxes paid or accrued | | See page 19 |

☐ Final K-3 ☐ Amended K-3

**Schedule K-3 (Form 1065)**

Department of the Treasury
Internal Revenue Service

# Partner's Share of Income, Deductions, Credits, etc.-International

For calendar year 2022, or tax year beginning ________, ending ________

**See separate instructions.**

OMB No. 1545-0123

**2022**

| Information About the Partnership | Information About the Partner |
|---|---|
| **A** Partnership's employer identification number (EIN)<br>36-[redacted] | **C** Partner's SSN or Taxpayer Identification Number (TIN) (Do not use TIN of a disregarded entity. See instructions.)<br>522-41-[redacted] |
| **B** Partnership's name, address, city, state, and ZIP code<br>ATLANTIC HOME HEALTH CARE LLC<br>15551 N GREENWAY-HAYDEN LOOP<br>SCOTTSDALE, AZ 85260 | **D** Name, address, city, state, and ZIP code for partner entered in C. See instr.<br>KIRK TJALAS<br>7620 N HARTMAN LN STE 180<br>TUCSON, AZ 85743 |

**E** Check to indicate the parts of Schedule K-3 that apply.

| | | Line | Yes | No |
|---|---|---|---|---|
| 1 | Does Part I apply? If "Yes," complete and attach Part I | 1 | | X |
| 2 | Does Part II apply? If "Yes," complete and attach Part II | 2 | X | |
| 3 | Does Part III apply? If "Yes," complete and attach Part III | 3 | X | |
| 4 | Does Part IV apply? If "Yes," complete and attach Part IV | 4 | X | |
| 5 | Does Part V apply? If "Yes," complete and attach Part V | 5 | | X |
| 6 | Does Part VI apply? If "Yes," complete and attach Part VI | 6 | | X |
| 7 | Does Part VII apply? If "Yes," complete and attach Part VII | 7 | | X |
| 8 | Does Part VIII apply? If "Yes," complete and attach Part VIII | 8 | | X |
| 9 | Does Part IX apply? If "Yes," complete and attach Part IX | 9 | X | |
| 10 | Does Part X apply? If "Yes," complete and attach Part X | 10 | X | |
| 11 | Does Part XI apply? If "Yes," complete and attach Part XI | 11 | | X |
| 12 | Reserved for future use | 12 | | |
| 13 | Does Part XIII apply? If "Yes," complete and attach Part XIII | 13 | | X |

For IRS Use Only

| Name of partnership | EIN | Name of partner | SSN or TIN |
|---|---|---|---|
| ATLANTIC HOME HEALTH CARE LLC | 36-[redacted] | KIRK TJALAS | 522-41-[redacted] |

**Part I Partner's Share of Partnership's Other Current Year International Information**

Check box(es) for additional specified attachments. See instructions.

- ☐ 1. Gain on personal property sale
- ☐ 2. Foreign oil and gas taxes
- ☐ 3. Splitter arrangements
- ☐ 4. Foreign tax translation
- ☐ 5. High-taxed income
- ☐ 6. Section 267A disallowed deduction
- ☐ 7. Form 8858 information
- ☐ 8. Form 5471 information
- ☐ 9. Other forms
- ☐ 10. Partner loan transactions
- ☐ 11. Dual consolidated loss
- ☐ 12. Form 8865 information
- ☐ 13. Other international items (attach description and statement)

**Part II Foreign Tax Credit Limitation**

**Section 1 - Gross Income**

| Description | (a) U.S. source | Foreign Source | | | | (f) Sourced by partner | (g) Total |
|---|---|---|---|---|---|---|---|
| | | (b) Foreign branch category income | (c) Passive category income | (d) General category income | (e) Other (category code ) | | |
| 1 Sales | | | | | | | |
| A | | | | | | | |
| B | | | | | | | |
| C | | | | | | | |
| 2 Gross income from performance of services | | | | | | | |
| A US | 14,929,564. | 0. | 0. | 0. | 0. | 0. | 14,929,564. |
| B | | | | | | | |
| C | | | | | | | |
| 3 Gross rental real estate income | | | | | | | |
| A | | | | | | | |
| B | | | | | | | |
| C | | | | | | | |
| 4 Other gross rental income | | | | | | | |
| A | | | | | | | |
| B | | | | | | | |
| C | | | | | | | |
| 5 Guaranteed payments | | | | | | | |
| 6 Interest income | | | | | | | |
| A | | | | | | | |
| B | | | | | | | |
| C | | | | | | | |
| 7 Ordinary dividends (exclude amount on line 8) | | | | | | | |
| A | | | | | | | |
| B | | | | | | | |
| C | | | | | | | |



224172 12-07-22

| Name of partnership | EIN | Name of partner | SSN or TIN |
|---|---|---|---|
| ATLANTIC HOME HEALTH CARE LLC | 36-[redacted] | KIRK TJALAS | 522-41-[redacted] |

**Part II Foreign Tax Credit Limitation** *(continued)*

**Section 1 - Gross Income** *(continued)*

| Description | (a) U.S. source | Foreign Source | | | | (f) Sourced by partner | (g) Total |
|---|---|---|---|---|---|---|---|
| | | (b) Foreign branch category income | (c) Passive category income | (d) General category income | (e) Other (category code ) | | |
| 8 Qualified dividends | | | | | | | |
| A | | | | | | | |
| B | | | | | | | |
| C | | | | | | | |
| 9 Reserved for future use | | | | | | | |
| 10 Royalties and license fees | | | | | | | |
| A | | | | | | | |
| B | | | | | | | |
| C | | | | | | | |
| 11 Net short-term capital gain | | | | | | | |
| A | | | | | | | |
| B | | | | | | | |
| C | | | | | | | |
| 12 Net long-term capital gain | | | | | | | |
| A | | | | | | | |
| B | | | | | | | |
| C | | | | | | | |
| 13 Collectibles (28%) gain | | | | | | | |
| A | | | | | | | |
| B | | | | | | | |
| C | | | | | | | |
| 14 Unrecaptured section 1250 gain | | | | | | | |
| A | | | | | | | |
| B | | | | | | | |
| C | | | | | | | |
| 15 Net section 1231 gain | | | | | | | |
| A | | | | | | | |
| B | | | | | | | |
| C | | | | | | | |



224173 12-07-22

| Name of partnership | EIN | Name of partner | SSN or TIN |
|---|---|---|---|
| ATLANTIC HOME HEALTH CARE LLC | 36-[redacted] | KIRK TJALAS | 522-41-[redacted] |

## Part II Foreign Tax Credit Limitation *(continued)*

### Section 1 - Gross Income *(continued)*

| Description | (a) U.S. source | Foreign Source: (b) Foreign branch category income | (c) Passive category income | (d) General category income | (e) Other (category code ) | (f) Sourced by partner | (g) Total |
|---|---|---|---|---|---|---|---|
| 16 Section 986(c) gain | | | | | | | |
| 17 Section 987 gain | | | | | | | |
| 18 Section 988 gain | | | | | | | |
| 19 Section 951(a) inclusions | | | | | | | |
| A | | | | | | | |
| B | | | | | | | |
| C | | | | | | | |
| 20 Other income (see instructions) | | | | | | | |
| A | | | | | | | |
| B | | | | | | | |
| C | | | | | | | |
| 21 Reserved for future use | | | | | | | |
| A | | | | | | | |
| B | | | | | | | |
| C | | | | | | | |
| 22 Reserved for future use | | | | | | | |
| A | | | | | | | |
| B | | | | | | | |
| C | | | | | | | |
| 23 Reserved for future use | | | | | | | |
| A | | | | | | | |
| B | | | | | | | |
| C | | | | | | | |
| 24 **Total gross income** (combine lines 1 through 23) | 14,929,564. | | | | | | 14,929,564. |
| A US | 14,929,564. | 0. | 0. | 0. | 0. | 0. | 14,929,564. |
| B | | | | | | | |
| C | | | | | | | |



224174 12-07-22

| Name of partnership | EIN | Name of partner | SSN or TIN |
|---|---|---|---|
| ATLANTIC HOME HEALTH CARE LLC | 36-[redacted] | KIRK TJALAS | 522-41-[redacted] |

**Part II Foreign Tax Credit Limitation** *(continued)*

## Section 2 - Deductions

| Description | (a) U.S. source | Foreign Source | | | | (f) Sourced by partner | (g) Total |
|---|---|---|---|---|---|---|---|
| | | (b) Foreign branch category income | (c) Passive category income | (d) General category income | (e) Other (category code ) | | |
| 25 Expenses allocable to sales income | | | | | | | |
| 26 Expenses allocable to gross income from performances of services | 14,927,968. | | | | | | 14,927,968. |
| 27 Net short-term capital loss | | | | | | | |
| 28 Net long-term capital loss | | | | | | | |
| 29 Collectibles loss | | | | | | | |
| 30 Net section 1231 loss | | | | | | | |
| 31 Other losses | | | | | | | |
| 32 Research & experimental (R&E) expenses | | | | | | | |
| A SIC code: | | | | | | | |
| B SIC code: | | | | | | | |
| C SIC code: | | | | | | | |
| 33 Allocable rental expenses - depreciation, depletion, and amortization | | | | | | | |
| 34 Allocable rental expenses - other than depreciation, depletion, and amortization | | | | | | | |
| 35 Allocable royalty and licensing expenses - depreciation, depletion, and amortization | | | | | | | |
| 36 Allocable royalty and licensing expenses - other than depreciation, depletion, and amortization | | | | | | | |
| 37 Depreciation not included on line 33 or 35 | 14,527. | | | | | | 14,527. |
| 38 Charitable contributions | | | | | | | |
| 39 Interest expense specifically allocable under Regulations section 1.861-10(e) | | | | | | | |
| 40 Other interest expense specifically allocable under Regulations section 1.861-10T | | | | | | | |
| 41 Other interest expense - business | | | | | | 28,134. | 28,134. |
| 42 Other interest expense - investment | | | | | | | |
| 43 Other interest expense - passive activity | | | | | | | |
| 44 Section 59(e)(2) expenditures, excluding R&E expenses on line 32 | | | | | | | |
| 45 Foreign taxes not creditable but deductible | | | | | | | |

| Name of partnership | EIN | Name of partner | SSN or TIN |
|---|---|---|---|
| ATLANTIC HOME HEALTH CARE LLC | 36-[redacted] | KIRK TJALAS | 522-41-[redacted] |

**Part II Foreign Tax Credit Limitation** *(continued)*

**Section 2 - Deductions** *(continued)*

| Description | (a) U.S. source | Foreign Source: (b) Foreign branch category income | (c) Passive category income | (d) General category income | (e) Other (category code ) | (f) Sourced by partner | (g) Total |
|---|---|---|---|---|---|---|---|
| 46 Section 986(c) loss | | | | | | | |
| 47 Section 987 loss | | | | | | | |
| 48 Section 988 loss | | | | | | | |
| 49 Other allocable deductions (see instructions) | | | | | | | |
| 50 Other apportioned share of deductions (see instructions) | | | | | | | |
| 51 Reserved for future use | | | | | | | |
| 52 Reserved for future use | | | | | | | |
| 53 Reserved for future use | | | | | | | |
| 54 **Total deductions** (combine lines 25 through 53) | 14,942,495. | | | | | 28,134. | 14,970,629. |
| 55 **Net income (loss)** (subtract line 54 from line 24) | -12,931. | | | | | -28,134. | -41,065. |

**Part III Other Information for Preparation of Form 1116 or 1118**

**Section 1 - R&E Expenses Apportionment Factors**

| Description | (a) U.S. source | Foreign Source: (b) Foreign branch category income | (c) Passive category income | (d) General category income | (e) Other (category code ) (country code ) | (f) Sourced by partner | (g) Total |
|---|---|---|---|---|---|---|---|
| 1 Gross receipts by SIC code | | | | | | | |
| A SIC code: | | | | | | | |
| B SIC code: | | | | | | | |
| C SIC code: | | | | | | | |
| E SIC code: | | | | | | | |
| E SIC code: | | | | | | | |
| F SIC code: | | | | | | | |

2 Exclusive apportionment with respect to total R&E expenses entered on Part II, line 32. Enter the following.

| | | |
|---|---|---|
| A R&E expense with respect to activity performed in the United States | | |
| (i) SIC code: | 2A(i) | |
| (ii) SIC code: | 2A(ii) | |
| (iii) SIC code: | 2A(iii) | |
| B R&E expense with respect to activity performed outside the United States | | |
| (i) SIC code: | 2B(i) | |
| (ii) SIC code: | 2B(ii) | |
| (iii) SIC code: | 2B(iii) | |



TJALAS PARTIES 000083

| Name of partnership | EIN | Name of partner | SSN or TIN |
|---|---|---|---|
| ATLANTIC HOME HEALTH CARE LLC | 36-[redacted] | KIRK TJALAS | 522-41-[redacted] |

**Part III Other Information for Preparation of Form 1116 or 1118** *(continued)*

## Section 2 - Interest Expense Apportionment Factors

| Description | (a) U.S. source | Foreign Source (b) Foreign branch category income | (c) Passive category income | (d) General category income | (e) Other (category code ____ ) (country code ) | (f) Sourced by partner | (g) Total |
|---|---|---|---|---|---|---|---|
| 1 Total average value of assets | 4,964,109. | | | | | | 4,964,109. |
| 2 Sections 734(b) and 743(b) adjustment to assets - average value | | | | | | | |
| 3 Assets attracting directly allocable interest expense under Regulations section 1.861-10(e) | | | | | | | |
| 4 Other assets attracting directly allocable interest expense under Regulations section 1.861-10T | 4,964,109. | | | | | | 4,964,109. |
| 5 Assets excluded from apportionment formula | | | | | | | |
| 6a Total assets used for apportionment (subtract the sum of lines 3, 4, and 5 from the sum of lines 1 and 2) | | | | | | | |
| b Assets attracting business interest expense | | | | | | | |
| c Assets attracting investment interest expense | | | | | | | |
| d Assets attracting passive activity interest expense | | | | | | | |
| 7 Basis in stock of 10%-owned noncontrolled foreign corporations (see attachment) | | | | | | | |
| 8 Basis in stock of CFCs (see attachment) | | | | | | | |

## Section 3 - Foreign-Derived Intangible Income (FDII) Deduction Apportionment Factors

| Description | (a) U.S. source | Foreign Source (b) Passive category income | (c) General category income | (d) Other (category code ____ ) (country code ) | (e) Sourced by partner | (f) Total |
|---|---|---|---|---|---|---|
| 1 Foreign-derived gross receipts | | | | | | |
| 2 Cost of goods sold | | | | | | |
| 3 Partnership deductions allocable to foreign-derived gross receipts | | | | | | |
| 4 Other partnership deductions apportioned to foreign-derived gross receipts | | | | | | |

| Name of partnership | EIN | Name of partner | SSN or TIN |
|---|---|---|---|
| ATLANTIC HOME HEALTH CARE LLC | 36-[redacted] | KIRK TJALAS | 522-41-[redacted] |

## Part IV Information on Partner's Section 250 Deduction With Respect to Foreign-Derived Intangible Income (FDII)

### Section 1 - Information To Determine Deduction Eligible Income (DEI) and Qualified Business Asset Investment (QBAI) on Form 8993

| | | | |
|---|---|---|---|
| 1 | Net income (loss) | 1 | -41,065. |
| 2a | DEI gross receipts | 2a | 6,264,565. |
| b | DEI cost of goods sold (COGS) | 2b | 8,664,999. |
| c | DEI properly allocated and apportioned deductions | 2c | 6,305,630. |
| 3 | Section 951(a) inclusions | 3 | |
| 4 | CFC dividends | 4 | |
| 5 | Financial services income | 5 | |
| 6 | Domestic oil and gas extraction income | 6 | |
| 7 | Foreign branch income | 7 | |
| 8 | Partnership QBAI | 8 | |

### Section 2 - Information To Determine Foreign-Derived Deduction Eligible Income on Form 8993 (see instructions)

| | | (a) Foreign-derived income from all sales of general property | (b) Foreign-derived income from all sales of intangible property | (c) Foreign-derived income from all services | (d) Total (add columns (a) through (c)) |
|---|---|---|---|---|---|
| 9 | Gross receipts | | | | |
| 10 | COGS | | | | |
| 11 | Allocable deductions | | | | |
| 12 | Other apportioned deductions | | | 12 | |

### Section 3 - Other Information for Preparation of Form 8993

| | | (a) DEI | (b) FDDEI | (c) Total |
|---|---|---|---|---|
| 13 | Interest deductions | | | |
| A | A Interest expense specifically allocable under Regulations section 1.861-10(e) | | | |
| B | Other interest expense specifically allocable under Regulations section 1. 861-10T | | | |
| C | Other interest expense | | | |
| 14 | Interest expense apportionment factors | | | |
| A | Total average value of assets | 4,964,109. | | |
| B | Sections 734(b) and 743(b) adjustment to assets - average value | | | |
| C | Assets attracting directly allocable interest expense under Regulations section 1.861-10(e) | | | |
| D | Other assets attracting directly allocable interest expense under Regulations section 1.861-10T | 4,964,109. | | |
| E | Assets excluded from apportionment formula | | | |
| F | Total assets used for apportionment (the sum of lines 14C, 14D, and 14E subtracted from the sum of lines 14A and 14B) | | | |
| | R&E expenses apportionment factors | | | |
| 15 | Gross receipts by SIC code | | | |
| A | SIC code: | | | |
| B | SIC code: | | | |
| C | SIC code: | | | |

| | | | |
|---|---|---|---|
| 16 | R&E expenses by SIC code | | |
| A | SIC code: | 16A | |
| B | SIC code: | 16B | |
| C | SIC code: | 16C | |

| Name of partnership | EIN | Name of partner | SSN or TIN |
|---|---|---|---|
| ATLANTIC HOME HEALTH CARE LLC | 36-[redacted] | KIRK TJALAS | 522-41-[redacted] |

## Part VIII Partner's Interest in Foreign Corporation Income (Section 960)

**A** EIN or reference ID number of controlled foreign corporation ______ **B** Separate category. See instructions ______

**C** If PAS was entered on line B, applicable grouping under Regulations section 1.904-4(c). See instructions ______

**D** Box is checked if there is more than one source country for a line. See attachment and instructions ☐

**E** Box is checked if U.S. source income ☐

**F** Box is checked if FORI or FOGEI ☐

| *Amounts are in functional currency unless otherwise noted. See instructions.* | (i) Country code | (ii) Partner's share of net income | (iii) Reserved for future use | (iv) Reserved for future use |
|---|---|---|---|---|
| 1 Subpart F income groups | | | | |
| a Dividends, interest, rents, royalties, and annuities (total) | | | | |
| (1) Unit: | | | | |
| (2) Unit: | | | | |
| b Net gain from certain property transactions (total) | | | | |
| (1) Unit: | | | | |
| (2) Unit: | | | | |
| c Net gain from commodities transactions (total) | | | | |
| (1) Unit: | | | | |
| (2) Unit: | | | | |
| d Net foreign currency gain (total) | | | | |
| (1) Unit: | | | | |
| (2) Unit: | | | | |
| e Income equivalent to interest (total) | | | | |
| (1) Unit: | | | | |
| (2) Unit: | | | | |
| f Other | | | | |
| (1) Unit: | | | | |
| (2) Unit: | | | | |
| g Foreign base company sales income (total) | | | | |
| (1) Unit: | | | | |
| (2) Unit: | | | | |
| h Foreign base company services income (total) | | | | |
| (1) Unit: | | | | |
| (2) Unit: | | | | |
| i Full inclusion foreign base company income (total) | | | | |
| (1) Unit: | | | | |
| (2) Unit: | | | | |
| j Insurance income (total) | | | | |
| (1) Unit: | | | | |
| (2) Unit: | | | | |
| k International boycott income (total) | | | | |
| l Bribes, kickbacks, and other payments (total) | | | | |
| m Section 901(j) (total) | | | | |

| Name of partnership | EIN | Name of partner | SSN or TIN |
|---|---|---|---|
| ATLANTIC HOME HEALTH CARE LLC | 36-[redacted] | KIRK TJALAS | 522-41-[redacted] |

## Part VIII Partner's Interest in Foreign Corporation Income (Section 960) *(continued)*

| *Amounts are in functional currency unless otherwise noted. See instructions.* | (i) Country code | (ii) Partner's share of net income | (iii) Reserved for future use | (iv) Reserved for future use |
|---|---|---|---|---|
| 2 Recaptured subpart F income | | | | |
| 3 Tested income group (total) | | | | |
| (1) Unit: | | | | |
| (2) Unit: | | | | |
| 4 Residual income group (total) | | | | |
| (1) Unit: | | | | |
| (2) Unit: | | | | |
| 5 **Total** | | | | |

## Part IX Partner's Information for Base Erosion and Anti-Abuse Tax (Section 59A)

### Section 1 - Applicable Taxpayer (see instructions)

| Description | (a) Total | (b) Total ECI gross receipts | (c) Total non-ECI gross receipts |
|---|---|---|---|
| 1 Gross receipts for section 59A(e) | 14,929,564. | 14,929,564. | |
| 2 Gross receipts for the first preceding year | | | |
| 3 Gross receipts for the second preceding year | | | |
| 4 Gross receipts for the third preceding year | | | |
| 5 Amounts included in the denominator of the base erosion percentage as described in Regulations section 1.59A-2(e)(3) | 6,305,765. | | |

### Section 2 - Base Erosion Payments and Base Erosion Tax Benefits (see instructions)

| Description | (a) Total | (b) Total base erosion payments | (c) Total base erosion tax benefits |
|---|---|---|---|
| 6 Reserved for future use | | | |
| 7 Reserved for future use | | | |
| 8 Purchase or creations of property rights for intangibles (patents, trademarks, etc.) | | | |
| 9 Rents, royalties, and license fees | | | |
| 10 a Compensation/consideration paid for services **not** excepted by section 59A(d)(5) | | | |
| b Compensation/consideration paid for services excepted by section 59A(d)(5) | | | |
| 11 Interest expense | | | |
| 12 Payments for the purchase of tangible personal property | | | |
| 13 Premiums and/or other considerations paid or accrued for insurance and reinsurance as covered by sections 59A(d)(3) and 59A(c)(2)(A)(iii) | | | |
| 14 a Nonqualified derivative payments | | | |
| b Qualified derivative payments excepted by section 59A(h) | | | |
| 15 Payments reducing gross receipts made to surrogate foreign corporation | | | |
| 16 Other payments-specify: | | | |
| 17 Base erosion tax benefits related to payments reported on lines 6 through 16, on which tax is imposed by section 871 or 881, with respect to which tax has been withheld under section 1441 or 1442 at the 30% (0.30) statutory withholding tax rate | | | |

| Name of partnership | EIN | Name of partner | SSN or TIN |
|---|---|---|---|
| ATLANTIC HOME HEALTH CARE LLC | 36-[redacted] | KIRK TJALAS | 522-41-[redacted] |

**Part IX Partner's Information for Base Erosion and Anti-Abuse Tax (Section 59A)** *(continued)*

**Section 2 - Base Erosion Payments and Base Erosion Tax Benefits** (see instructions) *(continued)*

| | | (a) Total | (b) Total base erosion payments | (c) Total base erosion tax benefits |
|---|---|---|---|---|
| 18 | Portion of base erosion tax benefits reported on lines 6 through 16, on which tax is imposed by section 871 or 881, with respect to which tax has been withheld under section 1441 or 1442 at reduced withholding rate pursuant to income tax treaty. Multiply ratio of percentage withheld divided by 30% (0.30) times tax benefit. See instructions | | | |
| 19 | **Total base erosion tax benefits** (subtract the sum of lines 17 and 18 from the sum of lines 8 through 16) | | | |
| 20 | Reserved for future use | | | |
| 21 | Reserved for future use | | | |
| 22 | Reserved for future use | | | |

**Part X Foreign Partner's Character and Source of Income and Deductions**

**Section 1 - Gross Income**

| Description | (a) Total | (b) Partner determination | Partnership Determination: ECI (c) U.S. source | ECI (d) Foreign source | Non-ECI (e) U.S. source (FDAP) | Non-ECI (f) U.S. source (other) | Non-ECI (g) Foreign source |
|---|---|---|---|---|---|---|---|
| 1 Ordinary business income (gross) | 14,929,564. | | 14,929,564. | | | | |
| 2 Gross rental real estate income | | | | | | | |
| 3 Other gross rental income | | | | | | | |
| 4 Guaranteed payments for services | | | | | | | |
| 5 Guaranteed payments for use of capital | | | | | | | |
| 6 Interest income | | | | | | | |
| 7 Dividends | | | | | | | |
| 8 Dividend equivalents | | | | | | | |
| 9 Royalties and license fees | | | | | | | |
| 10 Net short-term capital gain | | | | | | | |
| 11 Net long-term capital gain | | | | | | | |
| 12 Collectibles (28%) gain | | | | | | | |
| 13 Unrecaptured section 1250 gain | | | | | | | |
| 14 Net section 1231 gain | | | | | | | |
| 15 Reserved for future use | | | | | | | |
| 16 Reserved for future use | | | | | | | |
| 17 Reserved for future use | | | | | | | |
| 18 Reserved for future use | | | | | | | |
| 19 Reserved for future use | | | | | | | |
| 20 Other income (loss) not included on lines 1 through 19 | | | | | | | |
| 21 **Gross income** (sum of lines 1 through 20) | 14,929,564. | | 14,929,564. | | | | |



224187 12-07-22

| Name of partnership | EIN | Name of partner | SSN or TIN |
|---|---|---|---|
| ATLANTIC HOME HEALTH CARE LLC | 36-[redacted] | KIRK TJALAS | 522-41-[redacted] |

**Part X Foreign Partner's Character and Source of Income and Deductions** *(continued)*

**Section 2 - Deductions, Losses, and Net Income**

| Description | (a) Total | (b) Partner determination | Partnership Determination: ECI (c) U.S source | ECI (d) Foreign source | Non-ECI (e) U.S. source (FDAP) | Non-ECI (f) U.S. source (other) | Non-ECI (g) Foreign source |
|---|---|---|---|---|---|---|---|
| 1 Expenses related to ordinary business income (gross) | 14,927,967. | | 14,927,967. | | | | |
| 2 Research and experimental expenses | | | | | | | |
| 3 Expenses from rental real estate | | | | | | | |
| 4 Expenses from other rental activities | | | | | | | |
| 5 Royalty and licensing expenses | | | | | | | |
| 6 Section 179 deduction | | | | | | | |
| 7 Interest expense on U.S.-booked liabilities | | | | | | | |
| 8 Interest expense directly allocable under Regulations sections 1.882-5(a)(1)(ii)(B) and 1.861-10T | | | | | | | |
| 9 Other interest expense | 28,134. | | 28,134. | | | | |
| 10 Section 59(e)(2) expenditures | | | | | | | |
| 11 Net short-term capital loss | | | | | | | |
| 12 Net long-term capital loss | | | | | | | |
| 13 Collectibles loss | | | | | | | |
| 14 Net section 1231 loss | | | | | | | |
| 15 Other losses | | | | | | | |
| (1) | | | | | | | |
| (2) | | | | | | | |
| 16 Charitable contributions | | | | | | | |
| 17 Other: | | | | | | | |
| 18 Other: | | | | | | | |
| 19 Reserved for future use | | | | | | | |
| 20 Reserved for future use | | | | | | | |
| 21 Reserved for future use | | | | | | | |
| 22 Reserved for future use | | | | | | | |
| 23 Reserved for future use | | | | | | | |
| 24 **Total** (sum of lines 1 through 23) | 14,956,101. | | 14,956,101. | | | | |
| 25 **Net income (loss)** (line 21 (Section 1) minus line 24 (Section 2)) | -26,537. | | | | | | |



224188 12-07-22

| Name of partnership | EIN | Name of partner | SSN or TIN |
|---|---|---|---|
| ATLANTIC HOME HEALTH CARE LLC | 36-[redacted] | KIRK TJALAS | 522-41-[redacted] |

## Part X Foreign Partner's Character and Source of Income and Deductions *(continued)*

### Section 3 - Allocation and Apportionment Methods for Deductions

| | | |
|---|---|---|
| **1** | Gross income | |
| a | Gross ECI | 6,264,565. |
| b | Worldwide gross income | 6,264,565. |
| **2** | Assets | |
| a | Average U.S. assets (inside basis) | 4,964,109. |
| b | Worldwide assets | 4,964,109. |
| **3** | Liabilities | |
| a | U.S.-booked liabilities of partnership | 3,845,653. |
| b | Directly allocated partnership indebtedness | 3,845,653. |
| **4** | Personnel | |
| a | Personnel of U.S. trade or business | |
| b | Worldwide personnel | |

**5** Gross receipts from sales or services by SIC code

| | (i) SIC code | (ii) ECI | (iii) Worldwide |
|---|---|---|---|
| a | | | |
| b | | | |

**6** Reserved for future use

| | (i) | (ii) | (iii) |
|---|---|---|---|
| a | | | |
| b | | | |

**7** Other allocation and apportionment key

| | (i) Key/Factor | (ii) Allocation |
|---|---|---|
| a | | |
| b | | |

**8** Other allocation and apportionment key

| | (i) Key/Factor | (ii) Allocation |
|---|---|---|
| a | | |
| b | | |

### Section 4 - Reserved for Future Use

| | Reserved | (a) | (b) | (c) |
|---|---|---|---|---|
| 1 | Reserved for future use | | | |
| 2 | Reserved for future use | | | |
| 3 | Reserved for future use | | | |
| 4 | Reserved for future use | | | |
| 5 | Reserved for future use | | | |
| 6 | Reserved for future use | | | |
| 7 | Reserved for future use | | | |
| 8 | Reserved for future use | | | |
| 9 | Reserved for future use | | | |
| 10 | Reserved for future use | | | |

2

Arizona Form 165 Schedule K-1

# Resident and Part-Year Resident Partner's Share of Adjustment to Partnership Income

2022

**Corporate partners must use Form 165 Schedule K-1(NR).**

For the [X] calendar year 2022 or [ ] fiscal year beginning ______ and ending ______.

CHECK ONE: [X] Original [ ] Amended

| Partner's Tax Identification Number | Partnership's Employer Identification Number (EIN) |
|---|---|
| 522-41-[redacted] | 36-[redacted] |
| Partner's Name: KIRK TJALAS | Partnership's Name: ATLANTIC HOME HEALTH CARE LLC |
| Partner's Address - number and street or rural route: 7620 N HARTMAN LN STE 180 | Partnership's Address - number and street or rural route: 15551 N GREENWAY-HAYDEN LOOP |
| Partner's City, Town or Post Office, State, ZIP Code: TUCSON, AZ 85743 | Partnership's City, Town or Post Office, State, ZIP Code: SCOTTSDALE, AZ 85260 |

**Pass-Through Entity Election:**

Did the partnership make the Pass-Through Entity (PTE) Election? [ ] Yes [X] No

If the partnership made the PTE Election, did this partner consent to that election? [ ] Yes [ ] No

| Partner's Percentage of: | Beginning of Year | End of Year |
|---|---|---|
| Profit sharing | 50.0000000 % | 50.0000000 % |
| Loss sharing | 50.0000000 % | 50.0000000 % |
| Ownership of capital | 50.0000000 % | 50.0000000 % |
| Type of partner (individual, trust, or estate) | INDIVIDUAL | |

## Part 1 Arizona Partnership Adjustment

| | | | |
|---|---|---|---|
| 1 | Adjustment of partnership income from federal to Arizona basis from Form 165, page 1, line 6 | 1 | 00 |
| 2 | Partner's percentage of profit or loss (expressed as a decimal) | 2 | |
| 3 | Partner's distributive share of the adjustment of partnership income from federal to Arizona basis. Multiply line 1 by line 2 | 3 | 00 |

## Part 2 Net Capital Gain (Loss) From Investment in a Qualified Small Business - Information Schedule

If the partner's federal Schedule K-1 (Form 1065) does not include any net capital gain (loss) from investment in a qualified small business as determined by the Arizona Commerce Authority, the partnership is not required to complete Part 2.

| Pro Rata Share Items | Distributive Share Amount |
|---|---|
| 4 Net capital gain (loss) from investment in a qualified small business ... 4 | |

## Part 3 Net Capital Gain (Loss) From the Exchange of Legal Tender - Information Schedule

If the partner's federal Schedule K-1 (Form 1065) does not include any net capital gain (loss) from the exchange of legal tender, the partnership is not required to complete Part 3.

| Pro Rata Share Items | Distributive Share Amount |
|---|---|
| 5 Net capital gain (loss) from the exchange of legal tender ... 5 | |

| Name of Partnership (as shown on page 1) | EIN |
|---|---|
| ATLANTIC HOME HEALTH CARE LLC | 36-[redacted] |

## Part 4 Net Long-Term Capital Gain Subtraction - Information Schedule

If the partner's federal Schedule K-1 (Form 1065) does not include any net long-term capital gain (loss), the partnership is not required to complete Part 4.

| Pro Rata Share Items From federal Form 1065, Schedule K-1 | (a) Distributive Share Amount | (b) Net long-term capital gain (loss) included in column (a) from assets acquired before January 1, 2012 | (c) Net long-term capital gain (loss) included in column (a) from assets acquired after December 31, 2011 |
|---|---|---|---|
| 6 Total Net long-term capital gain (loss) ............ 6 | | | |

ADDITIONAL INFORMATION:

| | | | |
|---|---|---|---|
| 7 Net long-term capital gain (loss) from investment in a qualified small business (amount already included in line 6, column (c)) ............ 7 | | | |
| 8 Net long-term capital gain (loss) from the exchange of legal tender (amount already included in line 6, column (c)) ............ 8 | | | |

## Part 5 Partner's Share of the Partnership's Pass-Through Entity Tax Credit

If the partner consented to the partnership's election to be a Pass-Through Entity (PTE), complete Part 5. Otherwise, leave blank.

| Partner's Pro Rata Share of PTE Election | Partner's Distributive Share |
|---|---|
| 21 Partner's pro-rata share of the PTE Tax Credit. *Individuals,* enter this amount on Form 355, Part 1, line 1. *Estates and trusts,* see the instructions for Form 141AZ, line 19, to claim this credit ............ 21 | |
| 22 Partner's pro-rata share of the Arizona PTE Taxes paid in 2022 for taxable year 2022. *Individuals,* add this amount back on Form 140, page 5, line P, or Form 140PY, page 5, line O, or Form 140-SBI, line 25, or Form 140PY-SBI, line 25. Estates and trusts, add this amount back on Form 141AZ, Schedule B, line B3 ............ 22 | |
| 23 Partner's pro-rata share of comparable PTE Taxes from other states paid in 2022 for taxable year 2022. *Individuals,* add this amount back on Form 140, page 5, line P, or Form 140PY, page 5, line O or Form 140-SBI, line 25, or Form 140PY-SBI, line 25 or *Estates and trusts,* add this amount back on Form 141AZ, Schedule B, line B3 ............ 23 | |

TAXABLE YEAR 2022

# Member's Share of Income, Deductions, Credits, etc.

229421 12-15-22

CALIFORNIA SCHEDULE **K-1 (568)**

TYB 01-01-2022 TYE 12-31-2022
522-41-[redacted]
KIRK TJALAS

7620 N HARTMAN LN STE 180
TUCSON AZ 85743

36-[redacted] 202021010292
ATLANTIC HOME HEALTH CARE LLC

15551 N GREENWAY-HAYDEN LOOP
SCOTTSDALE AZ 85260

**A** What type of entity is this member? ● See instructions.

(1) [X] Individual (4) [ ] C Corporation (7) [ ] LLP (10) [ ] Exempt Organization
(2) [ ] S Corporation (5) [ ] General Partnership (8) [ ] LLC (11a) [ ] Disregarded Entity (DE)
(11b) DE owner's name ACT NOW HEALTHCARE
(3) [ ] Estate/Trust (6) [ ] Limited Partnership (9) [ ] IRA/Keogh/SEP (11c) DE owner's TIN 92-[redacted]

**B** Is this member a foreign member? ● [ ] Yes [X] No

**C** Enter member's percentage (without regard to special allocations) of:

| | (i) Beginning | (ii) Ending |
|---|---|---|
| Profit | 50.0000 % | ● 50.0000 % |
| Loss | 50.0000 % | ● 50.0000 % |
| Capital | 50.0000 % | ● 50.0000 % |

Check the box if decrease is due to sale or exchange of LLC interest [ ]

**D** Member's share of liabilities:

| | (i) Beginning | (ii) Ending |
|---|---|---|
| Nonrecourse | $ 2,160,851 .00 | ● $ 3,845,653 .00 |
| Qualified nonrecourse financing | $ .00 | ● $ .00 |
| Recourse | $ 199,129 .00 | ● $ 0 .00 |

Check the box if Item D includes liability amounts from lower tier partnerships or LLCs [ ]

**E** Reportable transaction or tax shelter registration number(s)

**F** (1) Check here if this is a publicly traded partnership as defined in IRC Section 469(k)(2) ● [ ]

(2) Check here if this is an investment partnership (R&TC Sections 17955 and 23040.1) ● [ ]

229422 12-15-22

**Member's name**: KIRK TJALAS

**Member's identifying number**: 522-41-[redacted]

**G** Check here if this is: • **(1)** ☐ A final Schedule K-1 (568) **(2)** ☐ An amended Schedule K-1 (568)

**H** Is this member a resident of California? • ☐ Yes ▶ ☒ No

**I** Did this member contribute property with a built-in gain or loss? If "Yes" attach statement. See instructions ☐ Yes ☒ No

**J** Member's share of net unrecognized IRC Section 704(c) gain or (loss) (i) Beginning ______ (ii) Ending ______

**K** Analysis of member's **tax basis** capital account.

| (a) Capital account at beginning of year | (b) Capital contributed during year | (c) Current year net income (loss) | (d) Other increase (decrease) (attach explanation) | (e) Withdrawals and distributions | (f) Capital account at end of year, combine column (a) through column (e) |
|---|---|---|---|---|---|
| • 619,678 | • | • -41,065 | 708,954 | • ( ) | • 1,287,567 |

**Caution:** Refer to Member's Instructions for Schedule K-1 (568) before entering information from this schedule on your California return.

| | (a) Distributive share items | (b) Amounts from federal Schedule K-1 (Form 1065) | (c) California adjustments | (d) Total amounts using California law. Combine col. (b) and col. (c) | (e) California source amounts and credits |
|---|---|---|---|---|---|
| Income (Loss) | 1 Ordinary income (loss) from trade or business activities | -41,065 | 13,963 | • -27,102 | ▶ -249 |
| | 2 Net income (loss) from rental real estate activities | | | • | ▶ |
| | 3 Net income (loss) from other rental activities | | | ◉ | ◉ |
| | 4 a Guaranteed payments for services | | | | |
| | 4 b Guaranteed payments for capital | | | | |
| | 4 c Total guaranteed payments | | | • | ▶ |
| | 5 Interest income | | | • | ▶ |
| | 6 Dividends | | | • | ▶ |
| | 7 Royalties | | | • | ▶ |
| | 8 Net short-term capital gain (loss) | | | • | ▶ |
| | 9 Net long-term capital gain (loss) | | | • | ▶ |
| | 10 a Total gain under IRC Section 1231 (other than due to casualty or theft) | | | • | ▶ |
| | b Total loss under IRC Section 1231 (other than due to casualty or theft) | | | • | ▶ |
| | 11 a Other portfolio income (loss). Attach schedule | | | • | ▶ |
| | b Total other income | | | • | ▶ |
| | c Total other loss | | | • | ▶ |

2

229423 12-15-22

Member's name: KIRK TJALAS

Member's identifying number: 522-41-[redacted]

| | (a) Distributive share items | (b) Amounts from federal Schedule K-1 (Form 1065) | (c) California adjustments | (d) Total amounts using California law. Combine col. (b) and col. (c) | (e) California source amounts and credits |
|---|---|---|---|---|---|
| **Deductions** | **12** Expense deduction for recovery prop. (IRC Section 179) | | | | |
| | **13 a** Charitable contributions | | | | |
| | **b** Investment interest expense | | | | |
| | **c 1** Total expenditures to which an IRC Section 59(e) election may apply | | | | |
| | **2** Type of expenditures | | | | |
| | **d** Deductions related to portfolio income. Attach schedule | | | | |
| | **e** Other deductions. Attach schedule | | | | |
| **Credits** | **15 a** Total withholding (equals amount on Form 592-B if calendar year LLC) | | | • | ▶ |
| | **b** Low-income housing credit | | | | |
| | **c** Credits other than line 15b related to rental real estate activities | | | | |
| | **d** Credits related to other rental activities. Attach schedule | | | | |
| | **e** Nonconsenting nonresident members' tax paid by LLC | | | | |
| | **f** Other credits - Attach required schedules or statements | | | | |
| **Alternative Minimum Tax (AMT) Items** | **17 a** Depreciation adjustment on property placed in service after 1986 | | 347 | 347 | 3 |
| | **b** Adjusted gain or loss | | | | |
| | **c** Depletion (other than oil & gas) | | | | |
| | **d** Gross income from oil, gas, and geothermal properties | | | | |
| | **e** Deductions allocable to oil, gas, and geothermal properties | | | | |
| | **f** Other alternative minimum tax items. Attach schedule | | | | |
| **Tax-exempt Income and Nondeductible Expenses** | **18 a** Tax-exempt interest income | | | | |
| | **b** Other tax-exempt income | | | | |
| | **c** Nondeductible expenses STMT | | 821 | 821 | 8 |
| **Distributions** | **19 a** Distributions of money (cash and marketable securities) | | | | |
| | **b** Distributions of property other than money | | | | |
| **Other Information** | **20 a** Investment income | | | | |
| | **b** Investment expenses | | | | |
| | **c** Other information. See instructions | | STMT | | |

**21** ☐ More than one activity for at-risk purposes. See instructions.

**22** ☐ More than one activity for passive activity purposes. See instructions.

229424 12-15-22

**Member's name** KIRK TJALAS

**Member's identifying number** 522-41-[redacted]

**Other Member Information**

**Table 1** - Member's share of nonbusiness income from intangibles (source of income is dependent on residence or commercial domicile of the member):

| | | | | | |
|---|---|---|---|---|---|
| Interest ... | $ | Sec. 1231 Gains/Losses | $ | Capital Gains/Losses | $ |
| Dividends | $ | Royalties | $ | Other | $ |

FOR USE BY MEMBERS ONLY - See instructions.

**Table 2** - Member's share of distributive items.

A. Member's share of the LLC's business income. See instructions. $

B. Member's share of nonbusiness income from real and tangible personal property sourced or allocable to California.

| | | | |
|---|---|---|---|
| Capital Gains/Losses | $ | Rents/Royalties | $ |
| Sec. 1231 Gains/Losses | $ | Other | $ |

C. Member's distributive share of the LLC's property, payroll, and sales:

| Factors | Total within and outside California | Total within California |
|---|---|---|
| Property: Beginning | $ | $ |
| Property: Ending | $ | $ |
| Property: Annual rent expense | $ | $ |
| Payroll | $ | $ |
| Sales | $ | $ |

ATLANTIC HOME HEALTH CARE LLC 36-[redacted]

CA SCHEDULE K-1 NONDEDUCTIBLE EXPENSES

| DESCRIPTION | AMOUNT |
| --- | --- |
| EXCLUDED MEALS AND ENTERTAINMENT EXPENSES | 821. |
| TOTAL TO SCHEDULE K-1, LINE 18C | 821. |

CA SCHEDULE K-1 AGGREGATE GROSS RECEIPTS FOR AMT EXCLUSION

| DESCRIPTION | AMOUNT |
| --- | --- |
| GROSS SALES LESS RETURNS | 14,929,564. |
| TOTAL | 14,929,564. |

220106K 11019

DR 0106K (12/08/22)
**COLORADO DEPARTMENT OF REVENUE**
*Tax.Colorado.gov*
**Page 1 of 2**

# 2022 Colorado K-1

| | |
|---|---|
| ● Fiscal Year Beginning (MM/DD/22) | ● Fiscal Year Ending (MM/DD/YY) |
| | |
| ● Name of Partner or Shareholder | ● Partner's or Shareholder's SSN, ITIN, FEIN, or Colorado Account Number |
| KIRK TJALAS | 522-41-[redacted] |

| | | | |
|---|---|---|---|
| ● Address | ● City | ● State | ● ZIP |
| 7620 N HARTMAN LN STE 180 | TUCSON | AZ | 85743 |

● ☐ Resident ● ☒ Non-Resident

● ☐ Composite ● ☒ DR 0107 Included

● ☐ DR 0108 Filed ● ☐ SALT Parity Election

| | |
|---|---|
| ● Name of Partnership or S Corporation | ● Partnership's or S Corporation's Colorado Account Number or FEIN |
| ATLANTIC HOME HEALTH CARE LLC | 36-4900853 |

| | | | |
|---|---|---|---|
| ● Address | ● City | ● State | ● ZIP |
| 15551 N GREENWAY-HAYDEN LOOP | SCOTTSDALE | AZ | 85260 |

| Partner's or Shareholder's: | | A. Share of Income and Other items | B. Share of Income and Other Items Attributable to Colorado |
|---|---|---|---|
| 1. Ordinary business income (loss) | ● 1 | -41,065 00 | -2,069 00 |
| 2. Net rental real estate income (loss) | ● 2 | 00 | 00 |
| 3. Other net rental income (loss) | ● 3 | 00 | 00 |
| 4. Total guaranteed payments | ● 4 | 00 | 00 |
| 5. Interest and dividends | ● 5 | 00 | 00 |
| 6. Royalties | ● 6 | 00 | 00 |
| 7. Net capital gain | ● 7 | 00 | 00 |
| 8. Other income (loss) | ● 8 | 00 | 00 |
| 9. State income tax addback | ● 9 | 00 | 00 |
| 10. Other Colorado additions STATEMENT | ● 10 | 821 00 | 41 00 |
| 11. Federal deductions | ● 11 | 00 | 00 |
| 12. Colorado subtractions | ● 12 | 00 | 00 |
| 13. Partner's share of total receipts from line 8 of the DR 0106, part V. | ● 13 | 14,272,611 00 | 718,970 00 |
| 14. Partner's share of non-apportionable income from the DR 0106, part V. | ● 14 | 00 | 00 |
| 15. Partner's or shareholder's share of tax paid with SALT Parity election | ● 15 | | 00 |

220106K 21019

DR 0106K (12/08/22)
**COLORADO DEPARTMENT OF REVENUE**
*Tax.Colorado.gov*
**Page 2 of 2**

| Name of Partner or Shareholder | Partner's or Shareholder's SSN, ITIN, FEIN, or Colorado Account Number |
|---|---|
| KIRK TJALAS | 522-41-[redacted] |

| Partner's or Shareholder's Share of Credits | | Amount |
|---|---|---|
| **16.** Advanced Industry Investment credit | • 16 | 00 |
| **17.** Business Personal Property credit | • 17 | 00 |
| **18.** Child care center family care home investment credit | • 18 | 00 |
| **19.** Child care contribution credit | • 19 | 00 |
| **20.** Colorado job growth incentive credit | • 20 | 00 |
| **21.** Preservation of Historic Structures credit | • 21 | 00 |
| **22.** SALT Parity credit from lower-tier partnership (see instructions) | • 22 | 00 |
| **23.** Enterprise zone agricultural processing new employee credit | • 23 | 00 |
| **24.** Enterprise zone commercial vehicle investment tax credit | • 24 | 00 |
| **25.** Enterprise zone contribution credit | • 25 | 00 |
| **26.** Enterprise zone employee health insurance credit | • 26 | 00 |
| **27.** Enterprise zone enhanced rural agricultural processing new employee credit | • 27 | 00 |
| **28.** Enterprise zone enhanced rural new employee credit | • 28 | 00 |
| **29.** Enterprise zone investment tax credit | • 29 | 00 |
| **30.** Enterprise zone job training investment tax credit | • 30 | 00 |
| **31.** Enterprise zone research and experimental activities credit | • 31 | 00 |
| **32.** Enterprise zone vacant commercial building rehabilitation credit | • 32 | 00 |
| **33.** Other Credits, explain below: | • 33 | 00 |

Explain

ATLANTIC HOME HEALTH CARE LLC 36-[redacted]

CO DR 0106K OTHER COLORADO ADDITIONS

| DESCRIPTION | SHARE OF INCOME AND OTHER ITEMS | SHARE ATTRIBUTABLE TO COLORADO |
|---|---|---|
| FOOD AND BEVERAGE EXPENSE DEDUCTION ADDBACK | 821. | 41. |
| TOTAL TO DR 0106K, LINE 10 | 821. | 41. |

220107 11019

DR 0107 (06/22/22)
**COLORADO DEPARTMENT OF REVENUE**
Denver CO 80261-0008
*Tax.Colorado.gov*
**Page 1 of 1**

# 2022 Colorado Nonresident Partner or Shareholder Agreement

| Taxable Year of Partner or Shareholder | | Taxable Year of Pass-Through Entity | |
|---|---|---|---|
| Beginning MM/DD/YYYY | Ending MM/DD/YYYY | Beginning MM/DD/YYYY | Ending MM/DD/YYYY |
| 01/01/2022 | 12/31/2022 | 01/01/2022 | 12/31/2022 |

| Name and Address of Nonresident Partner or Shareholder | | | Name and Address of Pass-Through Entity | | |
|---|---|---|---|---|---|
| SSN or ITIN | FEIN | | Colorado Account Number | FEIN | |
| 522-41-[redacted] | | | | 36-[redacted] | |
| Last Name or Business Name | | | Last Name or Business Name | | |
| TJALAS | | | ATLANTIC HOME HEALTH CARE LLC | | |
| First Name | | Middle Initial | First Name | | Middle Initial |
| KIRK | | | | | |
| Street or Mailing Address | | | Street or Mailing Address | | |
| 7620 N HARTMAN LN STE 180 | | | 15551 N GREENWAY-HAYDEN LOOP | | |
| City | | | City | | |
| TUCSON | | | SCOTTSDALE | | |
| State | ZIP | | State | ZIP | |
| AZ | 85743 | | AZ | 85260 | |

I agree to file a Colorado income tax return and make timely payment of all taxes imposed by the state of Colorado with respect to my share of the Colorado income of the pass-through entity named above. I also agree to be subject to personal jurisdiction in the state of Colorado for purposes of the collection of unpaid income tax together with related penalties and interest. I furthermore understand the Department of Revenue will consider the timely first filing of this agreement as applicable to all future filing periods unless notified otherwise.

| Taxpayer's or Authorized Agent's Signature | Date (MM/DD/YY) |
|---|---|
| | |

Submit this agreement when filing the Colorado form DR 0106

A nonresident partner or shareholder can complete this form DR 0107 to establish that they will report the Colorado source income and pay the Colorado tax on any income derived from a Colorado partnership or S corporation.

This form shall be delivered by the nonresident partner or shareholder to the partnership or S corporation, which shall later be submitted by the partnership or S corporation with form DR 0106. This form need only to be filed with the Department for the year in which the agreement is made.

See the instructions for Nonresident Partners and Shareholders in the 106 Book and the income tax guidance publications available at Tax.Colorado.gov for more information.

NEW MEXICO SCHEDULE K-1 EQUIVALENT

# Partner's New Mexico Information

**For Calendar Year 2022 or Fiscal Year**

Beginning ______________ , 2021; and Ending ______________ , ______ .

**2022**

Partner's Name, Address and ZIP Code

KIRK TJALAS
7620 N HARTMAN LN STE 180
TUCSON, AZ 85743

Partner Number 2

Partner's Identifying Number
522-41-[redacted]

Resident [ ] Nonresident [X]
Amended Schedule K-1 [ ] Final Schedule K-1 [ ]

Partnership's Name, Address and ZIP Code

ATLANTIC HOME HEALTH CARE LLC
15551 N GREENWAY-HAYDEN LOOP
SCOTTSDALE AZ 85260

Partnership's Identifying Number
36-[redacted]

CRS Identification No.
36-[redacted]

Partner's Percentage of Profit: 50.0000000
Apportionment factor: 32.6086 %

| Distributive Share Items | Amount |
|---|---|
| 1. Total income (loss) from federal | -41,065 |
| 2. Total New Mexico income (loss) | -13,391 |
| 3. Interest on U.S. government obligations | |
| 4. Total state and local bond interest from non-New Mexico municipal bonds | |
| 5. State and local bond interest issued by New Mexico sources | |
| 6. Entity level and composite tax paid | |

**Other Credits**

267381 03-14-23

TJALAS PARTIES 000103

# 2022 Schedule OR-K-1

Page 1 of 1, 150-101-002 Oregon Department of Revenue
(Rev. 08-12-22, ver. 01)

17612201011019

Office use only

**Distributive Share of Income, Deductions, Credits, etc.**

For individual owners of pass-through entities

☐ Final OR-K-1 ☐ Amended OR-K-1

For calendar year 2022 or fiscal year — Beginning: 01/01/2022 Ending: 12/31/2022

## Part I - Pass-through entity (PTE) information

| Federal employer identification number | PTE name | | | Business code number |
|---|---|---|---|---|
| 36-4900853 | ATLANTIC HOME HEALTH CARE LLC | | | 621610 |
| **Address** | | **City** | **State** | **ZIP code** |
| 15551 N GREENWAY-HAYDEN LOOP | | SCOTTSDALE | AZ | 85260 |

## Part II - Owner information

| Social Security number | Owner's first name | Initial | Last name |
|---|---|---|---|
| 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 | KIRK | | TJALAS |

☐ General partner or LLC member manager ☐ Shareholder
☒ Limited partner or other LLC member ☐ Beneficiary

| Address | | |
|---|---|---|
| 7620 N HARTMAN LN STE 180 | | |
| **City** | **State** | **ZIP code** |
| TUCSON | AZ | 85743 |

Oregon resident? If no, state of legal residence: ☐ Yes ☒ No AZ

Check the appropriate box: ☐ Form OR-OC ☐ Form OR-19 ☐ Form OR-19-AF ☒ Not required

Owner's share of profit & loss/stock ownership: Beginning 50.0000 % End 50.0000 %

## Part III - Distributive share items

Apportionment percentage 1.6747 %

| | | (a) Federal column | (b) Oregon column |
|---|---|---|---|
| **Income (losses)** | | | |
| 1. Ordinary business income (loss) | 1. | -41,065.00 | -688.00 |
| 2. Net rental real estate income (loss) | 2. | | |
| 3. Other net rental income (loss) | 3. | | |
| 4. Guaranteed payments to partners | 4. | | |
| 5. Interest income | 5. | | |
| 6. Ordinary/qualified dividends | 6. | | |
| 7. Royalties | 7. | | |
| 8. Net short-term capital gain (loss) | 8. | | |
| 9. Net long-term capital gain (loss) | 9. | | |
| 10. Net section 1231 gain (loss) | 10. | | |
| 11. Other income (loss) (include schedule) | 11. | | |
| **Adjustments** | | | |
| 12. IRC section 179 expense | 12. | | |
| 13. Other adjustments (include schedule) | 13. | | |
| **Oregon additions** | | | |
| 14. Interest on state and local government bonds | 14. | | |
| 15. Other additions (include schedule) | 15. | | |
| **Oregon subtractions** | | | |
| 16. U.S. government interest | 16. | | |
| 17. Depreciation | 17. | | |
| 18. Other subtractions (include schedule) | 18. | | |
| **Oregon credits** | | | |
| 19. Credits (include schedule) | 19. | | |
| **Payments** | | | |
| 20. PTE owner payment from Form OR-19 | 20. | | |
| 21. Tax paid on Form OR-OC filed on owner's behalf | 21. | | |

273861 11-01-22 **Keep this schedule with your tax records. Don't submit with your individual tax return or the PTE return.**

65204

# Schedule K-1 - Partner's Share of Utah Income, Deductions and Credits

TC-65, Sch. K-1
2022

2

**Partnership Information**

A Partnership's EIN: 36-[redacted]

B Partnership's name, address, city, state, and ZIP code

ATLANTIC HOME HEALTH CARE LLC
15551 N GREENWAY-HAYDEN LOOP
SCOTTSDALE, AZ 85260

**Partner Information**

C Partner's SSN or EIN: 522-41-[redacted]

D Partner's name, address, city, state, and ZIP code

KIRK TJALAS
7620 N HARTMAN LN STE 180
TUCSON, AZ 85743

E Partner's phone number 734-560-[redacted]

F Percent of ownership 50.0000

G Enter "X" if limited partner or member X

H Entity code from list below: I

---Codes---
**I** = Individual **P** = Gen'l Partnership
**C** = Corporation **L** = Limited Partnership
**S** = S Corporation **B** = LLC **R** = LLP
**N** = Nonprofit Corp. **T** = Trust **O** = Other

I Enter date: 01/01/2019 (affiliated) ___ (withdrawn)

**Partner's Share of Apportionment Factors**

| | | Utah | Total |
|---|---|---|---|
| J | Property | $ 31200 | $ 784310 |
| K | Payroll | $ 724571 | $ 9894733 |
| L | Sales | $ 810480 | $ 14272611 |

**Other Information**

Note: To complete lines 1 through 16:
* Utah residents, enter the amounts from federal Schedule K-1.
* Utah nonresidents, see instructions to calculate amounts.
All filers complete lines 17 through 19, if applicable.

**Partner's Share of Utah Income, Deductions and Credits**

1 Utah ordinary business income/loss -2332

2 Utah net rental real estate income/loss

3 Utah other net rental income/loss

4 Utah guaranteed payments

5a Utah U.S. government interest income

5b Utah municipal bond interest income

5c Utah other interest income

6 Utah ordinary dividends

7 Utah royalties

8 Utah net short-term capital gain/loss

9 Utah net long-term capital gain/loss

10 Utah net Section 1231 gain/loss

11 Utah recapture of Section 179 deduction

12 Utah other income/loss (describe)

13 Utah Section 179 deduction

14 Contributions

15 Foreign taxes paid or accrued

16 Utah other deductions (describe)

17 Utah nonrefundable credits:

| Name of Credit | Code | Credit Amount |
|---|---|---|

18 Utah refundable credits:

| Name of Credit | Code | Credit Amount |
|---|---|---|

19 Utah tax withheld on behalf of partner
"X" if withholding waiver applied for

281981 11-04-22

RYAN RAPP
PACHECO
SORENSEN PLC

# EXHIBIT 8

ABSOLUTELY HAVEN HAVEN HEALTH CARE SERVICES HAVEN HOSPICE

Barbara Justice
Health Care Investigator
Washington State Board of Nursing
111 Israel Rd SE
P.O. Box 47864
Olympia, WA 98504

December 12, 2023

**Re: WA State Board of Nursing Investigation.**
**File # 2019-7006RN / Tjalas, Kirk**

Dear Ms. Justice:

I am the chief executive officer of Charis Healthcare Holdings, LLC. ("Charis"), the owner of Haven Home Health Care ("Haven"). Haven is an unincorporated multi-state network of Medicare-Certified home health, hospice & private duty agencies wholly owned and managed by Charis.

It has come to our attention that Kirk Tjalas, RN, ARNP, an owner of Atlantic Home Health Care, LLC (Atlantic), has corresponded with you regarding your state agency's investigation into a number of allegations of unprofessional conduct by Mr. Tjalas. A copy of your letter of October 5, 2023, and your email to him dated November 22, 2023 was provided to Charis by Mr. Tjalas together with his response to you dated November 22, 2023. Your correspondence to Mr. Tjalas and his response require that we write to you to correct an apparent misunderstanding regarding Mr. Tjalas' relationship with Haven.

Initially, it should be understood that Mr. Tjalas is not and never has been an owner of Charis or any home health or hospice agency owned by Charis other than his 50% interest in Atlantic. He currently holds no position of authority and provides no services as an employee of any entity in which Haven has or had an ownership interest, other than Atlantic. In your email to Mr. Tjalas of November 22, you mentioned your understanding that Mr. Tjalas was in the process of selling his interest in Haven to his business partner. Please be advised that he has no interest in Haven to sell for the

simple fact that he has no ownership interest in Haven. He only owns a 50% interest in Atlantic which we will explain next.

Victory Medical Solutions ("Victory"), mentioned in your letter, is wholly owned by Mr. Tjalas. It previously owned and operated a home health agency until January 2018 when it sold its assets to Atlantic Home Health Care, LLC ("Atlantic"). Atlantic is an entity Charis previously acquired in an unrelated transaction. In consideration of that transaction, Mr. Tjalas received a 50% membership interest in Atlantic while Charis retained the remaining 50% membership interest. Charis, in 2022, transferred its interest in Atlantic to in affiliate and is no longer the legal owner of an ownership interest in that entity. It is important to note that, while Mr. Tjalas remains an owner in Atlantic, he has no ownership interest in Charis or Haven.

Following the closing of the Victory/Atlantic asset purchase, Atlantic was licensed by the State of Washington to operate a home services agency license under the d/b/a name "Haven Home Health Care" (Lic. #IHS.FS.60880389). Attached is a copy of Atlantic's state license. Atlantic, through the execution of a management agreement with Charis, became a member of the Haven network under Charis' exclusive management. Mr. Tjalas was initially appointed to serve as Atlantic's chief nursing and business development officer. His employment was later terminated on January 1, 2021. Since that date, Mr. Tjalas has not been employed by Atlantic in any capacity and takes no part in Atlantic's management or patient care services. Regardless, Atlantic remains a member affiliate of Haven under Charis' management in which Mr. Tjalas takes no part. Notwithstanding his equity position in Atlantic, he has no authority to make any representations or transact any business on behalf of Charis, Haven or Atlantic. Furthermore, he has no authority to use Haven's name and letterhead to transact any business on behalf of Charis or Haven, or to make any statement or representation on behalf of Charis or Haven.

It is our understanding that Victory has not been in business since its assets were sold to Atlantic in 2018. Anything Mr. Tjalis may have done that involved Victory did not involve Charis, its subsidiaries, or affiliates, including Haven. Furthermore, to the extent that Mr. Tjalas represented to you or your agency that Victory is the parent company of Haven, such representation is absolutely incorrect and we ask that you correct your records in that regard. Charis takes no responsibility for any

misrepresentations, if any, made by Mr. Tjalas to you or anyone else. Charis also denies any involvement in, or responsibility for, anything Mr. Tjalas did while an owner of Victory. Anything he did or said on behalf of Victory after it sold its assets to Atlantic likewise has nothing to do with Charis or Haven. Charis is aware that Mr. Tjalas has an ownership interest in Act Now, a DME company, but Charis has no interest in that company or involvement in its operations.

Regarding the alleged activities outlined in your letter of October 5, Charis also denies any involvement in or knowledge of such activities regardless of when such activities took place. To the best of our knowledge, such actions have nothing to do with, or authorized by, Charis, Haven, or Atlantic. At no time was Mr. Tjalas ever authorized or instructed to offer or pay any form of remuneration to induce patient referrals to Atlantic or any Charis owned, operated, or managed entity.

Regarding Mr. Tjalas' interest in Act Now, neither Charis, Haven, nor Atlantic have any ownership or management interest in Act Now.

Charis has no knowledge of any of the facts alleged in paragraphs #2. b.-d. of your October 5 letter. Anything he filed with the state of Washington, including any representations or misrepresentations were done without Charis' knowledge. Likewise, Charis has no knowledge of the allegations made in paragraphs #3 - #5.

Regarding the response you are expecting from Mr. Tjalas, he has no authority to submit any documentation regarding Haven although obviously he is free to respond to matters involving his own personal business dealings. We are happy to provide you with any additional information you may need regarding Charis, Haven, or Atlantic.

Please feel free to reach out to us if you require any clarification regarding the above.

Regards,

Jamin Ruark, CEO

RYAN RAPP PACHECO SORENSEN PLC

# **EXHIBIT 9**

# FINANCIAL STATEMENT OF CORPORATE DEBTOR

## *United States of America*

*U.S. Department of Justice*

*Commercial Litigation Branch – Civil Frauds*

A separate statement must be completed for each corporation. Use additional sheets where needed.

Name (Debtor): Atlantic Home Health Care d/b/a Haven Home Health, LLC

Amount of Debt (If Established): Not Established

Agency debt incurred to: Department of Labor Amount of debt paid to date: ____________

## Verification and Affidavit

**With knowledge of the penalties for false statements provided by 18 U.S. Code 1001 (*fine and/or 5 years imprisonment*) and with knowledge that this financial statement is submitted by me as a responsible officer of this Corporation to affect action by the U.S. Department of Justice, I hereby certify that I believe I completely understand all questions in the following statement, that all responses and all documents provided with this statement are correct and accurate, and that this information is a true and complete statement of all corporate income and assets, real and personal, whether held in the Corporate name or otherwise.**

Date: 08/03/2022

Signature of Affiant (Must be an Officer)

Jamin Ruark

Print Name

Partner/Member

Position at Corporation

____________

Age

NOTARY PUBLIC

My Commission Expires 02/01/2023

*Federal Tax Returns*

Provide copies of United States Corporate Income Tax Returns for the last 5 years, *also complete Form 4506.* Correspondence with IRS and complete Form 8821 if you answer "Yes" to Question 1 or "No" to Question 2;

1. Has the IRS audited any of the Tax Returns? Yes ☐ No ☑
2. Are Federal Taxes Current? Yes ☐ No ☑

**1. Name (*Debtor*):** Atlantic Home Health Care d/b/a Haven Home Health, Ll **Type:** DOL - Home Health Provider

☑ **For Profit**
☐ **Not for Profit**

**2. Business Addresses:** 15551 N. Greenway Hayden LP Ste 155A Scottsdale AZ, 85260
**Street** **City** **State**

**Note: Attach schedule of all business addresses:**

**3. Foreign:** ______ **Domestic:** ______

**4. State of Incorporation:** Delaware **Date of Incorporation:** 01/01/2018

**Licensed to do business in:** ______

**5. Name of Registered Agent:** Jamin Ruark

**6. Address of Registered Agent:** 15551 N. Greenway Hayden LP Ste 155A Scottsdale AZ, 85260 **Phone** 801-296-5100

**7. Names and Addresses of Principal Stockholders. Indicate stock ownership of the Corporation. Number of Shares Owned by each:**

| | | *Number of Shares* |
|---|---|---|
| (A) | Act Now Healthcare Solutions, LLC/Kirk Tjalas, 7953 N. Coltrane Lane Tucson, AZ 85743 | 50% |
| (B) | Charis Healthcare Holdings, LLC 885 Penniman Ave Ste 6426 Plymouth, MI 48116 | 50% |
| (C) | | |
| (D) | | |
| (E) | | |
| (F) | | |
| (G) | | |

**8. (A) Names and Addresses of Current Officers and Number of Shares Held by Each. Term Expiration Date:**

| | | *Number of Shares* | *Term Expiration Date* |
|---|---|---|---|
| (1) | Jamin Ruark- President 1066 Burns Detroit MI, 48214 | 12.5% Indirect | None |
| (2) | Kirk Tjalas -Member 7953 N Coltrane Lane Tucson AZ, 85743 | 50% | None |
| (3) | | | |
| (4) | | | |
| (5) | | | |
| (6) | | | |
| (7) | | | |
| (8) | | | |

**(B) Names and Addresses of Current Members of Board of Directors. Term Expiration Date:**

| | *Term Expiration Date* |
|---|---|
| (1) Jamin Ruark- President 1066 Burns Detroit MI, 48214 | None |
| (2) Kirk Tjalas -Member 7953 N Coltrane Lane Tucson AZ, 85743 | None |
| (3) | |
| (4) | |
| (5) | |

**9. (A) Registration on National or Local Stock Exchange(s). (*Give details, including date of Registration and/or listing.*):**

(1) N/A

(2)

(3)

**(B) Total authorized Shares of each type issued and present market value per share on each type of stock:**

| | *Present Market Value* |
|---|---|
| (1) N/A | |
| (2) | |
| (3) | |
| (4) | |

**(C) Total outstanding shares of each type stock currently being held as Treasury Stock:**

N/A

**(D) Total outstanding shares of each type of stock. Amount of bonded debt and principal bondholders:**

**10. List States and Municipalities to which taxes have been paid and/or are being paid. Describe nature and amount of such taxes, state most recent year of payment thereof and whether tax payments are current:**

| | |
|---|---|
| Arizona | Nevada |
| California | Oregon |
| Colorado | Utah |
| Idaho | Washington |
| Montana | |
| New Mexico | |

**11. Name and Address of**

**(A) Corporation's Independent Certified Public Accountants:**

Current: CBIZ MHM, LLC, 4040 Embassy Pkwy., Akron, OH 44333

Former: Clockwork Accounting & Tax Service, 211 Peggy St., Worland, WY 82401

**(B) Retained Corporate Attorney(*s*) to Include Dates Retained:**

| | Retained From | Retained To |
|---|---|---|
| | | |
| | | |
| | | |

**12. Does this Corporation maintain bank accounts: Give names and addresses of Banks, Savings end Loan Associations, and other such entities, within the United States or located elsewhere. Indicate name and number of accounts and balances:**

| | | Account Number | Balance |
|---|---|---|---|
| **(A) Checking Account(*s*):** | BB&T | 9960 | 1,118.86 |
| | PNC Checking | 2605 | 1,183,766.26 |
| **(B) Savings Account(*s*):** | | | |
| | | | |
| | | | |
| **(C) Other Account(s):** | | | |
| | | | |
| | | | |
| **(D) Savings & Loan Associations or Other such Entities:** | | | |
| | | | |
| | | | |
| **(E) Trust Account(*s*):** | | | |
| **(F) Other Account(*s*):** | | | |
| | | | |

**13. List all commercial paper, negotiable or non-negotiable, in which the Corporation has any interest whatsoever, presently in transit or in the possession of any banking institution. Describe such paper and the Corporation's interest therein, and state its present location. List all accounts and loans receivable in excess of $300 and specify if due from an officer, stockholder, or director:**

**14. From personal knowledge as President, Vice President, or Chairman of the Board for the last taxable year, indicate in round figures:**

**(A) Gross Income:** $ 22,946,306.00

**(B) Expenses (*Fixed and Current*):** $ 24,067,082.00

**(C) Gross Profit (*or Loss*):** $ -1,092,895.00

**(D) Net Profit After Taxes:** $ -1,092,895.00

**(E) (*List approximate totals*):**

**Receivables:** $ 1,437,751.42

**Payables:** $ 845,989.74

**15. Is this Corporation presently:**

**(A) Active**
**(*Answer No if inactive but still in existence*):** Yes ☑ No ☐

**(B) Void and/or Terminated by State authority:** Yes ☐ No ☑

**(C) ) Otherwise dissolved:** Yes ☐ No ☑

Identify date of dissolution, how dissolution occurred, and cite reason.____________________

**16. (A) List corporate salaries to and/or drawings of the following personnel for the last three taxable years:**

| | Position (*Inc. officers*) | Specify Year (*Year*) 1. | (*Year*) 2. | (*Year*) 3. |
|---|---|---|---|---|
| **President:** | Jamin Ruark | $0.00 | $0.00 | $0.00 |
| **Vice President:** | | | | |
| **Chairman/Board:** | | | | |
| **Secretary:** | | | | |
| **Treasurer:** | | | | |

**(B) List five most highly compensated employees or officers other than above, describe position and set forth salary and/or bonus for last three taxable years:**

| | | Specify Year | | |
|---|---|---|---|---|
| | | 1. (Year) 2019 | 2. (Year) 2020 | 3. (Year) 2021 |
| 1. | Shodi Hornish- Operation Director | $116,596.97 | $223,325.75 | $216,685.05 |
| 2. | Roberta Graves- Bedside | $246,385.37 | $334,564.53 | $308,925.97 |
| 3. | Kirk Tjalas | $154,805.51 | $232,810.45 | $36,538.45 |
| 4. | Cynthia Yung | $125,707.34 | $135,037.43 | $198,459.22 |
| 5. | Leah Lewis | $128,282.62 | $235,274.64 | $165,064.37 |

**(C) Describe the nature of the compensation paid to the persons listed in (*A*) and (*B*) above and set forth any stock options, pensions, profit sharing, royalties, SERP, or other deferred compensation rights of said persons:**

No additional compensation, matching. Employees are able to participate in a 401k plan.

No additional pension plan or royalties

Kirk Tjalas - $125,000 Partner Distribution in 2020

**17. List Corporate commercial activity (*fields of activity resulting in income*) Prime:**

1. Home health care services to Energy Employees Occupational Illness Compensation Program claimants.
2.
3.
4.

**18. List all other supplementary fields of activity in which this Corporation is engaged, either directly, through subsidiaries, or affiliates, stating the name(*s*) and state(*s*) of incorporation of such subsidiaries or affiliates:**

None- One Business service line

**19. Has this Corporation at any time been the subject of any proceeding under the provisions of any State's insolvency law, or the Federal Bankruptcy Act as amended? If so, supply the following information as to each such proceeding:**

**(A) Date (*Commencement*)** ______________________

**(B) Date *(Termination)*** ______________________

**(C) Discharge or other disposition, if any, and operative effect thereof:** ______________________

______________________

______________________

______________________

**(D) State Court:** **Federal Court:**

**County** **District**

**(E) Docket No.** ______________________

**20. (A) List all Real Estate, and Personal Property of an estimated value in excess of $500.00, owned or under contract to be purchased by this Corporation and where located:**

| | Estimated Value | Where Located |
|---|---|---|
| Ford F150 | $10,000.00 | Arizona |
| | | |
| | | |
| | | |
| | | |

**(B) List and describe all judgments, recorded and unrecorded:**

**(1) Against the Corporation:**

______________________

______________________

______________________

______________________

______________________

______________________

**(2) In favor of the Corporation:**

______________________

______________________

______________________

______________________

______________________

**(C) List and describe all other encumbrances against Real Estate owned by the Corporation: (*including but not limited to mortgages, recorded or unrecorded*):**

N/A

**(D) List and describe all other encumbrances (*including but not limited to Security Interest, whether perfected or not*) against any such personally owned by the Corporation as is listed in 20(*A*) above:**

**(E) List and describe location of Real Estate, including Real Estate being purchased under contract, with name and address of Seller and contract price:**

| | Name & Address of Seller | Contract Price |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

**21. List all insurance coverage including but not limited to life insurance, general liability, and directors and officers insurance. For each type of coverage or policy identify: name of insurer, total coverage, coverage per incident, names of individuals and/or entities covered, and policy numbers where this Corporation has an "insurable interest," and/or is paying the premium or part of same. Where applicable indicate under which policy(s) this Corporation is a Beneficiary, type policy(*s*), yearly premium, and location of policy(*s*). Indicate whether insurer has been contacted about this matter**

Allied Health Professionals and General Liability Insurance Policy- $1,000,000 Limit per claim

See attached Declaration Page.

**22. List all transfers of any or all assets (*Real or/and Personal*) over *$1,000* made by this Corporation. OTHER THAN IN THE ORDINARY COURSE OF BUSINESS, during the last three (*3*) calendar years and state to whom each transfer was made. Describe compensation paid by recipient and show to whom it was paid:**

**23. Is this Corporation a party in any law suit now pending?** ☐ **Yes (*Give details below.*)** ☑ **No**

**24. Please list names and addresses of any person or other business entity, holding funds in escrow or in trust for this Corporation, or any of its subsidiaries or affiliates:**

**25. Additional Remarks:**

Provide the following materials.

1. Complete set of audited financial statements for the past five years and year-to-date financial statements for the current fiscal year. Such statements are to include: balance sheet, income statement, statement of cash flows, all accompanying footnotes, accounting explanations and disclosures and supporting schedules (schedules of general and administrative expenses, schedule of corporate overhead expense, schedule of operating expenses), if available. 2 Years internals attached 12/31/21

2. Provide complete, signed federal corporate income tax returns including all accompanying schedules, forms and attachments for each of the past five tax years. Attached 2018-2021

3. Copies of recent appraisals and/or valuation studies (including liquidation studies) prepared on any or all assets. Include insurance amounts for each asset insured. N/A

4. Provide:

   a. Most recent aging of receivables report that breaks out receivables by payer. Attached PDF

   b. Most recent aging of payables report. Attached PDF

   c. Recent cash and cash flow projections. N/A

   d. Operating budgets and/or projections of future profitability prepared within the past year for the current year and beyond, if available. Include schedule of debt repayments. N/A

   e. Capital budgets and/or projections of annual capital expenditures prepared within the past year for the current year and beyond, if available. Attached

5. All reports provided to major lender within the past three years. Provide all correspondence/materials within the past two years, if any, with lenders concerning attempts at obtaining additional credit and capital. PPP documents attached

6. Copies of all current credit and loan agreements. Only PPP & SBA Loan

7. Provide documents prepared within the past year relating to:

   a. any proposed changes in financing (debt restructuring, etc.) or capital structure; N/A

   b. acquisition and/or divestiture plans relating to significant assets or subsidiary companies; N/A

   c. any and all restructuring plans, if not included in the above questions. Includes bankruptcy reorganization and liquidation plans: and, N/A

8. Provide information pertaining to all claims and/or potential claims made to the Company's insurers, including but not limited to Directors and Officers' policies, with regard to obtaining payment of any kind for any and all matters relating to this investigation. Provide correspondence, relevant policies, payment information, etc.

9. Generally describe each type of affiliated transaction (including intercompany loans, services provided, transfer of funds, etc.) provided to/from your company and its owners and/or affiliates.

10. List all encumbered assets, identifying each asset, provide description, location, estimated value, basis for value provided, and indicate cost basis, if known.

11. Identify all liens placed on any assets, specifying asset, amount of lien, lien holder identification and indicate reason for lien.

RYAN RAPP PACHECO SORENSEN PLC

# EXHIBIT 10

Quarles & Brady LLP

1701 Pennsylvania Avenue, NW
Suite 700
Washington, District of Columbia 20006-5805
202.372.9600
Fax 202.372.9599
www.quarles.com

Attorneys at Law in
Chicago
Indianapolis
Madison
Milwaukee
Naples
Phoenix
Scottsdale
Tampa
Tucson
Washington, D.C.

Writer's Direct Dial: 202-780-2643
Email: David.Blank@quarles.com

October 2, 2020

**Via Electronic Delivery**

Assistant Inspector General for Investigative Operations
Office of Inspector General
Department of Health and Human Services
Cohen Building, Room 5409
330 Independence Avenue SW
Washington, DC 20201

Re: Self-Disclosure Pursuant to OIG's Provider Self-Disclosure Protocol

Dear Sir/Madam:

Atlantic Home Health Care, LLC d/b/a Haven Home Health, LLC ("Haven"), by and through undersigned counsel, submits this letter for acceptance into the Office of Inspector General's ("OIG") Self-Disclosure Protocol. This submission addresses a potential violation of 42 U.S.C. § 1320a-7b(b) – the Anti-Kickback Statute ("AKS") – based on Haven's payment of a "friends and family" bonus to individuals relating to referrals of claimants enrolled in the Department of Labor's ("DOL") Energy Employees Occupational Illness Compensation Program ("EEOICP"). In addition, Haven provided EEOICP claimants "in-kind" remuneration that was not authorized under the program.

**1. The name, address, type of health care provider, provider identification number(s), and tax identification numbers of the disclosing party and the Government payors (including Medicare contractors) to which the disclosing party submits claims or a statement that the disclosing party does not submit claims.**

Haven operates home health care facilities in Arizona, Colorado, Florida, Illinois, Michigan, New Mexico, Nevada, Oregon, and Washington State. Haven offers in-home skilled nursing and therapy services, case management services, companion care, and home aide services. The disclosed conduct occurred at Haven's New Mexico and Washington locations. The relevant addresses, tax identification number, and provider identification number for the Haven locations subject to this disclosure are:

| | | |
|---|---|---|
| Haven Home Health<br>1510 East 20th Street<br>Farmington, NM 87401<br><br>Tax ID #: 36-4900853<br>Haven Provider ID: 626191000<br>Atlantic Provider ID:625780000 | Haven Home Health<br>301 W. College Ave<br>Suite 18<br>Silver City, NM 87401<br><br>Tax ID #: 36-4900853<br>Haven Provider ID: 626191000<br>Atlantic Provider ID:625780000 | Haven Home Health<br>750 Swift Blvd.<br>Suite 1<br>Richland, WA 99352<br><br>Tax ID #: 36-4900853<br>Haven Provider ID: 626191000<br>Atlantic Provider ID: 625780000 |

The disclosed conduct involves the EEOICP. Section 7384, Title 42, United States Code, established the EEOICP to provide, in part, medical benefits to certain Department of Energy ("DOE") employees, contractors, and subcontractors suffering from occupational illnesses incurred in the performance of their duty for the DOE. The EEOICP was implemented by the DOL, the DOE, the Department of Justice, and the Department of Health and Human Services. The program is designed to cover medical services relating to radiation and beryllium exposure, resulting in radiogenic cancer, chronic silicosis nonmalignant diseases, beryllium sensitivity, and chronic beryllium disease. DOL has primary responsibility for administering the EEOICP, including the adjudication of claims for compensation and payment of benefits for conditions covered by EEOICP Parts B and E. EEOICP claimants that are awarded medical benefits are eligible to receive home health care services. Appropriations from the Treasury's General Fund finance the EEOICP.

**2. If the disclosing party is an entity that is owned or controlled by or is otherwise part of a system or network, an organizational chart, a description or diagram describing the pertinent relationships; the names and addresses of any related entities; and any affected corporate divisions, departments, or branches.**

Haven Home Health is the "doing business as" name for Atlantic Home Health Care, LLC. Atlantic Home Health Care, LLC, is owned by Charis Healthcare Holdings, LLC (50%), and Tjalas Enterprises, LLC (50%). Organizational Charts are attached. *See* Attachment A.

**3. The name, street address, phone number, and email address of the disclosing party's designated representative for purposes of the voluntary disclosure.**

The designated representative for purposes of communicating with OIG regarding this disclosure is Quarles & Brady, LLP. Please contact the following individuals in the event any additional information is needed.

Roger N. Morris
Quarles & Brady LLP
Renaissance One
Two North Central Avenue

David M. Blank
Quarles & Brady LLP
1701 Pennsylvania Ave, N.W.
Suite 700

Phoenix, AZ 85004
Phone: (602) 229-5269
Roger.Morris@quarles.com

Washington, D.C. 20006
Phone: (202) 780-2643
David.Blank@quarles.com

**4. A concise statement of all details relevant to the conduct disclosed, including, at minimum, the types of claims, transactions, or other conduct giving rise to the matter; the period during which the conduct occurred; and the names of entities and individuals believed to be implicated, including an explanation of their roles in the matter.**

**A. The Friends and Family Program**

In January 2018, Haven initiated a "friends and family" program that paid employees, and other individuals, a bonus for recruiting an EEOICP claimant for home care services. The bonus ranged between $500-$5000 per claimant. The employee, or other individuals, would be eligible under the program if an EEOICP claimant selected Haven to provide home care services. The friends and family program was made available to non-employees on the mistaken belief that the EEOICP was not a federal health care program as defined by 42 U.S.C. § 1320a-7b(f). The friends and family program was voluntarily terminated in early January 2020.

Over the duration of the program, Haven obtained 36 EEOICP claimants as a result of the friends and family program, seventeen in New Mexico, and nineteen in Washington. Of the seventeen New Mexico claimants, four were referred by employees, and thirteen were recruited by non-employees. The following chart provides a breakdown of the bonus payments connected to Haven's New Mexico facilities.

| Haven New Mexico | | | | | |
|---|---|---|---|---|---|
| Name | Employee | Paid Amount | Non-Employee | Paid Amount | Total Payments |
| K.G. | 2 | $3,000 | 2 | $3,000 | 4 |
| L.B. | 2 | $5,500 | 3 | $3,600 | 5 |
| G.B | | | 6 | $8,250 | 6 |
| C.F. | | | 1 | $1,500 | 1 |
| P.A. | | | 1 | $1,500 | 1 |
| **Total** | **4** | **$8,500** | **13** | **$17,850** | **17** |

Of the nineteen Washington claimants, six were recruited by employees, and two were referred by non-employees. Eleven claimants followed their existing caregiver, D.W., to Haven after accepting a position with the company. A week before her official start date, D.W. was made aware of the friends and family program. D.W. was told that she could be eligible for $1,000 per claimant bonus once she became an employee. While the eleven patients had previously elected to remain with D.W. before she was informed of the program, D.W. was

likely bonus eligible once employed. However, Haven voluntarily ended the friends and family program before D.W. received any bonus payment. The following chart provides a breakdown of the bonus payments connected to Haven's Washington facilities.

| Haven Washington | | | | | |
|---|---|---|---|---|---|
| Name | Employee | Paid Amount | Non-Employee | Paid Amount | Total Payments |
| L.R. | 4 | $20,000 | 0 | | 4 |
| M.P | 2 | $3,000 | | | 2 |
| D.G. | | | 1 | $1,500 | 1 |
| S.P. | | | 1 | $1,500 | 1 |
| D.W. | | | 11 | $0.00 | 0 |
| **Total** | **6** | **$23,000** | **13** | **$3,000** | **8** |

Haven's bonus payments to employees are protected under the AKS's statutory exception and regulatory safe harbor. The statutory exception excludes from the AKS "any amount paid by an employer to an employee . . . for employment in the provision of covered items or services." 42 U.S.C. § 1320a-7b(b)(3)(C). The regulatory safe harbor permits "an employer to pay an employee in whatever manner he or she chose for having that employee assist in the solicitation of program business and applied only to bona fide employee-employer relationships." 56 Fed. Reg. 35952, 35953 (July 29, 1991); *see also* 42 C.F.R. § 1001.952(i). The bonus payments made to K.G, L.B, L.R., and M.P., while employed by Haven is not remuneration under the AKS. The bonus payments made to non-employees are subject to the AKS.

All services furnished to the 36 EEOICP claimants subject to this disclosure were medically reasonable and necessary, provided to authorized claimants, based on a plan of care authorized by their treating physician, and did not result in any additional or unnecessary EEOICP reimbursement.

**B. "In-kind" Patient Remuneration**

Haven also provided "in-kind" remuneration to EEOICP claimants that was not pre-approved or were otherwise unauthorized under the EEOICP program. These payments, mostly of nominal value, are nonetheless prohibited remuneration under the AKS. From October 1, 2017, through August 17, 2020, Haven made 341 in-kind payments to, or on behalf of, an EEOICP claimant. The majority of payments included remuneration to cover expenses relating to food, internet, travel, utilities, medication, copayments, physician visits, medical treatments, safety improvements, and other equipment. Haven's in-kind payments totaled $61,192.40. Haven made these in-kind payments on the mistaken belief that the EEOICP was not a federal health care program as defined by 42 U.S.C. § 1320a-7b(f).

**5. A statement of the Federal criminal, civil, or administrative laws that are potentially violated by the disclosed conduct.**

Haven acknowledges the covered conduct described above potentially violates 42 U.S.C. § 1320a-7b(b)(2)(A), because it offered or paid non-employees remuneration relating to the referral of EEOICP claimants for services paid for by DOL.

**6. The Federal health care programs affected by the disclosed conduct.**

The federal health care program affected by this disclosure is the Energy Employees Occupational Illness Compensation Program administered by the Department of Labor.

**7. An estimate of the damages, as described in the applicable section below, to each Federal health care program relevant to the disclosed conduct.**

In accordance with section III.B of the self-disclosure protocol, the amount paid by DOL for the EEOICP claimants obtained through the friends and family program by non-employees, or EEOICP claimants receiving in-kind remuneration, totals approximately $14,076,007.69 through June 2020. Consistent with OIG's CMPL authorities, and per agency guidance regarding the calculation of damages in AKS submissions, the remuneration paid by Haven is the appropriate measure of damages based on the cover conduct.[1]

The covered conduct includes (1) the bonus payments offered or made to non-employees, and (2) the in-kind remuneration made to, or on behalf of, EEOICP claimants. In total, Haven paid, or offered to pay, $31,850 in remuneration connected to the friends and family bonus program. This includes fifteen payments, totaling $20,850, to non-employees. An additional $11,000 in remuneration, representing the offer of remuneration to D.W., is included as covered conduct because the statute prohibits the "offer" of remuneration, despite Haven making no payment. In addition, Haven's prohibited in-kind payments totaled $61,192.40 in remuneration.

Single damages for the covered conduct is $93,042.40. The covered conduct period is October 1, 2017, through August 17, 2020. Applying the OIG's traditional 1.5 times multiplier for self-disclosed conduct, the appropriate settlement amount is $139,563.60.

**8. A description of the disclosing party's corrective action upon discovery of the conduct.**

In January 2020, Haven ended the referral program. Haven has not paid a bonus to its employees, contractors, or any other individual or entity for the referral of an EEOICP claimant. Following the decision to end the program, Haven informed its operational and clinical staff of the decision and instructed them to remove any mention of the referral program from any promotional materials. In August 2020, Haven instructed its managerial and clinical staff to obtain prior

[1] *See* OIG Provider Self-Disclosure Protocol at 12 (April 17, 2013).

authorization from EEOICP before making any in-kind payment for a covered item or service, and further instructed employees to discontinue making any in-kind payments for non-covered items or services.

**9. A statement of whether the disclosing party has knowledge that the matter is under current inquiry by a Government agency or contractor. If the disclosing party has knowledge of a pending inquiry, it must identify any involved Government entity and its individual representatives. The disclosing party must also disclose whether it is under investigation or other inquiry for any other matters relating to a Federal health care program and provide similar information relating to those other matters.**

Haven has no knowledge of whether this matter is under investigation by any Government agency or contractor. According to its understanding, Haven is not under investigation or inquiry relating to any other matter connected to any federal health care program.

**10. A certification by the disclosing party, stating that to the best of the individual's knowledge, the submission contains truthful information and is based on a good faith effort to bring the matter to the Government's attention for the purpose of resolving potential liability to the Government and to assist OIG in its resolution of the disclosed matter.**

The disclosing party's certification is enclosed as Attachment B.

Please feel free to contact me if you have any questions or concerns regarding Haven's submission. I can be reached at david.blank@quarles.com or 202-780-2643.

Sincerely,

David Blank, Partner
QUARLES & BRADY LLP

Attachments

# Tjalas Enterprises LLC




Haven Home Health Self-Disclosure
Attachment A
Page 1 of 2

## Color Legend:

- Kirk Tjalas
- ACT NOW MANAGEMENT, LLC
- Energy Employees Healthcare Holdings LLC
- WESTERN SLOPES HOLDING, LLC
- INJURED WORKERS ADVOCACY NETWORK LLC
- ODIN RN LLC




Haven Home Health Self-Disclosure
Attachment A
Page 2 of 2

**Certification Statement**

I, JAMIN RUARK, certify to the best of my knowledge, that the attached submission contains truthful information and is based on a good faith effort to bring the matter to the Government's attention for the purpose of resolving Haven's potential liability to the Government and to assist the Office of Inspector General in its resolution of the disclosed matter.

NAME: Jamin Ruark
TITLE: Chief Operating Office
Haven Home Health, LLC

Arnall Golden Gregory LLP

DC Office
1775 Pennsylvania Ave. NW, Suite 1000
Washington, DC 20006
Direct Phone: 202.677.4968
Email: David.Blank@agg.com

August 3, 2022

**VIA EMAIL**

Allie Pang
Trial Attorney
U.S. Department of Justice
Civil Division, Fraud Section
175 N St., N.E., Room 9.105
Washington, D.C. 20002
Allie.Pang@usdoj.gov

Cole Hernandez
Assistant United States Attorney
U.S. Attorney's Office
District of Arizona
40 North Central Avenue, Ste. 1800
Phoenix, AZ 85004
Cole.Hernandez@usdoj.gov

**Re: Atlantic Home Health Care, LLC d/b/a Haven Home Health, LLC**
**Ability to Pay Financial Disclosure Form and Supporting Documentation**

Dear Allie and Cole:

Accompanying this letter is Atlantic Home Health Care, LLC d/b/a/ Haven Home Health, LLC's ("HHH") revised ability-to-pay financial disclosure form and supporting documentation. Section I addresses the inadvertent inclusion of unrelated financial information in HHH's initial Financial Statement of Corporate Debtor form submitted in April of 2022. Section II identifies the Attachments in support of HHH's revised Financial Statement of Corporate Debtor form. Section III responds to the U.S. Department of Justice's ("DOJ") requests for additional information relating to HHH's initial financial disclosure.

## I. The Removal of Unrelated Financial Information

The resubmission of HHH's Financial Statement of Corporate Debtor form is intended to replace the prior document submitted on April 26, 2022. The revised document removes certain financial information and documentation relating to a different company with the same name. As previewed on our July 25th call, HHH inadvertently included 2016 and 2017 tax returns for a now-defunct entity, also named Atlantic Home Health Care, LLC ("Old Atlantic"). Old Atlantic was a home

**Error! Unknown document property name.**

health provider operating in Arizona from 2006 through 2017. Old Atlantic was an Arizona limited liability company assigned Tax Identification Number 41-2216406. The current Atlantic Home Health Care, LLC, ("HHH"), which was the subject of DOJ's Civil Investigative Demand ("CID"), is a Delaware formed limited liability company created in 2018 and assigned Tax Identification Number 36-4900835. To be clear, HHH and Old Atlantic are different corporate entities that did not have any overlapping or intermingled operations.

For background, Old Atlantic was owned by Mr. George Ardelean (51%) and Mr. Fanel Tohatan (49%). Old Atlantic was acquired by Haven Holdings MI, LLC ("HHMI"), a Florida limited liability company, through two stock purchase agreements for a combined total of $800,000. On August 5, 2016, Ardelean sold his 51% interest to HHMI. On March 17, 2017, Tohatan sold his 49% ownership interest to HHMI. Each former owner received $400,000 for their respective interests. HHMI acquired the name "Atlantic Home Health, LLC," and the location at 15551 N. Greenway Hayden Loop, Scottsdale, AZ, 85260, in the acquisition.

Importantly, Old Atlantic was never enrolled in the Department of Labor's ("DOL") Energy Employees Occupational Illness Compensation Program ("EEOICP") and never furnished services to any EEOICP claimant. In approximately September 2017, Old Atlantic was permanently closed, and HHMI, its holding company, was dissolved.

On January 1, 2018, Atlantic Home Health Care, LLC, a Delaware limited liability company, acquired Victory Medical Solutions, LLC ("VMS"), through an asset purchase agreement. The new company was formed as Atlantic Home Health Care, LLC d/b/a Haven Home Health Care LLC. HHH is currently owned and operated by Charis Healthcare Holdings, LLC (50%), a Florida formed limited liability company, and Act Now Healthcare Solutions, LLC (50%), an Arizona formed single member limited liability company, owned by Mr. Kirk Tjalas. HHH is enrolled in the EEOICP program and furnishes home health services to DOL program claimants.

The use of the same name and office location resulted from some commonality of ownership between HHH and Old Atlantic. Specifically, Jamin Ruark was a member of Old Atlantic at the time of closure and now serves as President of HHH.

The common name caused Old Atlantic's tax returns to be included in HHH's April financial disclosure. In advance of completing the ability to pay documentation, HHH asked its former accountant to provide all "Atlantic Home Health Care, LLC" tax returns from 2016 to the present. The response included Old Atlantic's 2016 and 2017 tax records and HHH's tax records for 2018 through the present. Old Atlantic's 2016 and 2017 tax return information was inadvertently included in HHH's Financial Statement of Corporate Debtor form. Internal reviews failed to identify the different Tax Identification Numbers for Old Atlantic and HHH. We apologize for any confusion caused by the inclusion of the unrelated financial information.

## II. HHH's Revised Financial Statement of Corporate Debtor Support Documents

The following documentation is submitted in support of the corporate debtor form.

- Tax Returns
  - Attachment A - 2018 Atlantic – Haven Home Health
  - Attachment B - 2019 Atlantic – Haven Home Health
  - Attachment C - 2020 Atlantic – Haven Home Health
  - Attachment D – 2016 Victory Medical Solutions
  - Attachment E – 2017 Victory Medical Solutions
  - Attachment F – Atlantic – Haven Home Health Aging AR 2021.12.31
  - Attachment G - Insurance Declaration Page
  - Attachment H – State Tax Support Information
  - Attachment I – Haven Home Health 2022 PnL with Balance Sheet

## III. HHH's Responses to DOJ Requests for Additional Information

The following information addresses DOJ's request for additional information relating to HHH's financial disclosure. Some of DOJ's questions directly related to the inclusion of Old Atlantic's 2016 and 2017 financial information. All information provided below relates only to the current business, HHH, and revised financial disclosure. To the extent the question relates to Old Atlantic, HHH has tailored the response to information about the current business where possible.

1. **Request**: Provide Haven's cash basis financial statements for 2016-2019 and 2022 (year-to-date).

   - Response: Accompanying this letter is HHH's 2018, 2019, and 2022 (YTD) cash basis financial statements. *See* "Response 1A, 1B, and 1C – HHH Cash Basis Financial Statement."

   - HHH does not possess 2016-2017 cash financial statements because the company was formed in 2018. The April 2022 financial disclosure inadvertently included information relating to a different company for fiscal years 2016 and 2017. HHH's revised submission removes the inapplicable information.

2. **Request**: Did Haven have a change of ownership in 2021 or 2022 (year-to-date)?

   - Response: No.

3. **Request**: Provide Haven's financial projections, with supporting assumptions, for the next five years, including: (a) Income Statements; (b) Schedule of Debt Repayments; (c) Bonus and Commission Payments; (d) Capital Expenditures; and (e) Other Extraordinary Items.

   - Response: HHH does not use or maintain cash flow projections. HHH does not intend to make any Capital Expenditures over the next five years.

- The 2022 – 2023 revenue budget is attached. *See* "Response 3 – Atlantic Haven Home FY 2022 – 2023 Rev Budget."

**A. Atlantic Home Health P&L – Tax Return**

4. **Request**: Explain the swings in annual revenue?

- Response: HHH's annual revenue increase is primarily attributable to an increasing patient census. The chart below provides the monthly patient census figures for 2017 through January 2022.

- Please note, the following patient census data from 2017 predates the 2018 formation of HHH. The 2017 figures represent VMS's monthly patient population.

| | Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec | Mo. Avg. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2022** | 115 | | | | | | | | | | | | |
| **2021** | 89 | 88 | 87 | 86 | 89 | 88 | 92 | 100 | 100 | 101 | 105 | 106 | 94.25 |
| **2020** | 73 | 77 | 80 | 81 | 83 | 85 | 88 | 88 | 93 | 94 | 94 | 89 | 85.42 |
| **2019** | 45 | 45 | 46 | 49 | 57 | 59 | 61 | 64 | 63 | 62 | 59 | 74 | 57 |
| **2018** | 25 | 25 | 28 | 32 | 33 | 36 | 39 | 39 | 41 | 42 | 42 | 42 | 35.33 |
| **2017** | 21 | 24 | 24 | 23 | 22 | 16 | 15 | 26 | 26 | 23 | 24 | 24 | 22.33 |

5. **Request:** Summarize back office management cost of labor for the years 2016-2022.

- Response: For the years 2018 to present, back office management costs include: (1) billing and collections services, (2) HR support services, (3) payroll servicing fees, and (4) general management and administration services. The administrative and management services fee is approximately 8% of gross revenue.

- Prior to 2018, VMS did not outsource back office services. The administrative and management services described above were performed by VMS.

- The itemized management costs for 2018-2022 (YTD) are:

| Category | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|
| Back Office Management Fee | $710,423.90 | $1,184,808.21 | $1,818,551.25 | $1,979,361.61 | $532,936.55 |

6. **Request:** Explain the increased insurance cost in 2019 compared to other years.

   - Response: The 2019 increase was caused by the payment of past due premiums, a doubling of the Washington State workers compensation payments, and the increasing costs related to HHH's general liability insurance.

7. **Request:** Explain the $81,349 "miscellaneous expense" reported on the 2020 tax return?

   - Response: The miscellaneous expense relates to an expense charged by a HHH's previous accounting firm.

8. **Request**: Who is Haven's Landlord?

   - HHH's landlords vary by location. The chart below identifies HHH's landlords and each location's respective rent payments:

| Landlord | Total Payments | Total Paid Amount | Office Location |
|---|---|---|---|
| David & Bonnie Shannon | 36 | $33,150.00 | Milton Freewater DOL |
| 4GS Investments | 34 | $64,400.00 | Farmington DOL |
| Bar TN Holdings LLC | 33 | $17,572.50 | Blanding DOL |
| American Andalus | 32 | $64,809.25 | Silver City DOL |
| Corrado Office Park | 27 | $98,200.00 | Richland DOL |
| Regus Management | 26 | $35,663.61 | Las Vegas DOL |
| CC Park | 23 | $93,006.48 | Tucson DOL |
| Crown Property | 21 | $38,284.16 | Richland DOL |
| Basin Street Properties | 19 | $12,993.51 | California DOL |
| Array, Inc | 18 | $18,000.00 | Wyoming DOL |
| Linden Street Suites, LLC | 14 | $10,500.00 | Cortez DOL |
| Infinity Management | 13 | $22,100.00 | Durango DOL |
| Parkview Estates | 12 | $36,940.00 | Richland - DOL |
| Garage AZ LLC (deleted) | 8 | $7,424.50 | |
| Ayani Neez Inc (deleted) | 7 | $8,020.87 | Famington DOL |
| Square Co-working Space | 6 | $2,750.00 | Idaho DOL |
| Bindiya Properties | 5 | $1,988.80 | HH Tucson Corp |
| Bruce Bender Globe Rent | 4 | $1,600.00 | HH Tucson |
| Casa Grande Rent | 4 | $12,528.02 | Scottsdale Corp |
| PC Black Investments | 4 | $3,600.00 | Blanding DOL |
| Deebco Properties | 4 | $10,822.36 | HH Tucson |
| Hawthorne Court | 3 | $7,729.00 | |

| | | | |
|---|---|---|---|
| The Groves | 3 | $2,100.00 | HH Scottsdale |
| CasaGrande | 2 | $7,318.51 | Scottsdale Corp |
| Park LLC (deleted) | 2 | $9,404.35 | Tucson - DOL |
| Bruce Bender | 2 | $1,100.00 | HH Tucson |
| Oxaca | 1 | $2,203.00 | HH Safford |
| POZ Group (deleted) | 1 | $3,050.00 | |
| Dixie Halliburton | 1 | $1,150.00 | |
| CC Park LLC | 1 | $4,153.49 | Tucson - DOL |
| (blank) | | $4,203.00 | |

9. **<u>Request</u>**: Provide subtotals for total taxes and total licenses.

- Response: The annual allocation for taxes and licenses is below:

| Sub Catergory | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|
| Taxes & Licenses | $28,935.00 | $775,543.00 | $2,132,809.66 | $1,556,855.28 | $466,682.28 |
| Licenses Fees | | | $25,466.34 | $8,424.09 | |

- For example, the tax and licensing subtotals for 2020 is below:

| 2020 License and Fee Breakout | |
|---|---|
| Business Licenses & Permits | $25,466.00 |
| Payroll Taxes | $59,877.00 |
| Taxes | $1,365,845.00 |
| Payroll Expense Admin Taxes | $707,088.00 |
| **Total** | **$2,158,276.00** |

10. **<u>Request</u>**: Explain the source of the $2,698,684 bad debt allocation on Haven's 2020 tax Return?

- Response: The bad debt allocation represents an Accounts Receivable reconciliation for uncollected home health services.

11. **<u>Request</u>**: Provide Haven's compensation structure for each key employee for 2019, including base salary and bonus.

- Response: The compensation information for the five most highly compensated employees is attached. *See* "Response 11 – [Last Name, First Name]."

12. **Request**: Explain the increase in Kirk Tjalas's 2020 compensation compared to the other years on a relative basis to himself and others?

- Response: The increased compensation in 2020 was cause by the combining a portion of Mr. Tjalas salary with services provided by Tjalas Consulting. The revised corporate debtor form corrects Mr. Tjalas' 2020 and 2021 earnings.

- In 2020, HHH paid Mr. Tjalas a total of $357,810.45 in compensation. The 2020 compensation consisted of $232,810.45 in salary plus a partnership distribution in the amount of $125,000.00. In 2021, HHH paid Mr. Tjalas a salary of $36,538.45. This updated information appears in Section 16(B) and (C) of the corporate debtor form.

- In 2020, HHH paid Tjalas Consulting a total of $360,818.97 for services and expenses furnished on behalf the company. In 2021, HHH paid Tjalas Consulting a total of $492,546.60 for services and expenses furnished on behalf the company.

**B. Atlantic Home Health P&L – Cash Basis**

13. **Request:** Explain what "employee recruitment" means for all years.

- Response: Employee recruitment includes expenses related to (i) job postings seeking prospective employees, and (ii) employee pre-hire background screenings/checks.

- The 2018-2022 annual employment recruitment expenses by allocation are:

| Employee Recruitment | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|
| Indeed/ Career Builder | $21,885.20 | $49,832.04 | $47,840.69 | $105,842.16 | $54,710.46 | $280,110.55 |
| Background Checks | $1,610.94 | $2,724.08 | $10,132.86 | $6,404.02 | $7,828.12 | $28,700.02 |
| Annual Total | $23,496.14 | $52,556.12 | $57,973.55 | $112,246.18 | $62,538.58 | |

14. **Request:** Why were employee benefits cut in half in 2020 compared to 2018 and 2019?

- Response: The benefit reduction is attributable to a reduction in employee enrollment/participation and reduced benefit costs.

**15. Request:** Summarize the one time fees and/or bonuses for all years.

- The one-time fees and bonuses are itemized below:

| | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|
| Bonus Payments | $27,600.00 | $57,172.00 | $107,601.49 | $142,899.76 | $105,936.05 |
| Commission Payments | | $86,966.98 | $114,391.28 | $41,965.20 | $37,410.54 |

**16. Request:** Provide detailed legal and professional fees on a cash basis for all years.

- Response: The annual itemized expenses for 2018 – 2022 (YTD) are attached. *See* "Response 16 - Itemized Legal and Professional Fees."

**17. Request:** Explain and summarize reimbursement expenses for 2016-2022.

- Response: The itemized expenses for 2019-2022 (YTD) are provided below:

| | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|
| Mileage Reimbursements | $ 161,501.28 | $ 44,183.99 | $ 173,130.81 | $ 78,987.37 |
| Telephone Expense | $ 3,197.39 | $ 1,773.00 | $ 4,146.83 | $ 4,673.70 |
| Office Expenses | $ 55,491.33 | $ 13,244.30 | $ 1,217.58 | $ 3,260.14 |
| Travel Expenses | $ 104,120.43 | | $ 27,082.20 | $ 37,331.36 |
| Advertising & Promotion | $ 29,635.66 | | | $ 18,739.92 |
| Automobile Expense | $ 9,688.65 | | | |
| Vehicles | $ 12,199.50 | | | |
| Computer/Internet Expense | $ 10,592.19 | | | |
| Wages Signing Bonus | $ 760.00 | | | |
| Business License and Permits | $ 4,202.91 | | | |
| Rent Expense | $ 325.00 | | | |
| Professional Fees | $ 2,094.00 | | | |
| Continuing Education | $ 7,804.14 | | | |
| Meals and Entertainment | $ 6,105.79 | | $ 11,370.41 | |

**18. Request:** Explain the non-recurring expense of $632,537 taken in 2021.

- Response: The expenses relate to:
  - A one-time settlement payment in the amount of $600,000 to United Energy Workers.
  - Accounting Fees: $33,000
  - A refund: (-$462.78)

### C. Ownership Structure

**19. <u>Request</u>:** Ownership Structure: What is the ownership structure of The Charis Foundation?

- Response: The Charis Foundation, Inc., is a Florida corporation owned by Ms. Breanne Saagman (50%) and Ms. Janice Ruark (50%).

**20. <u>Request</u>:** Ownership Structure: What is the ownership structure of Tjalas Enterprises LLC?

- Response: Tjalas Enterprises, LLC, is an Arizona limited liability company, owned by Mr. Kirk Tjalas (50%) and Mr. Nick Tjalas (50%).

**21. <u>Request:</u>** What is the qualified nonrecourse financing seen in 2016, 2017 K-1's?

- Response: The question is inapplicable to HHH because the company was formed in 2018. The April 2022 financial disclosure inadvertently included information relating to a different company for fiscal years 2016 and 2017. The qualified nonrecourse financing was a line of credit related to an Old Atlantic acquisition. HHH's revised submission removes the inapplicable information.

**22. <u>Request:</u>** Reconcile 2016 ending capital account in 2016 tax return with 2017 beginning capital account.

- Response: The question is inapplicable to HHH because the company was formed in 2018. The April 2022 financial disclosure inadvertently included information relating to a different company for fiscal years 2016 and 2017. The question relates to Old Atlantic.

**23. <u>Request</u>**: What were the terms of the George Ardelean and Fanel Tohatan buyouts?

- Response: The question is inapplicable to HHH because the company was formed in 2018. The April 2022 financial disclosure inadvertently included information relating to a different company for fiscal years 2016 and 2017.

- As explained in Section I, Old Atlantic was founded in 2006. George Ardelean purchased the entity in 2009. Fanel Tohatan acquired a 49% interest in approximately 2013. Haven Holdings MI, LLC ("HHMI") acquired Old Atlantic from Adelean and Tohatan for approximately $800,000.

- Old Atlantic was closed in late 2017.

**24. <u>Request</u>**: Does George Ardelean still have any ownership % in Atlantic Home Health?

- Response: Mr. Ardelean never held an ownership or control interest in HHH.

25. **Request**: Does Fanel Tohatan still have any ownership % in Atlantic Home Health?

   - Response: Mr. Tohatan never held an ownership or control interest in HHH.

26. **Request**: In 2018, Haven Holdings MI LLC switched its 100% ownership in 2018 to The Charis Rescue Foundation and Act Now Management who each owned 50% as a result of the change that year. What were the terms of the change in ownership?

   - Response: The question is inapplicable to HHH because the company was formed in 2018. The April 2022 financial disclosure inadvertently included information relating to a different company for fiscal years 2016 and 2017. Haven Holding MI, LLC never owned HHH.

   - Since its inception in 2018, HHH has been owned and controlled by Charis Healthcare Holdings Charis Rescue Foundation and Act Now Management each owning 50% of the company.

27. **Request**: In 2020, Act Now Management sold its 50% ownership to Kirk Tjalas. What were the terms of the change in ownership?

   - Response: Mr. Tjalas has held an ownership interest in HHH since its formation in 2018 starting with Act Now Management LLC ("ANM"). In 2019, Mr. Tjalas held his ownership interest in Act Now Healthcare Solutions, LLC ("ANHS"). Both ANM and ANHS are single member limited liability companies owned by Mr. Tjalas and considered disregarded entities for tax purposes.

   - ANM (or ANHS) did not sell any interest to Mr. Tjalas. Rather, the change in ownership identification from ANM to Mr. Tjalas on the 2020 Schedule K-1 was made to comply with a change in IRS rules concerning interests held by a disregarded entity. Ownership interests of a single member limited liability company is now reported under the beneficial member of the disregarded entity.

**D. Balance Sheet**

28. **Request**: Why did Atlantic Home Health omit patient information in the 2016 and 2017 account receivables?

   - Response: The question is inapplicable to HHH because the company was formed in 2018. The April 2022 financial disclosure inadvertently included information relating to a different company for fiscal years 2016 and 2017. The 2016 and 2017 account receivables information pertained to Old Atlantic.

**29. Request**: Explain and summarize "other current assets" in the 2018 Tax Return.

- Response: This asset relates to a one time health insurance payment that was made on behalf of the company and was is an intercompany transfer payable due to Charis Healthcare Holdings in the amount of $52,500.

**30. Request:** In 2018 tax return, Atlantic Home Health identifies 4 properties (2 residential rental properties, 1 nonresidential and 1). What is the status of all 4 properties?

- Response: HHH does not own any real property owned. The properties reflect rental offices (or leased office space).

**31. Request**: In the 2020 tax return, Atlantic Home Health identified a Tesla purchased on 8/11/2020. Who is the title holder of vehicle?

- Response: The vehicle is titled in the name of Lauren Ratiani, a former independent contractor. The purchase was not a company expense and should have been excluded from 2020 tax return.

**32. Request**: Summarize Atlantic Home Health's current liabilities identified in the 2016 and 2017 tax returns.

- Response: The question is inapplicable to HHH because the company was formed in 2018. The April 2022 financial disclosure inadvertently included information relating to a different company for fiscal years 2016 and 2017. The liabilities are unrelated to HHH.

**33. Request**: Summarize Atlantic Home Health's short-term and long-term notes payable identified in the 2018 and 2019 tax returns.

- Response: 2019 Balance of $3,080,686.00
    - N/P – Charis Rescue Foundation $398,259.00
    - US Bank Note: $1,097.10
    - GM Loan: 774.17
    - Loan Payable to Charis Operating Fund: $2,605,354.40
- 2018 Balance of $1,678,559.00
    - Loan Payable to Charis Operating Fund $1,678,559.00

**34. Request**: What were the terms and use of proceeds on Charis loan in 2020 and 2021?

- Response: The loans reflect an infusion of operating cash for the company. The funding is extended on an as needed basis. The loan is not subject to interest.

**35. Request**: Explain the details of goodwill and non-compete for all years.

- Response: The goodwill related to the purchase of VMS' assets in January 2018.

- The non-compete covenant applied to Mr. Kirk Tjalas and was imposed after the 2018 acquisition of VMS and formation of HHH. Mr. Tjalas was prohibited from competing against the company as a condition of the VMS acquisition.

- The VMS asset purchase agreement is attached. *See* "Response 35 – Atlantic Purchase Agreement."

**36. Request**: For Each PPP Loan obtained by Atlantic provide (i) the loan amount. (ii) covered period; (iii) status of loan forgiveness, including full or partial amounts and the maturity date of any non-forgiven loan; and (iv) documentation provided to the Lender in support of obtaining the PPP Loan, (v) documentation provided to the Lender in support of discharging or forgiving the PPP Loan.

- Response: The documents for the PPP loan are attached. *See* "Response 36A – HHH Paycheck Protection Program Forgiveness Loan" and "Response 36B – SBA PPP Forgiveness Review Notification Letter."

- A summary of the forgiven loan is provided below:
  - Loan amount $1,920,050.00
  - Covered period: 06/22/20-12/07/20
  - Status of loan: Forgiven

Please let me know if you have any questions or require any additional information in support of the answers above.

Sincerely,

Arnall Golden Gregory LLP

David M. Blank

DMB:

**Error! Unknown document property name.**